# 26-2060

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

NEW YORK STATE BOARD OF ELECTIONS, KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co−Executive Director of the Board of Elections of the State of New York, RAYMOND J. RILEY III, in his official capacity as Co−Executive Director of the Board of Elections of the State of New York, PETER S. KOSINSKI, in his official capacity as Commissioner of the Board of Elections of the State of New York, HENRY T. BERGER, in his official capacity as Commissioner of the Board of Elections of the State of New York, ANTHONY J. CASALE, in his official capacity as Commissioner of the Board of Elections of the State of New York, ESSMA BAGNUOLA, in her official capacity as Commissioner of the Board of Elections of the State of New York, STATE OF NEW YORK,
Defendants-Appellees

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE NEW YORK STATE CONFERENCE, LEAGUE OF WOMEN VOTERS OF NEW YORK STATE,
Intervenors-Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

BRIEF AND SPECIAL APPENDIX FOR THE UNITED STATES AS APPELLANT

*(See inside cover for continuation of Counsel)*

*(continuation of Counsel)*

HARMEET K. DHILLON
Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MICHAEL T. HAYES
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 616-9405

# TABLE OF CONTENTS

PAGE


STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

SUMMARY OF THE ARGUMENT .......... 11

STANDARD OF REVIEW .......... 13

ARGUMENT

I. The DOJ's demand for an electronic, unredacted copy of New York's SVRL satisfied Title III's requirements. .......... 14

A. New York's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand. .......... 16

1. New York's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA. .......... 16

2. There is no "self-created" carve-out within Title III's retention and inspection requirements. .......... 20

3. The Sixth Circuit's *Benson* decisions suggest that the SVRL is a record subject to inspection under Title III. .......... 28

**TABLE OF CONTENTS (continued):** **PAGE**


4. The SVRL came "into . . . possession" of the election officers named in this lawsuit. ........ 30

5. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with, and does not conflict with, other federal voting laws. ........ 32

B. The DOJ adequately stated the basis of its demand for New York's SVRL. ........ 37

1. Courts play a limited role in assessing the Attorney General's demand under Title III. ........ 37

2. The DOJ's demand stated an adequate basis. ........ 40

C. The DOJ's stated purpose of ascertaining New York's compliance with the NVRA and HAVA was sufficient. ........ 44

1. Title III does not limit the proper purposes for which a records request under Section 303 may be issued. ........ 44

2. The United States' stated purpose of ensuring compliance with federal election law is a proper purpose under Title III. ........ 48

3. Mere allegations of purported improper purposes do not eliminate the DOJ's entitlement to records under Section 303. ........ 51

**TABLE OF CONTENTS (continued): PAGE**

II. The DOJ's demand for an electronic, unredacted copy of New York's SVRL does not violate federal or state privacy laws. .......... 53

A. The DOJ's demand complied with the Privacy Act. .......... 54

1. The Privacy Act prohibition on maintaining records regarding the exercise of First Amendment rights does not apply in this case. .......... 54

2. The DOJ properly issued a System of Records Notice covering the information and records sought. .......... 55

B. The E-Government Act does not prevent the DOJ from obtaining data supporting its claims. .......... 57

C. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining data supporting its claims. .......... 61

D. Federal law preempts any contrary New York privacy law. .......... 62

CONCLUSION .......... 66

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961) .......... 37

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .......... 57

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .......... 63

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 14

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) .......... 47

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 50, 57

*Bryan v. United States*, 524 U.S. 184 (1998) .......... 35

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 63

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......... 14

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)
(per curiam) .......... *passim*

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .......... 64

*Dean v. United States*, 556 U.S. 568 (2009) .......... 45

*Doe v. Chao*, 540 U.S. 614 (2004) .......... 54

**CASES (continued): PAGE**

*Donaldson v. United States*, 400 U.S. 517 (1971),
*superseded by statute on other grounds*, Tax Reform
Act of 1976, Pub. L. No. 94-455, 90 Stat.1520 ..........................39-40

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*,
356 F. Supp. 3d 85 (D.D.C.),
*vacated and remanded on other grounds*,
928 F.3d 95 (D.C. Cir. 2019) ....................................................59-60

*Ex Parte Siebold*, 100 U.S. 371 (1879)....................................................63

*Fischer v. United States*, 603 U.S. 480 (2024) ........................................34

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019)...............18

*Foster v. Love*, 522 U.S. 67 (1997)..........................................................64

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023).................................................. 18, 33

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc.
Union No. 174*, 598 U.S. 771 (2023) ...............................................63

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).......................... 17, 45

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) .................................42

*Heckler v. Chaney*, 470 U.S. 821 (1985)..................................................40

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)..........................37-38, 41

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).............................. *passim*

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) (per curiam) ................19

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) .............17

**CASES (continued):** **PAGE**

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) .......................... 16

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ............................................................ 16, 45

*Public Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .............................................. 21, 27-28

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ............................................................... 34

*Reno v. Condon*, 528 U.S. 141 (2000) ........................................ 61

*Richards v. Ashcroft*, 400 F.3d 125 (2d Cir. 2005) ......................... 17

*SEC v. Brigadoon Scotch Distributing Co.*,
480 F.2d 1047 (2d Cir. 1973) ................................................ 52

*SEC v. Knopfler*, 658 F.2d 25 (2d Cir. 1981) (per curiam) ................ 52

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ...................... 4-5

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ................ 60

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ......................... 22, 50-51, 53

*United States v. Benson*, 179 F.4th 470, *reh'g en banc denied,* No. 26-1225, 2026 WL 2364306
(6th Cir. Aug. 14, 2026) ......................................................... *passim*

*United States v. Board of Elections of the State of N.Y.*,
No. 1:25-cv-1338, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) ........................................................... 3

*United States v. Epskamp*, 832 F.3d 154 (2d Cir. 2016) ........................ 45

**CASES (continued):** **PAGE**

*United States v. Hansen*, 599 U.S. 762 (2023)........................................17

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ........................39, 41

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) .......................53

*United States v. Mississippi*, 380 U.S. 128 (1965) .................................16

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)...........................44

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026),
*appeal pending*, No. 26-1231 (9th Cir.) ................................. *passim*

*United States v. Powell*, 379 U.S. 48 (1964) ..........................................40

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) .........................................................20, 24, 27

*Vaughn v. Phoenix House N.Y. Inc.*,
957 F.3d 141 (2d Cir. 2020).............................................13-14, 52

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025).....................................................33

*Webster v. Doe*, 486 U.S. 592 (1988).......................................................40

*Wyeth v. Levine*, 555 U.S. 555 (2009)......................................................64

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1.....................................................................63

U.S. Const. Art. VI, Cl. 2..........................................................................64

**STATUTES:** **PAGE**

Civil Rights Cold Case Records Collection Act of 2018
44 U.S.C. 2107 note ........ 19
Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) ........ 19

Civil Rights Act of 1960
(Title VI)
52 U.S.C. 10101 ........ 36-37, 46
52 U.S.C. 10101(a)(1) ........ 36
52 U.S.C. 10101(c) ........ 36
(Title III)
52 U.S.C. 20701 *et seq.* ........ 2, 4
52 U.S.C. 20701 ........ *passim*
52 U.S.C. 20701-20706 ........ 45-46
52 U.S.C. 20702 ........ 10, 54
52 U.S.C. 20703 ........ *passim*
52 U.S.C. 20704 ........ 5, 63, 65
52 U.S.C. 20705 ........ 5, 9, 15, 66
Pub. L. No. 86-449, § 601, 74 Stat. 90 ........ 46

Driver's Privacy Protection Act
18 U.S.C. 2721 ........ 61
18 U.S.C. 2721(a) ........ 61
18 U.S.C. 2721(b)(1) ........ 61-62
18 U.S.C. 2721(c) ........ 61
18 U.S.C. 2725(1) ........ 61
18 U.S.C. 2725(3)-(4) ........ 61

E-Government Act of 2002
44 U.S.C. 3501 note ........ 58
44 U.S.C. 3502 ........ 58, 61
44 U.S.C. 3502(3)(A)(i) ........ 59, 61
44 U.S.C. 3502(3)(B) ........ 58
44 U.S.C. 3502(10) ........ 58
§ 201 ........ 59
§ 208(b)(1)(A)(ii) ........ 39, 58-59, 61
§ 208(b)(1)(B)(i) ........ 58-59

**STATUTES (continued):** **PAGE**

Pub. L. No. 107-347, 116 Stat. 2899 ............................................ 58

Help America Vote Act of 2002
52 U.S.C. 20901 *et seq.* ............................................ 2
52 U.S.C. 21083(a) ............................................ 61
52 U.S.C. 21083(a)(1)(A) ............................................ 6, 60-61
52 U.S.C. 21083(a)(1)(A)(i) ............................................ 35
52 U.S.C. 21083(a)(1)(A)(ii) ............................................ 36
52 U.S.C. 21083(a)(1)(A)(iv) ............................................ 35
52 U.S.C. 21083(a)(1)(A)(vi) ............................................ 36
52 U.S.C. 21083(a)(1)(A)(viii) ............................................ 33, 35
52 U.S.C. 21083(a)(2)(A) ............................................ 6
52 U.S.C. 21083(a)(2)(A)(i)-(iii) ............................................ 6
52 U.S.C. 21083(a)(4) ............................................ 66
52 U.S.C. 21083(a)(5)(A)(i)-(ii) ............................................ 7
52 U.S.C. 21083(a)(5)(A)(iii) ............................................ 7
52 U.S.C. 21111 ............................................ 55, 62, 67
Pub. L. No. 107-252, 116 Stat. 1666 ............................................ 50

National Voter Registration Act of 1993
52 U.S.C. 20501 *et seq.* ............................................ 2
52 U.S.C. 20501 ............................................ 2
52 U.S.C. 20501(a)(3) ............................................ 50
52 U.S.C. 20501(b)(3) ............................................ 5
52 U.S.C. 20507(i)(1) ............................................ 6
52 U.S.C. 20507(a)(4) ............................................ 6
52 U.S.C. 20507(i)(1) ............................................ 6
52 U.S.C. 20510 ............................................ 55
52 U.S.C. 20510(a) ............................................ 62

President John F. Kennedy Assassination Records Collection
Act of 199244 U.S.C. 2107 note ............................................ 19
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 ............................................ 19

Privacy Act of 1974
5 U.S.C. 552a(e)(4) ............................................ 55

**STATUTES (continued):** **PAGE**

5 U.S.C. 552a(e)(4)(B) .......... 56
5 U.S.C. 552a(e)(7) .......... 54-55-56
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 .......... 55

8 U.S.C. 1445(f) .......... 26

8 U.S.C. 1449 .......... 26

8 U.S.C. 1454(a) .......... 25-26

10 U.S.C. 130c(d)(2)(C) .......... 23

13 U.S.C. 214 .......... 23

28 U.S.C. 1291 .......... 1

28 U.S.C. 1331 .......... 1

28 U.S.C. 1345 .......... 1

30 U.S.C. 1732(b) .......... 24

31 U.S.C. 5314(a) .......... 58

44 U.S.C. 2107 .......... 19

44 U.S.C. 3518(c)(1) .......... 60

44 U.S.C. 3572(f) .......... 23

44 U.S.C. 3601 .......... 58

**REGULATIONS:**

28 C.F.R. 0.50(a) .......... 56

**REGULATIONS (continued):** **PAGE**

68 Fed. Reg. 47,610 (Aug. 11, 2003) ....................56-57

70 Fed. Reg. 43,904 (July 29, 2005) ....................56

82 Fed. Reg. 24,147 (May 25, 2017) ....................56

**LEGISLATIVE HISTORY:**

*Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ....................52

106 Cong. Rec. 6392 (1960) ....................42, 48

106 Cong. Rec. 7767 (1960) ....................46

H.R. Rep. No. 956, 86th Cong., 1st Sess. (1959) ....................19

**RULES:**

Fed. R. App. P. 2 ....................66-67

Fed. R. App. P. 40(d)(1) ....................67

Fed. R. App. P. 41(b) ....................66

Fed. R. Civ. P. 12(b)(6) ....................9, 52, 54

**MISCELLANEOUS:**

1 *New Shorter Oxford English Dictionary* (4th ed. 1993) ....................18

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026), https://www.justice.gov/olc/media/1440346/dl ....................19

**MISCELLANEOUS:** **PAGE**

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) ......................60

Report of the United States Commission on Civil Rights (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf ......................26-27, 65

*The American College Dictionary* (1959) ......................33

*The American Heritage College Dictionary* (4th ed. 2002) ......................60

*The Oxford Universal Dictionary* (3d ed. 1955) ......................18

U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited August 24, 2026) ......................56

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury# ......................57

U.S. Election Assistance Comm'n, Celebrating 20 Years of HAVA, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf......................50

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960) ......................18

*Webster's Third New International Dictionary* (1966 ed. unabridg.)......................23, 33

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1345. That court entered a Memorandum-Decision and Order granting defendants' Motions to Dismiss, dismissing the United States' Complaint with prejudice, denying as moot the United States' Cross-Motion to Compel Production, and directing entry of Judgment, on July 10, 2026. JA Vol. II at 430-462.[1] The United States filed a timely Notice of Appeal on July 23, 2026. JA Vol. II at 463-465. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether New York's Statewide Voter Registration List (SVRL) is a record or paper that Title III of the Civil Rights Act of 1960 requires the State to retain and preserve and to produce upon the Attorney General's written demand.

2. Whether the Department of Justice adequately stated the basis and purpose of its demand for an electronic, unredacted copy of New York's SVRL under Title III of the Civil Rights Act of 1960.

[1] For citations to the record not found in the Joint Appendix (JA), "Doc. __, at __" refers to the docket number and internal page numbers within the cited trial court document, No. 1:25-cv-1338 (N.D.N.Y.).

3. Whether federal or state privacy laws prevent the Department of Justice from demanding an electronic, unredacted copy of New York's SVRL.

## STATEMENT OF THE CASE

1. The United States Department of Justice (DOJ or United States) brought this case against the New York State Board of Elections (BOE) and the State of New York (collectively, New York) alleging, inter alia, that New York violated Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. 20701 *et seq*., which entitles the federal government to demand certain records pertaining to elections for federal office. JA Vol. I at 22-40. Specifically, the DOJ alleged that New York violated the CRA by refusing the Attorney General's written demand for an electronic, unredacted copy of New York's SVRL to determine the State's compliance with the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq*., and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq*. JA Vol. I at 33-38.

District court Judge Mae A. D'Agostino granted New York's and intervenors' (collectively, defendants) Motions to Dismiss the DOJ's Title

III claim[2] and denied the United States' Cross-Motion to Compel Production, concluding that (1) the SVRL is not a record or paper that Title III requires New York election officers to retain and preserve and to produce upon the DOJ's written demand, *see* 52 U.S.C. 20701; and (2) the DOJ failed to state an adequate basis and purpose of the demand, *see* 52 U.S.C. 20703.[3] *See* JA Vol. II at 430-461.

Because neither of these reasons for granting the Motions to Dismiss and denying the Motion to Compel Production has merit, this Court should reverse the district court's Judgment and remand with instructions for the district court to order New York to produce the requested SVRL.

2. The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote

---

[2] The United States brought three separate claims in its Complaint: one under Title III, one under the NVRA, and one under HAVA. *See generally* JA Vol. I at 35-38. While the NVRA and HAVA are relevant to understanding the United States' Title III claim, the present appeal focuses solely on the dismissal of the Title III claim.

[3] The district court's opinion is not reported but is available at *United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026).

on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq*.

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted additional laws that affect the "records and papers which come into [election officers'] possession," 52 U.S.C. 20701. Relevant here are the NVRA and the HAVA, which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

The NVRA requires each State, with exceptions, "for at least 2 years . . . [to] make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The NVRA further requires each State to conduct "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . change in the residence of the registrant." 52 U.S.C. 20507(a)(4).

Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL, and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters," who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-

assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

3.a. On June 30, 2025, the DOJ sent a letter to the BOE seeking information regarding New York's compliance with the HAVA, including the processes and documentation that reflects the State of New York's compliance with HAVA, and specifically requested a copy of "New York's current statewide voter registration list", including "both active and inactive voters." JA Vol. I at 85-87.

On August 14, 2025, the DOJ sent a second letter "clarifying the United States' demand for all fields of the SVRL, under its authority from the CRA, NVRA, and HAVA." JA Vol. I at 33, 92-94. The August 14 letter requested an electronic copy of New York's SVRL "with all fields," which "must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under" Section 303(a)(5)(A)(i) of HAVA. JA Vol. I at 33-34, 92. The letter informed the BOE of New York's obligations under 52 U.S.C. 20701 and 20703,

invoked the Attorney General's authority "to request records" under "Title III of the Civil Rights Act of 1960," and stated that the "purpose" of the demand was "to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." JA Vol. I at 33, 92-94.

The BOE did not produce the full, unredacted SVRL. JA Vol. I at 34. Its response "contained a partisan split on the request for the nonpublic version of the SVRL": the Democratic counsel took the position that only "the public list" should be shared, while "[t]he Republican counsel maintained that the entire list should be shared with the United States." JA Vol. I at 34, 104-108. "Given the split, the State of New York only shared the public version of the SVRL with the Attorney General." JA Vol. I at 34, 99, 104.

On September 25, 2025, the DOJ sued the BOE, its Co-Executive Directors and Commissioners, and the State of New York, alleging, inter alia, that the refusal to provide an electronic, unredacted copy of New York's SVRL violated Title III of the CRA. JA Vol. I at 23-40. The DOJ later moved to compel production of the SVRL. JA Vol. I at 75-77. The NAACP (along with its New York State Conference) and the League of

Women Voters of New York State intervened as defendants. Docs. 7, 20. New York and the intervenor defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). JA Vol. I at 42-49; Doc. 77. They argued, among other things, that the SVRL is not a record subject to production under Title III, that the DOJ's demand did not contain a sufficiently stated basis and purpose, and that the demand violated state and federal privacy laws. Doc. 74-1, at 8-20; Doc. 76-6, at 3-25; Doc. 77-1, at 14-22.

b. On July 10, 2026, the district court granted the Motions to Dismiss, dismissed the Complaint with prejudice, and denied the Cross-Motion to Compel Production as moot. JA Vol. II at 460-461.

As a threshold matter, the district court rejected the United States' argument that its CRA claim should be evaluated under Title III's summary procedures. JA Vol. II at 442-445. The court reasoned that Section 305's reference to "appropriate process," 52 U.S.C. 20705, means that "the Federal Rules of Civil Procedure provide 'appropriate process,'" and it applied "Rule 12(b)(6) standards in evaluating the sufficiency of" the United States' allegations. JA Vol. II at 445.

On the merits, the district court held that Title III does not include

the SVRL among the records and papers subject to the retention and preservation requirements of Section 301 (52 U.S.C. 20701), and thus the SVRL was not subject to the Attorney General's demand under Section 303 (52 U.S.C. 20703). JA Vol. II at 447-454. The court interpreted the phrase "come into [their] possession" in Section 301 to refer only to "those documents that state election officials receive from prospective voters," and not to records that officials created. JA Vol. II at 449-450 (citation omitted). The court further reasoned that treating the SVRL as a Section 301 document would place Title III in conflict with Section 302 (52 U.S.C. 20702) and with the NVRA and HAVA, because the SVRL "is a dynamic list that is constantly updated and, thus, altered," yielding an "absurd result." JA Vol. II at 451-452.

The court also stated that the Attorney General's demand for New York's SVRL failed because it lacked a sufficient basis. JA Vol. II at 447. While the court stated that it "need not even reach [52 U.S.C.] 20703's basis and purpose requirements," it did nonetheless say that the demand "states no basis," and that the "purported 'purpose' of 'ascertain[ing] New York's compliance with the list maintenance requirements of the NVRA and HAVA' lacks any relation to the purposes for which Title III was

enacted." JA Vol. II at 447-448 (brackets in original).

**SUMMARY OF THE ARGUMENT**

The district court erred in dismissing the DOJ's Title III claim on the grounds that (1) the SVRL is not a record or paper subject to Title III's preservation and demand requirements and (2) the DOJ failed to state an adequate basis and purpose of its demand for an electronic, unredacted copy of New York's SVRL.

First, the district court erred in holding that only "documents that state election officials receive from prospective voters" fall within the scope of the CRA. JA Vol. II at 450 (citation omitted). Nothing in the statute limits the scope of records subject to the Attorney General's inspection authority. Nor does the CRA exclude from inspection documents created by the State. Rather, the court erred in holding that documents—such as an SVRL—created by state election officers do not "come into [an officer's] possession" and therefore escape the Attorney General's inspection powers under the CRA. JA Vol. II at 449 (citation omitted). The CRA's text does not exclude self-generated documents. At most, the distinction between records "com[ing] into [one's] possession" and being "in [one's] possession" is a temporal one—not a distinction

between obtaining records from an outside source and through self-generation. And in any event, the statute does not specify *how* records might come into an election officer's possession. Rather, records like the SVRL come into election officers' possession when they assume office or otherwise gain control over the SVRL. Thus, the Attorney General is entitled to reproduction and copying of a State's SVRL through the CRA to assess the State's compliance with the NVRA and HAVA.

Second, the DOJ's demand satisfied Title III's minimal basis-and-purpose requirement. Title III establishes a special statutory proceeding in which courts play a limited role, and the factual sufficiency of the Attorney General's statement of basis and purpose is not open to judicial review. The DOJ's assertion that it was seeking to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA sufficiently stated both the basis and a proper purpose of its demand; the DOJ was not required to allege factual anomalies or a prima facie case of a violation. This assertion also sufficiently stated a proper purpose of the DOJ's demand, as no statutory text limits the proper purposes of a Section 303 demand, and in any event Title III was enacted

to protect the rights of voters, and the DOJ's request aligns with that purpose.

While the district court did not reach defendants' various privacy-related arguments, this Court should now reject these arguments as meritless. First, the demand did not violate the Privacy Act because the DOJ has an applicable System of Records Notice, and because maintaining voting registration records (*i.e.*, records describing First Amendment exercise) is within the scope of an authorized law enforcement activity. Second, the E-Government Act does not require a privacy impact assessment in these circumstances. Third, the Driver's Privacy Protection Act permits disclosure of information when carrying out official government functions. Finally, the CRA preempts any contrary New York privacy law under the Constitution and Supreme Court precedent.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House*

*N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (emphasis omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

"The complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Vaughn*, 957 F.3d at 145 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of New York's SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Those same records or papers are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703. Section 303

provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the state election officer has rejected it, the Attorney General may seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the ground that New York's SVRL is not a record or paper subject to the retention and preservation requirements of Section 301 because it did not "come into [an officer's] possession," and thus was not subject to the Attorney General's demand under Section 303. JA Vol. II at 447-454. And the court reached that conclusion only after subjecting the Attorney General's demand to the ordinary pleading standards of the Federal Rules of Civil Procedure rather than Title III's summary procedures. JA Vol. II at 442-445. Both conclusions were erroneous.

### A. New York's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Section 301 of the CRA requires an election official to "retain and preserve, for a period of twenty-two months from the date of any" covered election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Those same records or papers are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703.

#### 1. New York's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA.

The "sweeping" retention provision applies to New York's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that

language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). At the same time, statutory history may provide context helpful for discerning the meaning of the statutory text. *See United States v. Hansen*, 599 U.S. 762, 775 (2023) ("Statutory history is an important part of this context."). The text and history both refute the district court's reading.

The term "relating to" should be defined "expansively." *Richards v. Ashcroft*, 400 F.3d 125, 129 (2d Cir. 2005) (citation omitted); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). In Section 301, the phrase expands the type of records to be preserved beyond simply "application[s], registration[s], payment[s] of poll tax, or [any] other act requisite to voting." 52 U.S.C. 20701. Instead, any record "relating to" one of those activities—even the catchall "other act requisite to voting"—must be preserved. *Ibid.* The SVRL (which stands for the statewide voter registration list) is a record that relates to voter registration.

Furthermore, any officer in possession of the SVRL came into possession of the SVRL at a distinct point in time. When a statute does not itself define a term, courts "ask what that term's ordinary,

contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The Oxford Universal Dictionary* 17 (3d ed. 1955) (defining "acquire" similarly).

Congress likely used the term "comes into his possession" precisely because it is broad enough to include both voter-generated and state-

generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 8-9), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself").[4] Contemporaneous decisions confirm the point. *See Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (per curiam) (requiring the district court to order "each appellee to make available . . . all records and papers in the possession, custody or control of said appellee relating to any application, registration, payment of poll tax or other act requisite to voting"); *see also* H.R. Rep. No. 956, 86th Cong., 1st Sess. 6, 37, 39 (1959) (explaining that Section 301 "would include *all records and papers in the possession of* election officers") (emphasis added).

---

[4] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ("was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (emphasis added, citation and internal quotation marks omitted). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *Id.* at 145.

**2. There is no "self-created" carve-out within Title III's retention and inspection requirements.**

According to the district court, the SVRL is not a covered "record" or "paper" under Title III because it is "created by state officials" and therefore does not "come into [their] possession." JA Vol. II at 449 (brackets in original; citation omitted); 52 U.S.C. 20701. In the district court's view, Section 301 "refer[s] to only . . . documents that state

election officials receive from prospective voters." JA Vol. II at 450 (citation omitted). This was error for several reasons.

First, courts have already rejected similar attempts to limit the scope of voting records under other statutes. *See Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). In *Public Interest Legal Foundation*, the First Circuit held that Section 8(i)(1) of the NVRA applies to the state voter file because it is an electronic report generated from the central voter registration system that reflects the additions and changes made by state election officials in carrying out voter list registration and maintenance activities. *See id.* at 47-49.

Second, for the reasons explained above, the district court's requirement that election officers receive the relevant records or papers from voters (JA Vol. II at 449-450) is not the most natural reading of the statutory phrase "come into his possession." *See United States v. Benson*, 179 F.4th 470, 485 n.3, 486 n.7 (*Benson II*) (Nalbandian, J., dissenting), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*). As an initial matter, the district court's holding that a record or paper must come, not just from an external source, but from a *prospective voter* (JA Vol. II at 450), has no basis in the text. Even if the

example documents listed in Section 301 are all submitted by voters, the statutory text is explicitly not limited to those example documents. 52 U.S.C. 20701.[5]

But even requiring a more general external-source limitation on Section 301 is an unnatural reading. *See Benson II*, 179 F.4th at 485 n.3, 486 n.7 (Nalbandian, J., dissenting). Election officers in New York acquired records and information from individual voters in the course of carrying out their duties. When they aggregated those individual records into one new, single record—the SVRL—they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *See id.* at 484 (Nalbandian, J., dissenting).

---

[5] The district court cited *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*) for its prospective-voters reading of the statute (JA Vol. II at 450), but the Sixth Circuit did not impose any such limitation even while requiring that an election officer obtain a Title III record "from a third party." *Benson II*, 179 F.4th at 478; *see also id.* at 479 ("Election officers do not create these kinds of records" but "obtain them from third parties—generally voters or prospective voters."). And as further explained below, many Sixth Circuit judges refused to limit Section 301's scope to only those documents and records received by prospective voters in the *Benson* en banc denial. *See generally Benson III*, 2026 WL 2364306.

Contrary to the district court's conclusion, the word "come" cannot create a carve-out for self-generated documents. *Cf.* JA Vol. II at 449-450. If anything, Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*.[6]

Following this focus on the *how* and *when* an individual gains possession of a record or paper, Section 301 places a duty of retention and

---

[6] *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only “for a period of twenty-two months from the date” of that same election. Thus, the phrase “come into his possession” “cabins an election official’s liability to documents she received during her tenure.” *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting). The distinction between records “com[ing] into [one’s] possession” and being “in[] [one’s] possession,” then, is a “temporal” one. *Id.* at 486 n.7.

The district court’s conclusion that, because the SVRL was “created by state officials,” it does not “come into [their] possession” is wrong for at least two reasons. JA Vol. II at 449 (citation omitted). First, the moment of the SVRL’s creation is one relevant moment of transition; after that moment, the creating officer possesses a new document that he or she previously did not have possession of. *See Tax Analysts*, 492 U.S. at 144-145. Second, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. *See* 52 U.S.C. 20701. Even assuming every single election officer collectively generated the SVRL at one time after the HAVA’s passage (which the district court never found), every new election officer

who has since gained control over the SVRL did not previously possess the SVRL and has instead "come into . . . possession" thereof at a later time. *See Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting); *see also Lynd II*, 306 F.2d at 230 (explaining that Title III duties are not "confined to records which are compiled subsequent to [the officer's] taking office").

In rejecting this interpretation, the district court placed undue emphasis on the fact that Congress could have, but did not, use the phrase "in the possession of." JA Vol. II at 450 (citation omitted). But this is an illusory distinction, as demonstrated by other statutes using similar language. For example, Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person *who shall have*" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . *may come into possession of* it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a) (emphasis added). Thus, the phrase "come into possession" implies a temporal change in circumstances: someone who "shall [not] have" the document at first but then "come[s] into

possession of it" later. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf)); *see also id.* at 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Id.*

at 486 (Nalbandian, J., dissenting) (citation omitted). These indices would be government-created records, but once an index was "passed . . . up the ladder," the receiving "state official came into possession of the index." *Ibid.*

The indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138. The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. *Id.* at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88.

Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic SVRL as required by HAVA. In short, documents created by state agencies have historically included the very type of record that the United States sought to investigate to weed out discrimination. The district court's reading would therefore exclude from the reach of Sections 301 and 303 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

#### 3. The Sixth Circuit's *Benson* decisions suggest that the SVRL is a record subject to inspection under Title III.

In *Benson II*, a divided panel of the Sixth Circuit held that an SVRL is not a record subject to retention and production under Title III because an SVRL is created by election officials, and therefore it does not "come into [their] possession." *Benson II*, 179 F.4th at 479. As explained above, the majority's narrow interpretation of Title III would have excluded the voter-registration lists of the 1960s—which, like SVRLs, were created by election officials—and thus it would have allowed election officials to

avoid accountability for not registering black citizens, a result Congress could not have intended. Not surprisingly, the majority's flawed decision drew a vigorous dissent. *See id.* at 483-488 (Nalbandian, J., dissenting).

Because the majority's decision in *Benson II* was incorrect, the United States sought rehearing en banc, which the Sixth Circuit denied. *Benson III*, 2026 WL 2364306. But the denial is instructive because while the court denied the United States' petition for rehearing en banc, a nine-judge majority agreed with the United States on several significant points.

Five judges outright agreed with Judge Nalbandian's dissent from the panel decision, and four more judges indicated they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and expressed "doubt over the panel opinion's interpretation of the phrase 'come into his possession' in Title III." *Benson III*, 2026 WL 2364306, at *1 (Murphy, J., concurring). Judge Murphy, and his fellow concurring judges, also acknowledged the possibility that the phrase "come into possession" had "developed a specialized legal meaning[,]" seemingly endorsing the position that "[t]he phrase marked the commencement of lawful possession and the legal

duties or liabilities that followed[,] . . . [b]ut it did not distinguish property according to its source." *Id.* at *2 (Murphy, J., concurring); *id.* at *7 (Griffin, J., dissenting).

A majority of judges likewise found Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See, e.g., Benson III*, 2026 WL 2364306, at *4-5 (Murphy, J., concurring); *id.* at *9 (Griffin, J., dissenting); *id.* at *14 n.7 (Thapar, J., dissenting).

The district court's reasoning, which relies in part on *Benson I*, therefore requires significant scrutiny. Circuit judges in the Sixth Circuit had substantial reason to be skeptical of the reasoning in *Benson I* and *II*; this Court too should be skeptical of the district court's decision below.

#### 4. The SVRL came "into . . . possession" of the election officers named in this lawsuit.

As explained above, there is no justification for restricting Section 301's application to only those documents received from "prospective voters." JA Vol. II at 450 (citation omitted). Some courts have imposed a more modest (but still atextual) gloss on Section 301's retention requirements, holding instead that the relevant records and papers are only those that are "acquired from an outside source." *Benson II*, 179

F.4th at 479. But even if Section 301 contained a hidden "outside source" requirement, that requirement was satisfied here. The SVRL "c[a]me into . . . possession" of each "officer of election" named in this suit, when that officer received it from someone else in his office, or upon assuming that office. *Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting) (citation omitted).

As noted previously, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701. Indeed, a majority of judges in *Benson III* endorsed Judge Nalbandian's conclusion that because "the language imposes a specific duty on an individual (each officer of election), not a general duty on the entire State of Michigan[,]" "the Secretary of State 'came into possession' of the voter-registration list when she assumed office in 2019." 2026 WL 2364306, at *2 (Murphy, J., concurring); *see also id.* at *9 (Griffin, J., dissenting) ("[W]hen the [SVRL] comes under Benson's official custody and control through the actions of those subordinates, it comes into her possession."); *id.* at *13-14 (Thapar, J., dissenting) (similar). The question is not whether the SVRL came into

possession of the state or the board of elections, but whether it came into possession of a particular election officer—and it clearly has.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if *some* state officials created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—the officers of election named in this suit "nonetheless 'c[a]me into . . . possession' of the [SVRL]" when they received it from other persons (including other election officers). *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701).

**5. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with, and does not conflict with, other federal voting laws.**

According to the district court, reading Title III to include the SVRL would put Title III's retention requirements and the NVRA and HAVA's updating-and-modification requirements at odds with each other, producing "an absurd result." JA Vol. II at 451. That is incorrect. Reading Title III harmoniously with the NVRA and HAVA—which require

continuous updates to the SVRL—yields the conclusion that an election officer properly "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by updating it accurately as required by those statutes, *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing").[7] There is no obligation to create a new, static version of the database with every single edit.[8]

The district court worried that statutorily required list maintenance would amount to "alter[ation]" under Section 302. JA Vol.

[7] *See The American College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

[8] Because HAVA requires that the "computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C. 21083(a)(1)(A)(viii), state election officials would be required to preserve a static version of the list used to generate the official voter registration lists distributed to local election offices used for the conduct of each federal election, or those lists themselves.

II at 451. But two considerations show that this worry is unfounded. First, the surrounding verbs elucidate the meaning of "alter" in this provision. *Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *See id.* at 489-490 (describing a similar list of verbs as "actions that, by their nature, impair the integrity or availability of records"). Performing list maintenance under HAVA is therefore not "alter[ing]" the SVRL at all; the SVRL is, as required by HAVA, an inherently evolving and changing record. List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 302.[9]

Second, Section 302's prohibition against altering "records and papers" is accompanied by a mens rea requirement. The requirement that any penalizable alteration must be *willful* erases any doubt that list maintenance under HAVA could run afoul of the CRA's ban on altering

---

[9] Even if the statutes were truly inconsistent—and they are not—the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Section 302. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

records. *See Bryan v. United States*, 524 U.S. 184, 191 (1998) (describing "a 'willful' act [a]s one undertaken with a 'bad purpose'").

Indeed, construing Title III to not include the SVRL itself would paralyze the United States' ability to enforce various federal voting laws. The SVRL is the only statewide federally mandated record of voters required to conduct every election. HAVA states "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii).

The SVRL is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election. Without the SVRL, federal elections cannot occur. The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The SVRL must contain "the name and registration information of every legally registered voter in the State." 52 U.S.C. 21083(a)(1)(A)(ii). The SVRL must be "coordinated with other agency databases within the State," 52 U.S.C. 21083(a)(1)(A)(iv), and "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local

official." 52 U.S.C. 21083(a)(1)(A)(vi). Absent this record, conducting federal elections is simply not possible.

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, Uniformed and Overseas Citizens Absentee Voting Act, NVRA, HAVA, or Voting Rights Act of 1965, 52 U.S.C. 10101 (VRA),[10] for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Lynd II*, 306 F.2d at 228.

The district court's assumed conflict between Section 302, the NVRA and HAVA, and treating the SVRL as subject to Section 301, is therefore not only illusory, but also harmful. It would effectively carve out vast numbers of federal election records, including SVRLs, from the

---

[10] The VRA provides that "all citizens of the United States who are otherwise qualified by law to vote at any election . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude." 52 U.S.C. 10101(a)(1). It provides that when "reasonable grounds" exist to "believe that any person is about to engage in any act or practice" in violation of the VRA, the Attorney General may institute an action for relief. 52 U.S.C. 10101(c).

United States' inspection authority under Title III, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

### B. The DOJ adequately stated the basis of its demand for New York's SVRL.

Though not framed as an alternative ground for dismissing the DOJ's Title III claim, the court made clear that it believed the DOJ's demand states "no basis." JA Vol. II at 447. The court erred in rejecting the DOJ's stated basis of examining the State's NVRA and HAVA compliance pursuant to the CRA. JA Vol. I at 92-94.

#### 1. Courts play a limited role in assessing the Attorney General's demand under Title III.

Courts undertake a limited role in evaluating the sufficiency of a Section 303 demand. The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and that "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir.

1962) (citation omitted).

By seeking records required to be maintained under Section 301 in court under Title III, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, production, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Title III's special statutory proceeding limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Accordingly, a state official responding to the

Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) *(Lynd I)*.

The Fifth Circuit's approach to Title III's "summary proceeding[s]," *Lynd II*, 306 F.2d at 226, is consistent with subsequent Supreme Court precedent. In *Donaldson v. United States*, the Supreme Court observed that, although the Rules of Civil Procedure "have an application to a summons proceeding," they "are not inflexible in this application," and, moreover, precedent does not suggest those rules should be used to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 528-529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *see Lynd II*, 306 F.2d at 226 (allowing judicial determination of whether "written demand has been made" and whether the custodian "ha[s] been

given reasonable notice of the pendency of the proceeding").[11]

In sum, so long as the Attorney General has stated in writing the basis and purpose of the demand, Title III is satisfied and the records must be produced. *See* 52 U.S.C. 20703.

### 2. The DOJ's demand stated an adequate basis.

In line with this summary proceeding, nothing in the statute purports to authorize courts to second-guess or probe the sufficiency or sincerity of the Attorney General's statement. Indeed, the statute provides no meaningful standards that would permit such judicial review. *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

[11] *Donaldson* also shows why the district court's reliance on *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964), is misplaced. *See* JA Vol. II at 444. As *Donaldson* explained, "the Civil Rules are not inflexible in th[eir] application," and "the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. at 528-529.

There is "no justification" for requiring the United States to "allege specific details" underlying its demand. *Lynd I*, 301 F.2d at 822. Title III does not specify that "the basis" must be a factual one, as opposed to a legal one. *See* 52 U.S.C. 20703. Instead, the Attorney General need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added; citation omitted); *see, e.g.*, *Bruce*, 298 F.2d at 861 ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.") (citation omitted). "No showing even of a prima facie case of a violation of Federal law need be made." *Coleman*, 313 F.2d at 868 (citation omitted).

Accordingly, the only "matters open for determination" by the court when a recipient of the Attorney General's demand challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. Additionally, "[i]f, *after issuance of an order to produce*, a genuine

dispute subsequently arises as to whether or not any specified particular paper or record comes within this broad statutory classification," that too may be addressed by the court. *Ibid.* (emphasis added).

Contemporaneous cases reflect this understanding. According to the Fifth Circuit, the purpose of Title III's "basis" requirement is to ensure that States have "reasonable notice" of what the United States is demanding and why. *Lynd II*, 306 F.2d at 226; *see* 106 Cong. Rec. 6392 (1960) ("notice as to why such an inspection was being made and as to what law or what constitutional provision, right, or immunity might be involved"). Nothing in Title III requires the United States to "ritualistically use the word 'basis,' 'based upon,' or any other magic words when communicating its demand to a State." *Cf. Hannah P. v. Coats*, 916 F.3d 327, 345 (4th Cir. 2019) (citation and internal quotation marks omitted) ("Proper notice does not require any magic words."). Rather, the Attorney General can simply assert that he demands records pursuant to the CRA for the purpose of investigating possible violations of federal law. *See Coleman*, 313 F.2d at 868.

The DOJ's demand for an unredacted copy of New York's SVRL easily satisfied the basic notice requirement imposed by the basis-and-

purpose language. The August 14 letter makes clear the "reasons for [the] demand," including the "assertion that the demand was made for the purpose of investigating possible violations" of federal law:

> We have requested New York's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the [NVRA] . . . .
>
> [HAVA Section 401] makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. . . .
>
> The purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA.

JA Vol. I at 92-94; *Coleman*, 313 F.2d at 868. And the letter further makes clear that the Attorney General's demand was based, among other things, on his authority under the CRA. Under any reasonable interpretation of this statement, the factual and legal bases for the DOJ's written demand are clear—that New York's list maintenance program may violate the NVRA and HAVA and that the Attorney General may investigate pursuant to the CRA—and thus the demand put New York on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. And in all events, federal agencies may "investigate merely on suspicion that the law is being violated, or even just because [they]

want[] assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).[12]

### C. The DOJ's stated purpose of ascertaining New York's compliance with the NVRA and HAVA was sufficient.

The district court also appeared to hold that the DOJ's demand lacked a sufficient purpose, stating that the DOJ's proffered purpose "lacks any relation to the purposes for which Title III was enacted." JA Vol. II at 447. This conclusion is incorrect.

#### 1. Title III does not limit the proper purposes for which a records request under Section 303 may be issued.

The district court held that the "purpose" required under Section 303 must be tied to "the purposes for which Title III was enacted." JA Vol. II at 447. Though the court did not elaborate, it cited to *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026), *appeal pending*, No. 26-1231 (9th Cir. oral argument held May 19, 2026) which held that this

[12] It should be further noted that in *Benson III*, a majority of the en banc Sixth Circuit concluded the DOJ satisfied the "basis" and "purpose" component of Title III in a written demand that "was based on 'Title III[,]'" described "factual concerns with [the State's] voter-registration list" and "identified its purpose to 'assess' the State's 'compliance' with the NVRA's and HAVA's list maintenance requirements." *Benson III*, 2026 WL 2364306, at *3 (Murphy, J., concurring); *see also id.* at *10 (Griffin, J., dissenting); *id.* at *15 (Thapar, J., dissenting).

"purpose" must be to "investigat[e] violations of individuals' voting rights," which it deemed mutually exclusive of "investigat[ing] list maintenance procedures." *Id.* at 1105. Title III does not so limit the purposes for which the Attorney General may demand records.

Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness*, 572 U.S. at 553, with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross*, 557 U.S. at 175-176 (citation omitted). "A particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (citation and internal quotation marks omitted). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (alteration in original; citation omitted).

Here, no language limiting Title III to violations of individuals' voting rights appears anywhere in the statutory text. *See* 52 U.S.C.

20701-20706. By contrast, Congress made clear elsewhere in the CRA that it intended a remedy to be limited to particular harms—namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).[13]

The district court offered no argument to the contrary. Rather, the court merely stated that the DOJ's stated purpose "lacks any relation to the purposes for which Title III was enacted." JA Vol. II at 447; *see also* Doc. 76-6, at 11-12. It is unclear how the district court reached this conclusion. Not only did the court fail to provide (a) the textual basis for Section 303's purported "relation[al]" requirement between the purposes of a record request and the "purposes for which Title III was enacted," it

[13] Judge Murphy of the Sixth Circuit observed in *Benson III*, that *Benson II* "did not hold that the DOJ lacks the authority to investigate NVRA and HAVA violations using Title III[,]" and found "nothing in the statute's text that limits the purposes for which the DOJ may request the records." *Benson III*, 2026 WL 2364306, at *4 (Murphy, J., concurring).

also failed to provide (b) the nature of this relational standard (*e.g.*, How can the standard be satisfied?), as well as (c) why it believed the DOJ's proffered purpose fell short of that standard. The district court's interpretation of Section 303 should be rejected, as it imposes ambiguous, atextual requirements into the statute. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("[T]he limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law[.]").

While the district court did not provide any explanation for why or how the Attorney General's "purpose" must be linked to the purposes behind Title III, the *Oregon* court attempted to justify its position by stating that "[i]f *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 828 F. Supp. 3d at 1104. But this reasoning assumes that Section 303's "basis and purpose" requirement was imposed to limit the scope of the Attorney General's inspection powers, and not—as the cases immediately following the CRA's passage indicate—to ensure reasonable notice to the

officers of election. *See Lynd II*, 306 F.2d at 226; *Coleman*, 313 F.2d at 868; *see also* 106 Cong. Rec. 6392 (1960) (explaining that the "basis and the purpose" requirement was designed to ensure election officials had "notice as to why such an inspection was being made and as to what law or what constitutional provision, right, or immunity might be involved").

The *Oregon* court's worry about granting the United States "unfettered authority to demand voting records for *any* purpose" is unfounded. 828 F. Supp. 3d at 1104. There are limitations on the United States' authority—namely, the very particularized set of documents that "have been specifically identified by Congress" as covered by Section 303. *Lynd II*, 306 F.2d at 226. There is no room or justification for the district court to second-guess whether the Attorney General should review records or papers so covered. *See ibid.*

**2. The United States' stated purpose of ensuring compliance with federal election law is a proper purpose under Title III.**

As stated above, Section 303 does not impose any purpose restrictions on an Attorney General's demand for records. But even if the above-discussed purpose requirement existed, that requirement has been met here.

The *Oregon* court held that "the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." 828 F. Supp. 3d at 1105. But neither the district court, nor the *Oregon* court, explained why ensuring compliance with the NVRA and HAVA does not satisfy that requirement. *See ibid.* (asserting that the investigation of "list maintenance procedures" does not relate to investigating violations of individuals' voting rights); *see also* JA Vol. II at 447-448 (citing *Oregon*, 828 F. Supp. 3d at 1105).

Rather, ensuring New York's compliance with the NVRA and HAVA *does* relate to individual voting rights, and thus is a proper purpose of the Attorney General's Title III demand for federal election records even under the *Oregon* court's test. By broadly authorizing the Attorney General to demand election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *Benson I*, 819 F. Supp. 3d at 767.

Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter

participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3). And HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election." U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf.

Moreover, the Supreme Court has recognized that invalid votes—which can be minimized through the NVRA's and HAVA's procedures—can "dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Because both the NVRA and the HAVA are federal election laws that protect voting rights, "the DOJ may use the CRA to investigate possible violations of" either statute. *Benson I*, 819 F. Supp. 3d at 767.

### 3. Mere allegations of purported improper purposes do not eliminate the DOJ's entitlement to records under Section 303.

To the extent defendants argue that the Attorney General's stated purpose is pretextual, that argument provides no basis to affirm. *See, e.g.*, Doc. 73-2, at 2-3 (citing a DOJ press release (Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws (Dec. 12, 2025), https://perma.cc/2N9T-YASF), and a New York Times Magazine story (Emily Bazelon, Racher Poser, & Stephen Voss, *The Unraveling of the Justice Department*, The New York Times, Nov. 16, 2025)).[14] As already discussed, Section 303 leaves no room for a court to second-guess the stated basis and purpose for the Attorney General's demand. Even if the demand were judicially reviewable, the district court

---

[14] In the press release, Assistant Attorney General Dhillon explained that the DOJ will "not permit states to jeopardize the integrity and effectiveness of elections by refusing to abide by our federal elections laws." Doc. 73-2, at 2. There is nothing suspicious about this statement; it reflects the purposes for which federal election laws were enacted. The New York Times Magazine article merely contains out-of-court comments of former DOJ employees who do not speak in any official capacity. Doc. 73-2, at 2-3. These sources cannot generate factual questions about the purpose of the DOJ's request, especially in the context of a Rule 12(b)(6) motion.

was required to take the well-pleaded facts as true and draw all reasonable inferences in favor of the United States. *See Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020). Even under administrative-subpoena precedents, *see Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"), a party resisting a subpoena based on claims of "bad faith" must support its assertions with evidence—a burden "not easily met." *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973); *SEC v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981) (per curiam) (explaining that a subpoena recipient must provide "a meaningful and substantial factual showing" of facts supporting a claim of bad faith to justify an evidentiary hearing).[15] Defendants' reliance on out-of-court statements and news articles not properly subject to judicial

---

[15] The United States does not agree that these precedents apply to CRA claims because, as the Fifth Circuit has explained, the CRA leaves *no* room for evaluating the sufficiency of the Attorney General's asserted purpose. *See* pp. 38-39 (citing *Lynd II*, *supra*); *see also Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . . rather than for the issuance of a subp[o]ena"). The United States invokes these precedents for the sake of argument.

notice falls well short of the required showing. *Cf.* Doc. 73-2, at 13-14 (citing administrative-subpoena case law without providing any supporting facts reviewable in a Rule 12(b)(6) context); Doc. 76-6, at 5-6 (same).

## II. The DOJ's demand for an electronic, unredacted copy of New York's SVRL does not violate federal or state privacy laws.

Because the district court held that the DOJ's demand was beyond the scope of Title III, it did not reach defendants' privacy-related arguments. JA Vol. II at 458 n.12. Defendants argued below that the demand violated three federal privacy laws—the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act—and New York privacy laws. *See* Doc. 74-1, at 8-20; Doc. 76-6, at 19-25. New York's duty to comply with Title III is independent of any duty the United States has under other federal law. Even if the United States' compliance were lacking—and it is not—New York's obligations under Title III are separate from, and not dependent on, the United States' obligations under other federal laws. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an [Internal Revenue

Service] summons"). In any event, the United States is complying with all applicable privacy laws.

### A. The DOJ's demand complied with the Privacy Act.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

#### 1. The Privacy Act prohibition on maintaining records regarding the exercise of First Amendment rights does not apply in this case.

New York relied below on a provision of the Privacy Act that prohibits federal agencies from "maintain[ing] [any] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7); *see* Doc. 74-1, at 10. Enforcing the CRA's willful destruction or alteration requirements, 52 U.S.C. 20702, which includes criminal penalties of up to one year of imprisonment, *ibid.*, and the NVRA's and HAVA's list-maintenance requirements satisfies the law-enforcement

exception. *See* 52 U.S.C. 20510, 21111 (giving the Attorney General enforcement authority). However, the United States agrees that certain information, like an individual's party affiliation and how that individual votes (including for which party), both "describ[es] how an[] individual exercises" his First Amendment rights and is not "pertinent to" the DOJ's investigation. 5 U.S.C. 552a(e)(7). Accordingly, the United States will not object to a redaction of that information in the State's SVRL. Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand.

**2. The DOJ properly issued a System of Records Notice covering the information and records sought.**

Defendants' contention that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), is also meritless. The Privacy Act requires federal agencies to "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4). The DOJ did so. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File

and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[16]

And the SORN covers registered voters. The Privacy Act requires that a SORN identify "the categories of individuals on whom records are maintained in the system." 5 U.S.C. 552a(e)(4)(B). The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art

[16] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited August 24, 2026).

in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. And because eligible voters' votes may be diluted by votes cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), they are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611.

### B. The E-Government Act does not prevent the DOJ from obtaining data supporting its claims.

In the district court, the BOE argued that because the United States did not allege that it conducted a privacy impact assessment (PIA), the United States had not complied with the E-Government Act. Doc. 76-6, at 24-25. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical

reporting requirements imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat. 2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the Department of Justice's demand for New York's (or any State's) SVRL. E-Government Act § 208(b)(1)(B)(i); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals "to keep records, file reports, or keep records and file reports" whenever

individuals engage in transactions or maintain relationships with "any person with a foreign financial agency").

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of information "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities." The Department's investigation into New York's compliance with the HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 33), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr.* (*EPIC*) *v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928

F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002) (defining "new" as "having existed or having been made but a short time" or "different from one of the same category that has existed previously").

The demand in this case did not begin any new collection of information. The Attorney General demanded that the BOE provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a

unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

### C. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining data supporting its claims.

New York argued that the United States' demand violated the Driver's Privacy Protection Act (DPPA), 18 U.S.C. 2721 *et seq.*, which precludes the disclosure of personal information obtained in connection with a motor vehicle record. Doc. 74-1, at 12; Doc. 76-6, at 25. Although the DPPA generally prohibits the disclosure of "personal information" obtained by a state department of motor vehicles in connection with a motor-vehicle record, *see* 18 U.S.C. 2721(a) and (c), 2725(1) and (3)-(4), disclosure is allowed "[f]or use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. 2721(b)(1); *see also Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000) ("The DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes,"

including "for use 'by any government agency . . . in carrying out its functions.'") (quoting 18 U.S.C. 2721(b)(1)).

The United States' demand for an electronic, unredacted copy of New York's SVRL falls squarely within this exception. The Justice Department is a "government agency . . . carrying out [one of] its functions," 18 U.S.C. 2721(b)(1), namely assessing and ensuring compliance with federal election statutes. *See* 52 U.S.C. 20510(a) (authority to enforce the NVRA); 52 U.S.C. 21111 (authority to enforce HAVA). In particular, the Department of Justice is verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exception in Section 2721(b)(1), the United States' use of and access to the SVRL is authorized even though some of the information originates from a motor-vehicle record.

### D. Federal law preempts any contrary New York privacy law.

Defendants argued that New York law bars unredacted disclosure of the SVRL. *See* JA Vol. I at 34; Doc. 73-2, at 18-20; Doc. 74-1, at 8-20; Doc. 76-6, at 19-21. State law does not permit New York to defy federal law. Notwithstanding a State's broad constitutional authority over the

conduct of federal elections, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Elections Clause "is a default provision" that leaves the States responsible for the mechanics of congressional elections "only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see Ex Parte Siebold*, 100 U.S. 371, 384 (1879). And "States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

Title III imposes a "sweeping" obligation to preserve and produce federal election records, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), while supplying its own privacy protections for the records produced, 52 U.S.C. 20704. To the extent New York law would bar production, it "conflict[s] with and thwart[s] the enforcement of federal law and therefore [is] preempted." *Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776

(2023) ("It is a bedrock rule . . . that federal law preempts state law when the two conflict."); *see* U.S. Const. Art. VI, Cl. 2.

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law" and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; citation omitted). Whether a state law poses a sufficient obstacle to implicate preemption is determined "by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373; *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation and internal quotation marks omitted) ("In every preemption case, the purpose of Congress is the ultimate touchstone."). A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Crosby*, 530 U.S. at 373.

Congress enacted broad regulations over the conduct of federal elections in the statutes at issue in this litigation. Title III of the CRA

imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd II*, 306 F.2d at 226. The CRA, moreover, imposes its own privacy protections for records and papers demanded under Section 303. *See* 52 U.S.C. 20704; *cf.* 1959 CCR Report at 138 (recommending "that all State registration and voting records shall be public records" that "shall be subject to public inspection [for five years], providing only that all care be taken to preserve the secrecy of the ballot"). And HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Ibid.* Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce

Section 303 of HAVA. *See* 52 U.S.C. 20703, 20705 (CRA); 52 U.S.C. 21111 (HAVA).

As such, the United States is entitled under federal law to compel and inspect New York's unredacted SVRL. To the extent state law prohibits New York from complying with the DOJ's demands—as defendants have argued—state law must yield.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment dismissing the DOJ's Title III claim and denying the Cross-Motion to Compel Production, and remand with instructions to order the BOE to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with the NVRA and HAVA.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). A decision in September or October

would still allow the United States to work with New York to take real steps to clean up its SVRL, if necessary, prior to the upcoming November 3, 2026, general election. The United States is confident that States will not ignore out-of-hand alerts from the United States that their SVRLs contain ineligible voters.

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

s/ David N. Goldman
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MICHAEL T. HAYES
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 616-9405

Date: August 25, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a) because the brief contains 13,995 words (in compliance with Local Rule 32.1(a)(4)(A)), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ David N. Goldman
DAVID N. GOLDMAN
Attorney

Date: August 25, 2026

# SPECIAL APPENDIX

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**PAGE**

Memorandum-Decision and Order,
filed July 10, 2026 (Doc. 101) ..................................................SPA 1

Judgment in a Civil Case, filed July 10, 2026 (Doc. 102).............. SPA 33

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**1:25-CV-1338**
**(MAD/PJE)**

**BOARD OF ELECTIONS OF THE STATE OF NEW YORK, *et al.*,**

**Defendants.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>150 M St. NE - Ste 8-139<br>Washington, District of Columbia 20002<br>Attorney for Plaintiff | **ERIC NEFF, ESQ.** |
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>950 Pennsylvania Avenue, NW<br>Washington, District of Columbia 20530<br>Attorneys for Plaintiff | **GREGORY DOLIN, ESQ.**<br>**JAMES T. TUCKER, ESQ.** |
| **OFFICE OF THE UNITED STATES ATTORNEY**<br>James T. Foley U.S. Courthouse<br>445 Broadway<br>Albany, New York 12207<br>Attorney for Plaintiff | **JOHN A. SARCONE, III, First Assistant United States Attorney** |
| **HARRIS BEACH MURTHA CULLINA PLLC**<br>445 Hamilton Avenue, Suite 1206<br>White Plains, New York 10601<br>Attorney for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola | **BRIAN GINSBERG, ESQ.** |
| **HARRIS BEACH MURTHA CULLINA PLLC** | **THOMAS J. GARRY, ESQ.** |

333 Earle Ovington Blvd, Suite 901
Uniondale, New York 11553
Attorney for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola

**HARRIS BEACH MURTHA CULLINA PLLC**
677 Broadway - Suite 1101
Albany, New York 12207
Attorneys for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola

**DANIEL R. LECOURS, ESQ.**
**ELLIOT AARON HALLAK, ESQ.**
**LISA A. LECOURS, ESQ.**

**NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**
28 Liberty Street
New York, New York 10005
Attorney for Defendant State of New York

**YUVAL RUBINSTEIN, AAG**

**EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
Attorneys for Intervenor Defendants National Association for the Advancement of Colored People and National Association for the Advancement of Colored People New York State Conference

**ANDREW G. CELLI , JR., ESQ.**
**CLAIRE ABBADI, ESQ.**
**DANIEL M. EISENBERG, ESQ.**
**KATHERINE R. ROSENFELD, ESQ.**

**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Washington, District of Columbia 20001
Attorneys for Intervenor Defendants National Association for the Advancement of Colored People and National Association for the Advancement of Colored People New York State Conference

**ARIA BRANCH, ESQ.**
**CHRISTOPHER D. DODGE, ESQ.**
**TINA MENG MORRISON, ESQ.**

**BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW**
120 Broadway, Suite 1750
New York, New York 10271
Attorney for Intervenor Defendant League of Women Voters of New York State

**PATRICK BERRY, ESQ.**

**CAMPAIGN LEGAL CENTER**
1101 14th St. NW - Suite 400
Washington, District of Columbia 20005
Attorneys for Intervenor Defendant League
of Women Voters of New York State

**ALEXIS D. GRADY, ESQ.**
**DANIEL S. LENZ, ESQ.**
**HEATHER J. SZILAGYI, ESQ.**
**KATE R. HAMILTON, ESQ.**
**RENATA O'DONNELL, ESQ.**
**ROBERT B. FERGUSON, ESQ.**
**SEJAL JHAVERI, ESQ.**

**BRENNAN CENTER FOR JUSTICE**
777 6th St. NW - Suite 1100
Washington, District of Columbia 20001
Attorney for Intervenor Defendant League
of Women Voters of New York State

**MAURA E. O'CONNOR, ESQ.**

**JOHN L. O'KELLY**
339 Richard Avenue
Hicksville, New York 11801-1248
Attorney for Amicus NY Citizens Audit
Civic Fund, Inc. d/b/a RealAmerica.Vote

**JOHN L. O'KELLY, ESQ.**

**DEMOCRATIC NATIONAL COMMITTEE**
430 South Capitol St SE #3
Washington, District of Columbia 20003
Attorney for Amicus Democratic National
Committee

**DANIEL J. FREEMAN, ESQ.**

**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF MARYLAND**
Civil Litigation Division
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Attorney for Amicus Maryland

**DANIEL M. KOBRIN, AAG**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff United States of America ("Plaintiff" or the "Government") brings this civil action to compel the production of the State of New York's complete and unredacted computerized voter registration list against Defendants the Board of Elections of the State of New

York (the "BOE"); Co-Executive Directors of the BOE Kristen Zebrowski Stavisky, Raymond Riley, III, and Peter Kosinski; Commissioners of the BOE Henry Berger, Anthony Casale, and Essma Bagnuola; and the State of New York ("New York" or the "State"). *See* Dkt. No. 1. This case mirrors dozens of similar actions brought by the Government in district court across the country, seeking the production of state voter registration lists.

Presently before the Court are (1) motions to intervene filed by the National Association for the Advancement of Colored People and the National Association for the Advancement of Colored People New York State Conference ("NAACP Intervenors"), and the League of Women Voters of New York State ("LWV Intervenors") (collectively, "Intervenor Defendants"), *see* Dkt. Nos. 7, 20; (2) motions to dismiss filed by (a) the State, (b) Defendants Essma Bagnuola, Henry Berger, Kristen Zebrowski Stavisky,[1] and (c) Intervenor Defendants, *see* Dkt. Nos. 73, 74, 76, 77; (3) amicus briefs filed by amici NY Citizens Audit Civic Fund, Inc. d/b/a RealAmerica.Vote ("NYCA"), the Democratic National Committee, and the states of Arizona, California, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, by and through their respective Attorneys General (the "Seventeen Amici States"), *see* Dkt. Nos. 46, 51, 78, 79; (4) Plaintiff's cross-motion to compel, *see* Dkt. No. 81; and (5) numerous notices of supplemental authority and responses thereto, *see* Dkt. Nos. 64, 91, 92, 94, 95, 96, 97, 98.

For the reasons that follow, the motions to intervene and motions to dismiss are granted, and Plaintiff's cross-motion to compel is denied.

---

[1] As explained in Plaintiff's briefing, Defendants Bagnuola, Berger, and Zebrowski Stavisky are the Democratic appointees to the BOE. *See* Dkt. No. 81-1 at 6 n.1. Defendants Anthony Casale, Peter Kosinski, Raymond Riley, III, the remaining defendant members of the BOE, answered the complaint and have not moved to dismiss. *See* Dkt. No. 75. For ease of reference, Defendants New York, Bagnuola, Berger, and Zebrowski Stavisky will be referred to as "Defendants" herein.

## II. BACKGROUND

### A. Relevant Legal Background

At the forefront of the discussion of this lawsuit are the Constitutional principles of federalism and the separation of powers. Pursuant to the Elections Clause of the United States Constitution, the States are empowered, in the first instance, to regulate and administer elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1. As the Supreme Court has explained,

> times, places and manner . . . [are] comprehensive words [that] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932).

It has long been recognized that the Elections Clause entrusts the administration of federal elections to the States. *See United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day, with the exception, as we have seen, of twenty-four years, was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . ."). "In practice, the [Elections] Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted).

Among those statutes enacted by Congress to regulate elections are Title III of the Civil Rights Act of 1960 ("Title III" or the "CRA"), the National Voter Registration Act (the "NVRA"),and the Help America Vote Act ("HAVA")[2]—the statutes the Government now invokes in its pursuit to compel disclosure of New York's unredacted voter registration list.

***1. Title III***

As relevant here, Title III requires state election officials to "retain and preserve, for a period of twenty-two months from the date of [certain elections], all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." 52 U.S.C. § 20701.[3] Section 20703 permits the Attorney General to demand production of § 20701 documents:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

52 U.S.C.A. § 20703. Additionally, § 20703 requires that "[t]his demand shall contain a statement of the basis and the purpose therefor." *Id.*

***2. The NVRA***

Congress enacted the NVRA in 1993 with "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). The NVRA states four purposes: (1) "to

---

[2] *See* 52 U.S.C. § 20701 *et seq.*; 52 U.S.C. § 20501 *et seq.*; 52 U.S.C. § 20901 *et seq.*

[3] The Court will refer the records and papers subject to § 20701 as "§ 20701 documents" for purposes of this Memorandum-Decision and Order.

establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;" (2) "to enhance[ ] the participation of eligible citizens as voters in elections for Federal office;" (3) "to protect the integrity of the electoral process;" and (4) "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

"The NVRA 'erect[s] a complex superstructure of federal regulation atop state voter-registration systems.'" *Husted*, 584 U.S. at 761 (quoting *Arizona*, 570 U.S. at 5). Among other directives, the NVRA "'requires States to provide simplified systems for registering to vote in federal elections,'" *Arizona*, 570 U.S. at 5 (citation and emphasis omitted), and to "'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason of' death or change in residence[,]" *Husted*, 584 U.S. at 761 (quoting 52 U.S.C. § 20507(a)(4)). As relevant here, the NVRA contains a disclosure provision which requires that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with certain exceptions. 52 U.S.C. § 20507(i)(1). The Attorney General, as well as private individuals, may bring civil actions "in an appropriate district court for declaratory or injunctive relief" to enforce the NVRA. *See id.* § 20510(a)-(b).

***3. HAVA***

HAVA requires states to implement, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" containing the names of all registered voters and their pertinent personal information. 52 U.S.C. § 21083(a)(1)(A). Under HAVA, states must "make[ ] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A). Further,

HAVA requires states "to ensure that voter registration records . . . are accurate and are updated regularly," *id.* § 21083(a)(4), including implementing "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters," *id.* § 21083(a)(4)(B). "The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [§ 21083]." *Id.* § 21111.

***4. New York's voter registration list***

New York's "[v]oter registrations are actively maintained through the statewide system known as NYSVoter, the 'official' registration database for all of New York." *Tenney v. Oswego Cnty. Bd. of Elections*, 142 N.Y.S.3d 288, 294 (N.Y. Sup. Ct. 2021) (citations omitted); *see* N.Y. Elec. Law § 5-614. The NYSVoter List contains "the name and registration information of every legally registered voter in [New York]," as well as "a unique identifier for each legally registered voter . . . ." N.Y. Elec. Law § 5-614(3)(b)-(c). The NYSVoter List is in the "custody" of the BOE, and is "administered and maintained" by the BOE. *Id.* § 5-614(1).

**B. Factual Background**

On June 30, 2025, the Government sent a letter to Defendants Stavisky and Riley, Co-executive directors of the BOE. *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3.[4] In the June 30, 2025

[4] Defendants have submitted copies of the June 30, 2025 letter, a subsequent letter from the United States dated August 14, 2025, as well as letters from the BOE dated July 24 and August 29, 2025. *See* Dkt. Nos. 74-3, 74-4, 74-5, 74-6, 74-7, 76-2, 76-3, 76-4, 76-5. This correspondence between the Government and the BOE is expressly referenced and quoted in the complaint. *See* Dkt. No. 1 at ¶¶ 42-48. As such, the letters are incorporated in the complaint by reference and the Court will consider them in deciding the present Rule 12(b)(6) motions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference[,]'" and "[e]ven where a document is not incorporated

letter, the Government requested certain information pertaining to the NYSVoter List and New York's compliance with HAVA. *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3 at 2-3. The BOE acknowledged the June 30, 2025 letter in a letter dated July 24, 2025. *See* Dkt. No. 1 at ¶ 44. On August 14, 2025, the Government sent another letter to "clarify" the scope of the June 30, 2025 letter. *See id.* at ¶¶ 45-47; Dkt. No. 74-4 at 2. The August 14, 2025 letter stated that the requested NYSVoter List disclosure "should contain all fields, which means, [it] must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under [§ 21083(a)(5)(A)(i) of HAVA]." Dkt. No. 74-4 at 2.

The August 14, 2025 letter also asserted that the Government sought to "assess [New York's] compliance with the statewide maintenance provisions" of the NVRA, referenced the Attorney General's authority to bring enforcement actions pursuant to 52 U.S.C. § 20501(a), and stated that "the Attorney General is also empowered by Congress to request records" pursuant to Title III of the Civil Rights Act of 1960" under 52 U.S.C. §§ 20701 and 20703. *Id.* at 2-3. Although the final sentence of § 20703 requires that the Attorney General's "demand shall contain a statement of the basis and the purpose therefor," the August 14, 2025 letter did not explicitly state a "basis" and asserted that the "purpose" of the demand was "to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3.

On August 29, 2025, the BOE replied to the Government's letters. *See* Dkt. No. 1 at ¶ 48. The BOE's response reflects a partisan split regarding disclosure of an unredacted version of the NYSVoter List; the Democratic counsel's position was that only the public list without certain

---

by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint") (citations omitted).

identifying information such as last four digits of social security numbers and/or driver's licenses should be shared, while "the Republican counsel maintained that the entire list should be shared with the United States." *Id.* "Given the split, the State . . . only shared the public version of the [NYSVoter List] with the Attorney General." *Id.* The Government claims that the public NYSVoter List disclosed does not contain "information that is necessary for the Attorney General to carry out its duties of NVRA and HAVA enforcement" and prevents the Government from determining whether "New York is conducting effective list maintenance to ensure that the [NYSVoter List] is free of errors such as duplicitous registrations, deceased and noncitizen voters, and voters who have moved." *Id.* at ¶ 49.

Through the present action, the Government claims that it is entitled to New York's unredacted NYSVoter List pursuant to Title III, the NVRA, and HAVA. *See id.* at ¶¶ 1-7. Specifically, the complaint asserts claims pursuant to § 20703 of the CRA, § 20507(i) of the NVRA, and § 21083 of HAVA. *See id.* at ¶¶ 53-70. The Government requests a declaratory judgment as well as an order that "Defendants . . . provide to the United States the current electronic copy of [the NYSVoter List], with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number[,]" pursuant to 52 U.S.C. § 20703. *See id.* at 17-18.[5] Although the Government also alludes to its pursuit of information regarding New York's compliance with the NVRA and HAVA's "list maintenance requirements," *id.* at 17, the only data that the Government seeks to compel disclosure of through this action is the NYSVoter List, *see id.* at 17-18.

---

[5] This citation is to the pagination generated by CM/ECF, instead of paragraph numbers, as the Court is referring the section of the complaint titled "Prayer for Relief." Unless otherwise noted, citations to documents filed on the docket are to the pagination on the heading such documents, which is generated by CM/ECF, the Court's electronic filing system.

## III. DISCUSSION

### A. Motions to Intervene

The Court will begin by addressing the motions to intervene. *See* Dkt. Nos. 7, 20. NAACP Intervenors contend that they are entitled to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure (or, alternatively, should be permitted to intervene pursuant to Rule 24(b)) because (1) they have significant interests in, *inter alia*, ensuring that the personal information of their members is not disclosed; and (2) the existing parties do not adequately represent those interests. *See* Dkt. No. 7-1 at 9-11. LWV Intervenors also move pursuant to Rules 24(a) and 24(b), arguing that its members are at risk of having their sensitive data disclosed and the existing Defendants do not adequately represent LWV's interests. *See* Dkt. No. 20-1 at 11-20. On December 12, 2025, Plaintiff filed a letter which indicates, *inter alia*, that it "takes no position on any motions to intervene and submits to the court's discretion." Dkt. No. 66 at 1. Defendants have not opposed either motion to intervene.

Rule 24(a) provides that courts must permit a nonparty to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2) And, under Rule 24(b), even if a nonparty is not entitled to intervene as a matter of right, a court may grant permissive intervention where the movant "has a claim or defense that shares with the main action a common question of law or fact" and intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3).

The Second Circuit has held that an applicant seeking intervention as of right or by permission, "must (1) timely file an application, (2) show an interest in the action, (3) demonstrate

that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (citation and internal quotation marks omitted). Courts also consider the following factors in determining whether to grant permissive intervention:

> (1) whether the applicant will benefit by intervention, (2) the nature and extent of the intervenors' interests, (3) whether [the intervenors'] interests are adequately represented by the other parties, and (4) whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*Kearns v. Cuomo*, No. 19-CV-00902, 2019 WL 5060623, *4 (W.D.N.Y. Oct. 9, 2019) (quoting *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 102 (D. Conn. 2007)).

Although the Court has some doubt about whether intervention as of right is available under Rule 24(a)(2) (particularly with respect to whether Intervenor Defendants' interests are protected adequately by the parties), permissive intervention is nonetheless appropriate. Indeed, it appears that Intervenor Defendants have "a claim or defense that shares with the main action a common question of law or fact," the motions to intervene were timely filed within thirty days of the commencement of this action, no prejudice would stem from granting these unopposed motions, and Intervenor Defendants have submitted proposed briefing that significantly contributes to the development of the factual and legal issues presented. Fed. R. Civ. P. 24(b); *see Kearns*, 2019 WL 5060623, at *4. Accordingly, both motions to intervene are granted and the Court will consider the Intervenor Defendants' filings.[6]

---

[6] Because the Court grants the motions to intervene, the Court also grants Intervenor Defendants' motions for leave to file motions to dismiss. *See* Dkt. No. 73 at ¶¶ 7-14; Dkt. No. 77 at 1-2; *see also* Wright & Miller, Federal Practice and Procedure § 1920 (3d ed. 2021) ("[T]he intervenor is entitled to litigate fully on the merits once intervention has been granted . . . [and] may move to dismiss the proceeding"). Intervenor Defendants properly filed their respective proposed motions

**B. Appropriate Legal Standard**

***1. Judicial Review of a Title III Demand***

The parties dispute the applicable standard of review for this case. According to Plaintiff, it is entitled under Title III to a "special statutory proceeding," under which the Court's review is restricted to a "severely limited" inquiry. Dkt. No. 81-1 at 11-15. Defendants and Intervenor Defendants contend that the Court should apply the motion to dismiss standard as contemplated by the Federal Rules of Civil Procedure. *See* Dkt. No. 74-1 at 13-14; Dkt. No. 76-6 at 11; Dkt. No. 73-2 at 19; Dkt. No. 77-1 at 14-15.

Plaintiff's only support for its position is a series of Fifth Circuit cases from the early 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Dkt. No. 81-1 at 14. In *Lynd*, the Fifth Circuit considered its role in evaluating a Title III demand by the Attorney General for voter records, made to investigate the "infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. The court reasoned that Title III creates a "special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26. The Fifth Circuit concluded that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226.

Here, the Court joins the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited. *See United States v. Fontes*, No. 26-CV-00066, 2026 WL 1177244, *1 (D. Ariz. Apr. 28, 2026) ("Each court which addressed the issue

---

to dismiss in accordance with the parties' so-ordered scheduling request. *See* Dkt. No. 68. Thus, the Court accepts NAACP Intervenors' motion to dismiss filed at Dkt. No. 77 and LWV Intervenors' motion to dismiss filed at Dkt. No. 73.

found that the Federal Rules of Civil Procedure apply to the Attorney General's lawsuit") (collecting cases); *see, e.g.*, *United States v. Benson*, 819 F. Supp. 3d 753, 766 (W.D. Mich. 2026) ("Here, the procedural circumstances are somewhat abnormal because the United States brings its CRA records request alongside claims under the NVRA and HAVA, which do not confer administrative subpoena authority. The United States' complaint thus takes the form of a traditional civil complaint, not a petition for summary enforcement. Accordingly, the Court will apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim"); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026) ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures") (footnote omitted); *United States v. Amore*, No. 25-CV-00639, 2026 WL 1040637, *4 (D.R.I. Apr. 17, 2026) ("[T]he appropriate standard of review for this case is that common to motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6)"); *United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402, *8 (D. Or. Feb. 5, 2026) ("[T]he Court applies the Federal Rules of Civil Procedure as in any other case. There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place"); *cf. United States v. Wis. Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354, *2 (W.D. Wis. May 21, 2026) (declining to resolve dispute regarding whether Rule 12(b)(6) or a summary proceeding standard is appropriate because "the court's analysis of the dispositive issue would be the same either way").

Plaintiff cites no binding authority for its position that the Federal Rules of Civil Procedure (including the motion to dismiss standard) are inapplicable. Indeed, the text of Title III does not expressly provide for the type of proceeding proposed by Plaintiff. Rather, Title III

provides that district courts have jurisdiction over voting records demands "by appropriate process." 52 U.S.C. § 20705. Although the statute does not define "appropriate process," the Supreme Court's holding in *United States v. Powell*, 379 U.S. 48 (1964) categorically contradicts Plaintiff's reliance on *Lynd*. In *Powell*, the Supreme Court interpreted 26 U.S.C. § 7604(a), a statute similar to 52 U.S.C. § 20705, and explained that "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." *Powell*, 379 U.S. at 58 & n.18.

Moreover, "*Lynd* appears to contemplate an application directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1 (citing *Lynd*, 306 F.2d at 225). Here, Plaintiff commenced the instant action by filing a complaint and proceeding through ordinary litigation. *See* Dkt. No. 1. Perhaps recognizing that other district courts have rejected the characterization of nearly identical actions brought by the United States as "special proceedings," Plaintiff asserts through its cross-motion that "it is unnecessary for the Court to address [the Government's] claims under the NVRA and HAVA, which mandate production through the normal litigation process" and instead, Plaintiff's "CRA claim is dispositive of all the relief that it seeks through Title III's 'severely limited inquiry' in a 'summary proceeding.'" Dkt. No. 81-1 at 11. The Court rejects Plaintiff's belated attempt to recharacterize this matter. *See Weber*, 816 F. Supp. 3d at 1182 ("Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause").

For these reasons, the Court finds that the Federal Rules of Civil Procedure provide "appropriate process" and will apply Rule 12(b)(6) standards in evaluating the sufficiency of Plaintiff's allegations.

***2. Rule 12(b)(6) Standard***

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement of relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a

plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

In deciding a motion to dismiss, the court may consider "documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken[.]" *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted). "Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)).

**C. The Motions to Dismiss**

Defendants and Intervenor Defendants contend that the Government's complaint must be dismissed for the following reasons: (1) a voter registration list is not a record subject to production under Title III or the NVRA; (2) Plaintiff failed to provide an adequate statement of basis and purpose, as statutorily required under Title III; (3) the NVRA does not require the disclosure of an electronic version the NYSVoter List and, even if it did, the redaction of highly sensitive voter registration information does not violate the NVRA; (4) HAVA provides no statutory basis for Plaintiff's demand because it contains no inspection or disclosure provisions; (5) New York is not a proper party because it does not possess the NYSVoter List; and (6) Plaintiff's demand is barred by state and federal privacy laws and the complaint fails to allege compliance with federal privacy statutes. *See* Dkt. No. 73-2 at 19-33; Dkt. No. 74-1 at 13-25; Dkt. No. 76-6 at 11-34; Dkt. No. 77-1 at 15-29. Defendants' amici echo these arguments. *See*

Dkt. No. 78-2 at 6-15; Dkt. No. 79-1 at 11-16.[7] Amicus curiae NYCA voices its support for the Government's position. *See* Dkt. No. 51.[8]

**D. A Voter Registration List is Not a Record Subject to Production Under Title III**

Some district courts analyzing the Government's invocation of Title III in similar demands for voter registration lists have focused on the "basis" and "purpose" requirements imposed by 52 U.S.C. § 20703. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86; *Oregon*, 2026 WL 318402, at *8-10. This Court observes the same deficiencies in Plaintiff's demand to New York; Plaintiff's demand states no basis and the purported "purpose" of "ascertain[ing] New York's compliance with the list maintenance requirements of the NVRA and HAVA" lacks any relation to the purposes for which Title III was enacted. *See Oregon*, 2026 WL 318402, at *9-10 (concluding that "Plaintiff's August 14 Letter contains no statement of a factual basis for believing Oregon

---

[7] The Seventeen Amici States also present arguments regarding to the Government's purported motivations for demanding the NYSVoter List in light of similar demands the Government has made for personal data collected by various states in administering the Supplemental Nutrition Assistance Program and Medicaid. *See* Dkt. No. 79-1 at 6-9. Faced with analogous arguments, some district courts have noted their concern regarding the Government's potential ulterior motives for seeking sensitive voter data. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1186; *Oregon*, 2026 WL 318402, at *11. The Court understands these critical privacy considerations, and does not take them lightly. However, whatever motivations the Government may have is not dispositive of the issues presently before the Court (i.e, whether the allegations in complaint, taken as true, can survive the pending motions to dismiss). *See United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *3 n.6 (D. Me. May 21, 2026) (acknowledging that "Defendants, Defendant-Intervenors, and various *amici curiae* have repeatedly and loudly cast aspersions on the Department of Justice's reasons for seeking so many states' [voter registration lists]," but reiterating that "this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true") (citations omitted).

[8] NYCA provides an impassioned account of the reasons why it believes Plaintiff is "the only party left in the nation with the right to enjoin election administrators in defense of fair elections." Dkt. No. 51 at 17-18. In terms of substance, however, NYCA does not raise any arguments that alter the Court's decision herein.

violated the NVRA or HAVA" and "Plaintiff's stated purpose [of] investigat[ing] list maintenance procedures . . . lack[s] any reference or relation to the purposes for which Title III was enacted").

However, the Court need not even reach § 20703's basis and purpose requirements because Plaintiff's CRA claim fails at the outset for an even more fundamental reason—the Attorney General is simply not entitled to the NYSVoter List under Title III. This conclusion is supported by six recent district court decisions which have determined that voter registration lists are not records subject to retention and preservation under § 20701. *See Benson*, 819 F. Supp. 3d at 770;[9] *United States v. Scanlan*, No. 25-CV-371, 2026 WL 1864054, *6 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. 25-CV-3934, 2026 WL 1780586, *5 (D. Md. June 18, 2026); *Wis. Elections Comm'n*, 2026 WL 1430354, at *3; *United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *6-7 (D. Me. May 21, 2026); *Fontes*, 2026 WL 1177244, at *7. Indeed, although the briefing before the Court is primarily concerned with whether the Government's demand contained an adequate "statement of the basis and the purpose therefor" under § 20703, "this issue is moot if the [NYSVoter List] is not a § 20701 document in the first instance." *Fontes*, 2026 WL 1177244, at *3.

To reiterate the statutory framework which forms the basis of Plaintiff's CRA claim: "under § 20703, the Attorney General may only request documents that are 'required by [§ 20701] to be retained and preserved.'" *Id.* (quoting 52 U.S.C. § 20703). These § 20701 documents are those "'which come into [a state officer of election's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in' certain federal elections." *Id.*

[9] The Sixth Circuit recently affirmed the district court's decision in *Benson*, agreeing that "Title III's narrow text cannot withstand the weight of the government's broad request." *United States v. Benson*, No. 26-1225, 2026 WL 1815425, *1 (6th Cir. June 24, 2026).

(quoting 52 U.S.C. § 20701). The Attorney General must make a demand for § 20701 documents in writing, containing a statement of "the basis and the purpose therefor." 52 U.S.C. § 20703.

Whether the NYSVoter List is a § 20701 document is a question of statutory interpretation. *See Wis. Elections Comm'n*, 2026 WL 1430354, at *3. "As in any statutory construction case, '[courts] start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91 (2006)). "Statutory language, however, 'cannot be construed in a vacuum.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dept. of Treasury,* 489 U.S. 803, 809 (1989)). "'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting *Davis*, 489 U.S. at 809). Another "longstanding canon[] of statutory construction" is that courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

As first articulated in *Benson* and reiterated in *DeMarinis*, a voter registration list is not a § 20701 document because it is created by state officials and, therefore, "does not 'come into [their] possession.'" *DeMarinis*, 2026 WL 1780586, at *4; *see Benson*, 819 F. Supp. 3d at 768-69. "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 819 F. Supp. 3d at 768 (collecting sources) (emphasis in original). "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." *Id.* (collecting sources) (emphasis in original).

Congress chose to qualify what records were subject to a demand under Title III; "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," but it did not. *Id.* Thus, to give effect to the phrase "come into [their] possession" and prevent it from being surplusage, this Court joins the district courts that interpret "the phrase as referring to only those documents that state election officials receive from prospective voters." *Id.*; *see Bellows*, 2026 WL 1430481, at *6 n.10 ("Coming into possession of something most naturally implies receipt from an external source. Congress could have required the retention and production of all election-related records and papers 'in the possession of' the state election official but did not. The 'natural implication' of the failure to adopt this 'obvious alternative' is that Congress did not intend the alternative") (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)) (other citation omitted).

In *Benson*, the district court bolstered this interpretation of "come into [their] possession" by looking to the next phrase in the statute: "'relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.'" *Id.* at 768 (quoting 52 U.S.C. § 20701). "Each of these terms refers to something that the voter submits or does as part of the registration process," and, as such, refers to "records that election officials *receive*, rather than *create*." *Id.* at 768-69 (emphasis in original). "Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Id.* at 769 (citation omitted). "The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create." *Id.*

Moreover, looking at the statutory scheme, interpreting § 20701 to include the NYSVoter List would not be harmonious with an adjacent provision, 52 U.S.C. § 20702, and would place

Title III in conflict with the NVRA and HAVA. Section 20702 prohibits, *inter alia*, the alteration of any § 20701 document. *See* 52 U.S.C. § 20702 ("Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both"). "[A voter registration list], unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered." *DeMarinis*, 2026 WL 1780586, at *5. "The NVRA was enacted, in part, to 'ensure that accurate and current voter registration rolls are maintained[,]'" and "creates a scheme, under which, states are required to 'protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll.'" *Fontes*, 2026 WL 1177244, at *4 (quoting 52 U.S.C. § 20501(b)) (emphasis in original). Similarly, "HAVA requires state[s] to 'perform list maintenance with respect to the computerized list *on a regular basis*.'" *Id.* at *5 (quoting 52 U.S.C. § 21083(a)(2)(B)) (emphasis in original).

Therefore, if the NYSVoter List were deemed a § 20701 document, "then § 20702 would prohibit the [NYSVoter List] from being altered." *Id.* "This conclusion would directly conflict with both the NVRA and the HAVA, which affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Id.* Interpreting § 20701 in this manner would produce an absurd result. Thus, based on the text of § 20701, this Court finds that the NYSVoter List is not a document subject to demand by the Attorney General pursuant to § 20703.

The Government's arguments to the contrary are unpersuasive. *See* Dkt. No. 81-1 at 18-20. The Government contends that "the federal courts that have applied [§ 20701] have concluded that . . . [i]t does not exclude electronic records or records created by the officer of election," relying on *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) and

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *Id.* at 19. However, neither of these cases contain any affirmative findings that bind this Court's interpretation of § 20701. *See Fontes*, 2026 WL 1177244, at *5 (observing that both *Gallion* and *Lynd* "essentially reiterate the plain text of § 20701 and do not make any affirmative findings which would suggest that the [voter registration list] is covered by § 20701"). *Gallion* concerned the constitutionality of the CRA, and the court explained that "[t]here is nothing uncertain about that part of the [CRA] requiring the preservation and production of all records and papers which are in the possession of an election official . . . *if those records and papers relate to the acts requisite to voting*." *Gallion*, 187 F. Supp. at 855 (emphasis added). "Similarly, *Lynd* merely recognized that the documents covered by § 20701 are 'sweeping,' but did not make any additional finding which would suggest that § 20701's 'sweeping' language includes the [voter registration list]." *Fontes*, 2026 WL 1177244, at *5 (quoting *Lynd*, 306 F.2d at 226).

The Government also references its 2006 consent judgment with Georgia, as well as a 2008 Memorandum of Understanding with Texas, wherein those states agreed to provide their voter registration lists. *See* Dkt. No. 81-1 at 20 n.10. However, the Government provides no authority that would support a conclusion that these agreements between the United States and states that are not party to the present action are binding here. *See Taylor v. Sturgell*, 553 U.S. 880, 898 (2008) ("[O]ur decisions emphasize the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party") (collecting cases); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings") (footnote omitted). And, of course, the mere fact that other states agreed to provide their voter registration lists two decades ago is entirely irrelevant to a statutory interpretation of § 20701.

Additionally, the Government relies on *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312, 2025 WL 1503937, *2 (D.N.H. May 27, 2025) ("*Open Democracy*"), asserting that "private parties have been granted access to even more detailed voter data than what the [the Government] has requested where necessary to bring actions to enforce federal rights." Dkt. No. 81-1 at 26. In *Open Democracy*, the district court ordered disclosure of New Hampshire's voter registration list during discovery in a lawsuit challenging the constitutionality of a bill that made "changes to New Hampshire's voter registration and identification requirements" *Open Democracy*, 2025 WL 1503937, at *1. As Defendants correctly note, *Open Democracy* is inapposite because "disclosure was not pursuant to Title III or an investigative demand, nor was the recipient a federal agency." Dkt. No. 87 at 18 n.6. As such, nothing in *Open Democracy* bears on this Court's analysis of whether the NYSVoter List is a § 20701 document.

Finally, in a supplemental filing, the Government submits an opinion published by the Department of Justice's Office of Legal Counsel ("OLC") on May 12, 2026, which determined that the CRA authorizes the Government to compel production of the NYSVoter List. *See* Dkt. No. 97-1. The Sixth Circuit explicitly rejected the Government's reliance on the OLC opinion in *Benson*, noting that the Government's interpretation is "not contemporaneous with the passage of Title III[,]" does not adhere "to some earlier Executive Branch interpretations of Title III[,]" and "conflicts with the plain language of Title III." *Benson*, 2026 WL 1815425, at *8. Indeed, OLC opinions "are not binding [on the courts]," *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023), and "[t]his Court will not interpret the CRA contrary to its text simply because an office of the party advancing that interpretation has adopted it," *DeMarinis*, 2026 WL 1780586, at *5.

For these reasons, this Court joins every district court to have addressed this issue in concluding that a voter registration list is not a record or paper that a state must produce to the Government under Title III. *See Benson*, 819 F. Supp. 3d at 770; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5. Accordingly, the Government's CRA claim is dismissed and its cross-motion to compel is denied as moot.[10]

**E. The NVRA**

As for the Government's claim that it is entitled to the NYSVoter List under the NVRA, the Government focuses on the statute's public disclosure provision, arguing that New York violated § 20507(i) by refusing to disclose its full voter registration list. *See* Dkt. No. 81-1 at 35. Defendants contend that the NYSVoter List is not a record subject to a demand under the NVRA and, even if it were, sensitive voter information can be omitted or redacted. *See* Dkt. No. 74-1 at 20-23; Dkt. No. 76-6 at 20-25.

Many courts analyzing § 20507(i) have concluded that the statute does not require states to disclose the sensitive information of voters. *See Benson*, 819 F. Supp. 3d at 760 (collecting cases). In so holding, some courts have reasoned that the NVRA does require the disclosure of

[10] On April 9, 2026, NAACP Intervenors filed a notice of supplemental authority regarding *United States v. Galvin*, No. 25-CV-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026). *See* Dkt. No. 92. In *Galvin*, the District of Massachusetts ruled that the Attorney General's written demand letters did not provide an adequate factual basis as required under § 20703. *See Galvin*, 2026 WL 972129 at *6. In response to this notice of supplemental authority, Plaintiff requests that, if the Court were to come to the same conclusion as *Galvin*, Plaintiff be permitted leave to send the Defendants "a curing elaboration letter" (presumably containing some factual basis for its Title III demand). Dkt. No. 94 at 2. However, the Court dismisses the CRA claim on the grounds that the NYSVoter List is not a record or paper subject to demand under Title III, and does not reach the basis of Plaintiff's demand. As such, Plaintiff's request is denied as moot.

voter registration lists, but that states may redact voters' "uniquely or highly sensitive personal information." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

However, this Court finds it unnecessary to read a privacy exception into the NVRA that would permit limited disclosure of the NYSVoter List. Indeed, similar to the CRA claim, the Government's NVRA claim fails for a much simpler reason: § 20507(i) does not require the disclosure of voter registration lists at all. *See Benson*, 819 F. Supp. 3d at 762 ("[I]f § 20507(i) does not require disclosure of voter registration lists (or other information regarding individual voters), then there is no need to graft on an atextual privacy exception"). This Court finds itself in agreement with at least two other federal courts which recently determined that a voter registration list does not fall under § 20507(i) because Congress intended the statute to apply only to records pertaining to the NVRA's required list maintenance process (not the lists themselves). *See Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 679-83 (9th Cir. 2026); *Benson*, 819 F. Supp. 3d at 762. In reaching this conclusion, the Court utilizes the same tools for statutory interpretation described above.

To begin, § 20507(i) states in its entirety:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507 (emphasis added).

The phrase "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," *id.*. § 20507(i)(1), is important because it "narrows the scope of materials subject to public disclosure," *Nago*, 174 F.4th at 679. In order to "give effect, if possible, to every clause and word of" the statute, *Williams v. Taylor*, 529 U.S. 362, 404 (2000), the Court must determine whether the NYSVoter List is in fact a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," 52 U.S.C. § 20507(i)(1). "[A] natural reading of that language encompasses only records about the *process* that a state uses to maintain their voter list—not the underlying list itself." *Benson*, 819 F. Supp. 3d at 762 (emphasis added).

To be sure, "several courts have rejected this interpretation of § 20507(i) and adopted a broader reading under which any documents related to the maintenance process—including voter registration lists—must be disclosed." *Id.* (collecting cases). For example, in *Pub. Int. Legal Found., Inc. v. Bellows*, the District of Maine reasoned that a voter registration list is a record "concerning" the activities used to maintain the voter registration list because that list is "the output and end result of such activities." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th at 47. However, this Court agrees with *Benson*'s conclusion that *Pub. Int. Legal Found., Inc. v. Bellows* and other non-binding cases are unpersuasive. *See id.*

Instead, in addition to *Benson*, this Court is persuaded by the Ninth Circuit's recent interpretation of § 20507(i) in *Nago*:

> The phrase "concerning the implementation of" provides an initial limitation. Contemporaneous dictionaries state that "implement" connotes execution or administration—"to give practical effect to." *See Implement*, Webster's Third New International Dictionary (1993); *see also Implement*, Webster's Dictionary of English *680

> Usage (1989) (stating that "implement" "typically describes the taking of concrete measures to carry out an official policy or program"). The inclusion of that word suggests that covered records are those that describe measures to maintain the accuracy and currency of voter lists, not the lists themselves . . . . "Concerning" does have a "broadening effect," *see Patel v. Garland*, 596 U.S. 328, 339 (2022), but its sole object here is the word "implementation," not "all records." The category of "records concerning . . . implementation" therefore encompasses materials documenting each step a state undertakes when actively implementing relevant programs. Examples of records that would "concern[ ] implementation" might include duplicate-removal reports, procedural manuals about list maintenance tasks, or correspondence with voters, but not the very voter-registration lists that the implemented efforts seek to update and maintain. *See* 52 U.S.C. § 20507(d)(1)-(2) (requiring states to send confirmation notices before removing voters for changing their residence); *id.* at § 20507(c)(2)(A).
>
> The next clause—"programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"—further cabins the disclosure requirement. A "program" is "a proposed project or scheme," *Program*, Webster's Third New International Dictionary, and an "activity" is a "natural or normal function or operation," *Activity*, Webster's Third New International Dictionary. Both terms relate to active processes or the plan for carrying them out, not the outcome of those processes.

*Nago*, 174 F.4th at 679-80 (internal citation omitted).

Moreover, the Ninth Circuit reasoned that although the phrase "all records" broadens the scope of records subject to disclosure under the statute, courts "construe statutory language in context and 'limit otherwise capacious terms when that context "tug[s] . . . in favor of a narrower reading."'" *Id.* at 680 (quoting *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 953 (9th Cir. 2020)). "Here, Congress drafted a nuanced disclosure provision that includes qualifying language. If Congress had wanted to require that states make a statewide voter list public, it could have just said so." *Id.* at 680-81 (citing *Biden v. Texas*, 597 U.S. 785, 798 (2022)).

Some courts also reason that § 20507(i)(2) implies that "that the records required to be disclosed in paragraph (1) encompass information regarding individual voter applicants." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1339 (N.D. Ga. 2016) (citations omitted). But this Court reads § 20507(i)(2) differently. Reading the statute as a whole, the records referenced by § 20507(i)(2) "are administrative records relating to a discrete program for 'ensuring the accuracy and currency' of the voter lists, . . . which suggests that other covered records would also concern the active implementation of such programs." *Nago*, 174 F.4th at 681 (quoting 52 U.S.C. § 20507(i)(1)) (internal citation omitted).

In sum, this Court finds the Ninth Circuit's and Western District of Michigan's thorough analyses and statutory interpretation to be the most persuasive.[11] The Court agrees that "a natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself. " *Benson*, 819 F. Supp. 3d at 764. This interpretation "avoids the implausible suggestion that Congress intended for every member of the public to access voters' sensitive information" and also "avoids reading into § 20507(i) a privacy exception that appears nowhere in the text." *Id.*

Accordingly, the Court finds that the Government cannot obtain the NYSVoter List under § 20507(i) and the Government's NVRA claim is dismissed for failure to state a claim.[12]

---

[11] In *Nago* a private organization, as opposed to the Government, sought Hawaii's voter registration list. *See Nago*, 174 F.4th at 667. Plaintiff is correct that cases involving "efforts by private organizations to obtain" voter registration lists are distinguishable from cases where the Government seeks the lists, such as here. Dkt. No. 81-1 at 36 (emphasis omitted). Nevertheless, *Benson* is factually analogous to the present matter; there the Government sought Michigan's voter registration list under the NVRA and the district court also concluded that such data was not subject to disclosure under § 20507(i). *See Benson*, 819 F. Supp. 3d. at 757-65. The Court finds that, together, *Nago* and *Benson* offer ample support for the conclusions herein.

[12] The Court's conclusion that the NYSVoter List is not subject to disclosure under Title III or the NVRA obviates the need to reach the parties' arguments related to state and federal privacy laws.

**F. HAVA**

Finally, the Government claims that it is entitled to the NYSVoter List under HAVA, *see* Dkt. No. 1 at ¶¶ 65-70, but concedes that HAVA lacks any inspection or disclosure provisions, *see* Dkt. No. 81-1 at 34. Indeed, courts have explicitly recognized that HAVA has no disclosure provision. *See Oregon*, 2026 WL 318402, at *6 ("HAVA grants the Attorney General the ability to bring a civil action for enforcement, not disclosure. Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist") (citing *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988)).

The complaint states that Defendants' refusal to disclose the unredacted NYSVoter List "prevents the Attorney General from determining New York's compliance with the list maintenance requirements of HAVA." Dkt. No. 1 at ¶ 69. Of course, the Attorney General has the ability to bring a civil action to enforce HAVA's requirements. *See* 52 U.S.C. § 21111. But the Government does not allege New York actually violated any of HAVA's substantive provisions—it merely wishes to "evaluat[e]" and "ensure" New York has not done so. Dkt. No. 1 at ¶¶ 67-68.

The Government's position is that it may "seek list maintenance records under HAVA . . . through the ordinary discovery process necessary to prosecute its [HAVA] claim." Dkt. No. 81-1 at 34. But this argument inverts civil procedure; the Government cannot use discovery in hopes of finding an unpled HAVA violation. *See Jones v. Cap. Cities/ABC, Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y. 1996) ("'[T]he purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists'") (quoting *Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991)).

"To state a claim, 'a complaint must allege sufficient facts . . . to state a plausible claim for relief.'" *Romanova v. Amilus Inc.*, 138 F.4th 104, 108-09 (2d Cir. 2025) (citation omitted). "There is simply no basis in the Federal Rules of Civil Procedure for the [Government's] suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery." *Benson*, 819 F. Supp. 3d at 759 (citations omitted); *see Iqbal*, 556 U.S. at 678-79 ("[O]nly a complaint that states a plausible claim for relief" can "unlock the doors of discovery").

Accordingly, the Government's HAVA claim is dismissed for failure to state a claim.

## IV. CONCLUSION

After carefully considering the parties' submissions, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Intervenor Defendants' motions to intervene (Dkt. Nos. 7, 20) are **GRANTED**; and the Court further

**ORDERS** that Defendants' and Intervenor Defendants' motions to dismiss (Dkt. Nos. 73, 74, 76, 77) are **GRANTED**; and the Court further

**ORDERS** that the Government's complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Government's cross-motion to compel (Dkt. No. 81-1) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court is directed to enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: July 10, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge

*UNITED STATES DISTRICT COURT*
*NORTHERN DISTRICT OF NEW YORK*

**JUDGMENT IN A CIVIL CASE**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

**vs.** **1:25-CV-1338 (MAD/PJE)**

**BOARD OF ELECTIONS OF THE STATE OF NEW YORK; KRISTEN ZEBROWSKI STAVISKY; RAYMOND RILEY, III; PETER KOSINSKI; HENRY BERGER; ANTHONY CASALE; ESSMA BAGNUOLA; STATE OF NEW YORK,**
**Defendants.**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE NEW YORK STATE CONFERENCE; LEAGUE OF WOMEN VOTERS OF NEW YORK STATE;**
**Intervenor Defendants.**

---

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Intervenor Defendants' motions to intervene (Dkt. Nos. 7, 20) are **GRANTED**; and the Court further **ORDERS** that Defendants' and Intervenor Defendants' motions to dismiss (Dkt. Nos. 73, 74, 76, 77) are **GRANTED**; and the Court further **ORDERS** that the Government's complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further **ORDERS** that the Government's cross-motion to compel (Dkt. No. 81-1) is **DENIED as moot**; and the Court further **ORDERS** that the Clerk of the Court is directed to enter judgment in Defendants' favor and close this case, all of the above pursuant to the Memorandum-Decision and Order of the Honorable Mae A. D'Agostino, dated the 11th day of May, 2026.

DATED: July 10, 2026

Clerk of Court

s/Britney Norton

Britney Norton
Deputy Clerk