"I don't see anything wrong in asking them to do some more research before I burden a voter," Israel told NPR.

Top of mind for Israel is a past episode in 2019 when the secretary of state at the time claimed to have identified 95,000 potential noncitizens on the voter rolls but the list wound up including a significant number of naturalized citizens.

Israel is worried about the possibility of voter suppression efforts ahead of midterm elections and sees this process with SAVE as a test.

"We're living at a time in which the folks who are running this country are denying election results and using tools like this to tamp down the vote and discourage the vote," Israel said. "We've got a big election coming up next year. So this to me is also a note to how we could deal with this in a larger fashion next year."

### A known defect in SAVE

Nel was born in Port Elizabeth, South Africa, now known as Gqeberha, and immigrated to Texas with his family when he was just 8. He quickly settled into his new life, riding a yellow school bus to school and celebrating holidays like Halloween and Thanksgiving. His parents became U.S. citizens when he was a teenager, and he acquired American citizenship, too, since he was a minor with a green card.

"I consider myself more of an American than I do a South African," Nel told NPR. "I have passion for the United States."

But cases like Nel's, of foreign-born children who acquired citizenship from parents who naturalized, are known to stump SAVE.



"I consider myself more of an American than I do a South African," Nel told NPR.

USCIS' own fact sheet warns that "if an individual with acquired citizenship has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens) or is not designated as a U.S. citizen in [Social Security Administration] records, SAVE may not be able to confirm that individual's U.S. citizenship."

*Desiree Rios for NPR*

The sheet goes on to say, "In these circumstances, SAVE returns the case to the user agency for review of their information for data entry errors or to seek additional information from the individual."

Furthermore, a Privacy Impact Assessment DHS published at the end of October acknowledges, "due to misspellings of names, transposed numbers or incomplete information, the SAVE program may produce inaccurate results."

The assessment says that SAVE has a multistep review process, but when the system is queried with Social Security numbers — which is what states use to check voter rolls — it "does not allow for a second and third step review."

Voting rights advocates have also raised concerns about the completeness of Social Security Administration's citizenship records and the accuracy of data matches using just the last four digits of a Social Security number.

Nel was frustrated to learn that SAVE is known to not be able to identify U.S. citizens like him, and the only effort to contact him was a single letter.

In his own career in higher education he has set up information systems and said it would never be permissible to put out a product with a known flaw.

"When something doesn't work, we don't release it," Nel said. "We don't allow people to use a system that doesn't work."

voting stories department of homeland security

## The news you need to start your day

Our journalists summarize the biggest stories in the Up First newsletter so you can stay informed, not overwhelmed.

Email address

SIGN UP

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR




SHOTS - HEALTH NEWS

**RFK Jr.'s new food pyramid puts meat, cheese and vegetables at the top**

# EXHIBIT 5




# Privacy Impact Assessment

for the

# Systematic Alien Verification for Entitlements "SAVE" Program

**DHS Reference No. DHS/USCIS/PIA-006(d)**

**October 31, 2025**

Homeland Security

# Abstract


| **1. The abstract is the single paragraph that will be used to describe the program and the Privacy Impact Assessment.[1]** |
| --- |
| The U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Verification Division administers the Systematic Alien Verification for Entitlements (SAVE) Program. The SAVE Program is an online inter-governmental service designed to help federal, state, territorial, tribal, local government agencies, benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, determine citizenship and immigration status of individuals within their jurisdiction for the purpose of granting benefits, licenses, as well as for other lawful purposes. U.S. Citizenship and Immigration Services is publishing an update to this Privacy Impact Assessment to describe the collection, use, maintenance, and disclosure of personally identifiable information, as well as the risks associated with these updates. The purpose of this update is to discuss the changes to the tool, including: (1) documenting use of the tool for voter registration and voter maintenance list verification, (2) collection of Social Security numbers which may include those of U.S. born citizens for all benefit or license related uses of the program, (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State, (4) a new bulk upload feature for the program, and (5) reducing the fee for non-Federal government agencies. |


# Overview

| **2. The overview provides the context and background necessary to understand the project's purpose and mission and the justification for operating a privacy sensitive project.** |
| --- |
| The U.S. Citizenship and Immigration Services administers the SAVE Program. The SAVE Program is an online fee-based intergovernmental initiative designed to help federal, state, tribal, and local government agencies and licensing bureaus confirm immigration status information.[2] |

[1] Pursuant to Section 208 of the E-Government Act of 2002, agencies are required to conduct a Privacy Impact Assessment before developing or procuring Information Technology systems or projects that collect, maintain or disseminate information in identifiable form from or about members of the public. The Office of Management and Budget issued Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, which defines "information in identifiable form" as information in an Information Technology system or online collection: (i) that directly identifies an individual (e.g., name, address, social security number or other identifying number or code, telephone number, email address, etc.) or (ii) by which an agency intends to identify specific individuals in conjunction with other data elements. Furthermore, an individual is defined as "a citizen of the United States or an alien lawfully admitted for permanent residence."

[2] It is the intent of the current Administration to provide more of a supporting role to state, local, tribal, and territory governments. The U.S. Department of Homeland Security has determined to better serve and support non-Federal

The SAVE Program provides status verifications to requesting federal, state, territorial, tribal, and local government agencies; benefit granting agencies; and other authorized entities and licensing bureaus. The U.S. Citizenship and Immigration Services (or a contractor acting on its behalf) will confirm immigration and/or United States citizenship status as authorized by law, to the extent that such disclosure is necessary to enable these agencies to make decisions. These decisions may relate to: (1) determining eligibility for a federal, state, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; (5) registering voters or developing/ managing voter maintenance lists; or (6) any other lawful purpose.

A federal, state, territorial, tribal, or local government agency that provides a public benefit or license, or that is otherwise authorized by law to engage in an activity related to the verification of immigration status, may enroll in the SAVE Program as a registered agency. By using the SAVE Program, federal, state, territorial, tribal, and local registered agencies can request immigration status information to determine the applicant's eligibility for a benefit or a license. It is important to note that the program does not make the determinations on an applicant's eligibility for a specific benefit or license or eligibility to vote (at the local, state, or national level). Instead, it provides immigration status information to agencies to allow them to make an informed decision prior to issuing benefits or licenses or denying voting benefits. The registered agency analyzes the SAVE Program's response against the agency's own eligibility criteria to make an award determination. The SAVE Program may not always know the outcome of the benefit adjudication.

The SAVE Program has access to multiple immigration record systems from government agencies to confirm immigration status. All SAVE Program-registered agencies must adhere to a Memorandum of Agreement or Computer Matching Agreement, which include binding responsibilities regarding proper information usage and handling. The Memorandum of Agreement also stipulates the terms for billing and payment, if applicable. As part of its billing and registration process, the SAVE Program collects personally identifiable information, such as the registered agency's point of contact name and professional contact information, as well as registered agency and demographic information. The SAVE Program staff may also collect sensitive information such as registered agency credit card information and other data relevant to the billing process from the federal, state, territorial, tribal, or local government agencies using the SAVE Program. The U.S Citizenship and Immigration Service collects, maintains, and safeguards this information in accordance with U.S. Department of Homeland Security privacy and information technology policies.

The U.S. Citizenship and Immigration Services is currently implementing a comprehensive

government agencies, by eliminating the fees for their use of the SAVE Program.

optimization of the SAVE Program. The U.S. Citizenship and Immigration Services has developed a phased approach to further the U.S. Department of Homeland Security mission. This Privacy Impact Assessment supports use of the SAVE Program for (1) voter registration and voter maintenance list verification; (2) collection of Social Security numbers, which may include those of U.S. born citizens for all benefit- or license-related uses of the program; (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State; (4) a new bulk upload feature for the program; and (5) removing the fee for non-Federal government agencies.

***Social Security Administration Data Sharing***

On January 20, 2025, and March 25, 2025, the President issued Executive Orders 14159, *Protecting the American People Against Invasion* and 14248, *Preserving and Protecting the Integrity of American Elections* respectively.[3] Executive Order 14159 includes a requirement for the Secretary to "…promptly issue guidance to ensure maximum compliance by [Department of Homeland Security] personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law...."[4] Executive Order 14248 outlines that, "…Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. And [Department of Homeland Security] is required to share database information with States upon request so they can fulfill this duty."[5] Executive Order 14248 directs the Secretary to "…ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered…" The Department of Homeland Security is also required under Executive Order 14248, in coordination with the Department of Government Efficiency Administrator, to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. § 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements."

The Commissioner of Social Security also must assist states in determining whether individuals are eligible to register and vote by taking all appropriate action to make available the Social

[3] *See* Protecting the American People Against Invasion (January 2025) *available at* https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections; and Preserving and Protecting the Integrity of American Elections (March 2025) *available at* https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion.

[4] 8 U.S.C.§ 1373; 8 U.S.C. §1644.

[5] 8 U.S.C. 1373(c).

Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered.[6]

Most registered agencies may not have access in their voter, benefits, or licenses records to a U.S. Department of Homeland Security-issued identifier, (such as Alien Registration Number (Alien Number or A-number), Naturalization Certificate number, or Citizenship Certificate number) to initiate the initial SAVE Program query. To address this concern, the U.S. Citizenship and Immigration Services is incorporating a feature to allow SAVE Program-registered agencies to query records by Social Security numbers. Registered agencies will provide the U.S. Citizenship and Immigration Services with the individual's first and last name(s), date of birth and a full 9-digit or partial Social Security number. Registered agencies may additionally provide a U.S. Department of Homeland Security enumerator. The U.S. Citizenship and Immigration Services will provide the Social Security Administration with this information and in turn they will provide the U. S. Citizenship and Immigration Service with the following responses:

- Social Security number match (True/False);
- Name match (True/False);
- Date of birth match (True/False);
- Citizenship Indicator;
  - "A" - U.S. citizen;
  - "B" - Legal alien, eligible to work;
  - "C" - Legal alien, not eligible to work;
  - "D" – Other;
  - "E" - Alien student - restricted work authorized; and
  - "F" - Conditionally legalized alien.
- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);
- State/Country code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);

[6] Executive Order 14248 § 3(a).

- Death indicator (Yes / No); and
- Error code descriptions (transaction and record levels).

Of note, if a registered agency provides the names, dates of birth, and Social Security numbers of U.S. citizens by birth, the SAVE Program will maintain and process this information. For instance, a state may provide the U.S. Citizenship and Immigration Services information for all residents that are registered to vote within their jurisdiction. This would include U.S. citizens by birth. The U. S. Citizenship and Immigration Services will process this information as stated above and provide the appropriate response.

The SAVE Program now has a list processor feature to allow registered agencies to upload a list of individuals' case data instead of creating individual cases. A requesting agency, once signed into the program, will have an option to "upload" a list of individuals for the U.S. Citizenship and Immigration Services to verify citizenship and immigration status. Once uploaded, the SAVE Program creates individual cases for everyone identified on the uploaded list. The U. S. Citizenship and Immigration Services then sends from the list to the Social Security Administration the name, Social Security number, and date of birth of the individuals identified by the registered agency. The Social Security Administration then sends the status information (citizenship indicator noted above) back to the SAVE Program. The SAVE Program, if required, also queries other various systems (see below *List of Federal Systems Used to Respond to Registered Agency Queries*), and provides a consolidated result in each case file. The registered agency has the option of logging back into the program after twenty-four hours and searching for each case or generating a Web Agency Audit Report within the SAVE Program that can provide status information for multiple cases.

Additionally, program users will be able to download a list of individuals from the original list that the registered agency submitted, that the U.S. Citizenship and Immigration Services was not able to process. For example, a registered agency's list may not have a unique identifier for several individuals. To capture these incomplete cases, the program creates a spreadsheet that includes everyone who is not processed and requests additional information such as a Social Security number (corrected Social Security number), or Alien Registration Number. The registered agency can then update the spreadsheet provided with the additional information and upload it again into the program. The U.S. Citizenship and Immigration Services then provides the registered agency's account with the following information:

- Verification number (SAVE Program generated);
- Initial request date;
- Identification type;

- Identification number;
- Last name;
- Benefit code;
- Benefit description;
- Initial request response (Lawful status, No lawful status, Deceased);
- Additional request date;
- Additional request response (Lawful status, No lawful status, Deceased);
- Third step request date;
- Third step resolution (Lawful status, No lawful status, Deceased); and
- Closed date.

***Department of State Data Sharing***

Registered agencies may provide either a U.S. passport number or a photocopy of a U.S. passport as documentation of citizenship or immigration status. If a U.S. passport number is submitted, the SAVE Program will verify it against information from U.S. Department of State-issued passport. Additionally, the SAVE Program will receive or access information in the U.S. Department of State's Consular Consolidated Database / American Citizen Record Query system, which is a consular search engine used by the U.S. Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

***State Driver's Licensing Agencies and Other Organizations Maintaining Driver's License Information Data Sharing***

Within the U.S., driver's licenses are the most widely used form of identification. The SAVE Program can use driver's license and state identification card numbers to check and confirm identity information by working with state driver's licensing agencies and national agencies that store driver's license information for legal purposes (such as the National Law Enforcement Telecommunications System). When the registered agency provides a driver's license or state identification card number as the enumerator to verify the identity of the applicant, the SAVE Program will use state driver's licensing agencies or another source (such as the National Law Enforcement Telecommunications System) to validate the information and gain access to other government enumerators. This will allow the SAVE Program to match against other sources to verify immigration status and U.S. citizenship, which will improve accuracy and efficiency for SAVE registered agencies.

***Auditing of Federal and State Oversight Programs Data Sharing***

The SAVE Program will support organizations that have entered into required agreements with the U.S. Citizenship and Immigration Services and have a legal oversight authority over a program or benefit type supported by the SAVE Program through reporting capabilities for auditing purposes. User agencies with a legal authority to monitor and audit benefits granted may view case data such as biographic data, enumerators, case submission date/time, and the SAVE Program response information. Reporting options exist for individual agencies and their case data. Additionally, user agencies with legal authority may now be granted SAVE Program access to view other user agencies' case data through a linking mechanism based on either benefit type granted (e.g. Medicare) or by state. This new account type will have reporting options to view case data. Other account types enable user agencies to create cases within the SAVE Program to verify applicant current eligibility for benefits previously granted. This will allow federal and state oversight agencies to ensure user agencies are properly verifying immigration status or citizenship before making an eligibility determination. Oversight agencies can also ensure previously approved applicants remain eligible for the benefits they are receiving.

***List of Federal Systems Used to Respond to Registered Agency Queries***

The following is a list of federal information systems that the SAVE Program queries for responses to registered agencies:

**United States Citizenship and Immigration Services Systems:**

- Central Index System;[7]
- Electronic Immigration System;[8]
- Computer Linked Application Information Management System 3;[9]
- Enterprise Citizenship and Immigration Services Centralized Operational Repository;[10]
- GLOBAL (not an acronym);

[7] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CENTRAL INDEX SYSTEM, DHS/USCIS/PIA-009, *available at* Privacy Documents for USCIS | Homeland Security.

[8] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE USCIS ELECTRONIC IMMIGRATION SYSTEM, DHS/USCIS/PIA-056, *available at* Privacy Documents for USCIS | Homeland Security.

[9] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE COMPUTER LINKED APPLICATION INFORMATION MANAGEMENT SYSTEM AND ASSOCIATED SYSTEMS, DHS/USCIS/PIA-016, *available at* Privacy Documents for USCIS | Homeland Security.

[10] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE ENTERPRISE CITIZENSHIP AND IMMIGRATIONS SERVICES CENTRALIZED OPERATIONAL REPOSITORY, DHS/USCIS/PIA-023, *available at* Privacy Documents for USCIS | Homeland Security.

- RAILS (not an acronym);[11]
- Customer Profile Management System;[12] and
- Salesforce Customer Relationship Management Customer Relationship Management.

**Other U.S. Department of Homeland Security Systems:**

- U.S. Department of Homeland Security OneNet;
- U.S. Immigration and Customs Enforcement Student and Exchange Visitor Program;[13]
- U.S. Immigration and Customs Enforcement, Enforcement Integrated Database;[14]
- U.S. Customs and Border Protection Arrival and Departure Information System;[15] and
- Transportation Security Administration Office of Intelligence and Analysis Technology Infrastructure Modernization Program.[16]

**Other Federal Agency Systems:**

- U.S. Military Entrance Processing Command Integrated Resource System;
- U.S. Department of Education Federal Student Aid Central Processing System;
- U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services;
- U.S. Social Security Administration Numident system;
- U.S. Department of Justice Executive Office for Immigration's Immigration Review Information Exchange System;

---

[11] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR RAILS, DHS/USCIS/PIA-075, *available at* Privacy Documents for USCIS | Homeland Security.

[12] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CUSTOMER PROFILE MANAGEMENT SERVICE, DHS/USCIS/PIA-060, *available at* Privacy Documents for USCIS | Homeland Security.

[13] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE STUDENT AND EXCHANGE VISITOR PROGRAM, DHS/ICE/PIA-001, *available at* Privacy Documents for ICE | Homeland Security.

[14] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE ENFORCEMENT INTEGRATED DATABASE, DHS/ICE/PIA-015, *available at* Privacy Documents for ICE | Homeland Security.

[15] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, PRIVACY IMPACT ASSESSMENT FOR THE ARRIVAL AND DEPARTURE INFORMATION SYSTEM, DHS/CBP/PIA-024, *available at* Privacy Documents for CBP | Homeland Security.

[16] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION, PRIVACY IMPACT ASSESSMENT FOR THE TRANSPORTATION SECURITY ADMINISTRATION OFFICE OF INTELLIGENCE AND ANALYSIS TECHNOLOGY INFRASTRUCTURE MODERNIZATION PROGRAM, DHS/TSA/PIA-042, *available at* Privacy Documents for TSA | Homeland Security.

- U.S. Department of State Consular Consolidated Database; and
- U.S. Department of State American Citizen Record Query System.

## Fair Information Practice Principles

The U.S. Department of Homeland Security conducts Privacy Impact Assessments on developed or procured information technology systems involving the collection, maintenance, or dissemination of information in identifiable form or that make substantial changes to existing information technology that manages information in identifiable form, as required by Public Law 107-347, Section 208, "The E-Government Act of 2002," and any applicable and implementing Office of Management and Budget guidance; or proposed rulemakings affecting personal information as required by Section 222(a)(4) of the Homeland Security Act of 2002; or technologies that sustain, and do not erode, privacy protections relating to the use, collection, and disclosure of personal information pursuant to 6 U.S.C § 142(a)(1).

In response to these obligations, the U.S. Department of Homeland Security Privacy Office developed a set of Fair Information Practice Principles [17] from the underlying concepts of the Privacy Act of 1974[18] to encompass the full scope of the information and interactions of the U.S. Department of Homeland Security. The Fair Information Practice Principles account for the nature and purpose of the information being collected in relation to the U.S. Department of Homeland Security's mission to preserve, protect, and secure. The Fair Information Practice Principles are a set of eight principles that are rooted in the tenets of the Privacy Act.

**3. What specific legal authorities and/or agreements permit the collection of information by the project in question?**

In accordance with a 1986 Congress mandate, the U.S. Citizenship and Immigration Services, previously the Immigraton and Naturalization Service, established the SAVE Program to verify the citizenship and immigration status of individuals seeking government benefits for use by benefit granting agencies when making benefit determinations. The following provides authority for the program to collect, maintain, and share personally identifiable information:

- Immigration and Nationality Act, Public Law 82-414, 66 Statutory 163 (June 27, 1952);
- Homeland Security Act of 2002, Public Law Number 107-296, 116 Statutory 2135

[17] U.S. Department of Homeland Security, Privacy Policy Guidance Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security (2008), *available at* https://www.dhs.gov/privacy-policy-guidance.
[18] Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

(November 25, 2002);

- Immigration Reform and Control Act of 1986, Public Law 99-603, 11 Statutory 3359 (November 6, 1986);
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996 , Public Law 104-193, 110 Statutory 2105 (August 22, 1996);
- Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104-208, 110 Statutoty 3009 (September 30, 1996);
- Real ID Act of 2005, Public Law 109-13, 119 Statutory 231 (May 11, 2005);
- Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Statutory 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Public Law 111-152, 124 Stat. 1029 (March 30, 2010);
- Federal Aviation Administration Extension, Safety and Security Act of 2016, Public Law 114-190, 130 Statutory 615 (July 15, 2016); and
- Social Security Act of 1935, Public Law 74–271, 49 Statutory 620 (Aug. 14, 1935) as amended, 42 U.S.C. § 1306.

In addition, the Systematic Alien Verification for Entitlements Program has an obligation under 8 U.S.C. 1373(c) to "respond to an inquiry by a federal, state or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

The Social Security Administration is aiding by sending to, and receiving, U.S. Department of Homeland Security and U.S. Citizenship and Immigration Services information regarding the citizenship or immigration status, lawful or unlawful, of individuals within its records. The Social Security Administration is authorized to participate in this information sharing under the authority of the Social Security Act, 42 U.S.C. § 1306, and pursuant to 8 U.S.C. § 1373(a).

**4. Will this information be maintained as part of system of records,[19] as defined in the Privacy Act, 5 U.S.C. §552a?**

[19] The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

Yes, information retrieved by the Social Security Administration, U.S. Department of State, and registered agencies will be maintained in the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records.[20]

**5. From which population does the project collect, maintain, use, and/or disseminate personally identifiable information?[21]**

☒ a. Members of the public

☐ b. U.S. Department of Homeland Security employees and/or contractors

☐ c. Other federal employees

**6. What personally identifiable information is collected, maintained, used, or disseminated?**

The U.S. Citizenship and Immigration Services may collect the following information about aliens; legal permanent residents; and U.S. born, naturalized, and derived citizens from registered agencies:

- Name (last, first, middle);
- Unique identifiers;
    - Alien Regstriaton Number (Alien number or A-Number)/U. S. Citizenship and Immigration Services Number;
    - I-94 Arrival/Departure Record number;
    - Student and Exchange Visitor Information System Identification number;
    - Receipt number/card number;
    - Naturalized Certificate number; and
    - Citizenship Certificate number.

[20] *See* DHS/USCIS-004 Systematic Alien Verification for Entitlements, 90 Fed. Reg. 48948 (October 31, 2025), *available at* System of Records Notices | Homeland Security.

[21] Personally identifiable information means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual. *See* OMB M-06-19, Reporting Incidents Involving Personally Identifiable Information.

- Visa or Passport (Foreign and/or United Sates) numbers;
- Social Security number or Individual Tax Identification Number;
- Driver's license or state identification number;
- Date of birth;
- Country of birth;
- Citizenship or nationality;
- Class of Admission code and Date of entry;
- File Control Office;
- Benefit sought; and
- Immigration documentation.

The United States Citizenship and Immigration Services shares the following information to the Social Security Administration about U.S. born, naturalized, and/or derived citizens:

- Name (last, first, middle);
- Date of birth;
- Social Security number (full and partial); and
- U.S. Department of Homeland Security-issued identifier (such as Alien Registration Number).

The U. S. Citizenship and Immigration Services maintains the following information from the Social Security Administration:

- Social Security number match (True/False);
- Name match (True/False);
- Date of birth match (True/False);
- Citizenship indicator;
    - "A" - U.S. citizen;
    - "B" - Legal alien, eligible to work;
    - "C" - Legal alien, not eligible to work;
    - "D" – Other;
    - "E" - Alien student - restricted work authorized; and

  - "F" - Conditionally legalized alien.
- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);
- State/country code;
- American Samoa indicator (True/False);
- Alien Registration Number (Alien Number or A-Number) (where applicable);
- Death indicator (Yes / No); and
- Error code descriptions (transaction and record levels).

The United States Citizenship and Immigration Services provides the following information to requesting agencies:

- Verification number (system generated);
- Initial request date;
- Identification type;
- Identification number;
- Last name;
- Benefit code;
- Benefit description;
- Initial request response (lawful status, no lawful status, deceased);
- Additional request date;
- Additional request response (lawful status, no lawful status, deceased);
- Third step request date;
- Third step resolution (lawful status, no lawful status, deceased); and
- Closed date.

The U.S. Citizenship and Immigration Services shares the following information to the U.S. Department of State:

- Full name;
- Date of birth;

- Social Security number; and/or
- U.S. passport number.

The U.S. Citizenship and Immigration Services may maintain the following information from the U.S. Department of State:

- Full name;
- Date of birth;
- Certificate of Citizenship;
- Certificate of Naturalization;
- Alien RegistrationNumber (Alien Number or A-Number);
- U.S. passport book or passport card number;
- U.S. passport book or passport card issuance date;
- U.S. passport endorsement code(s) where applicable; and
- Images of U.S. passport book or passport card.

**7. What is the intended use of personally identifiable information?**

The SAVE Program uses personally identifiable information about individuals to help federal, state, territorial, tribal, and local government benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, verify the citizenship and/or immigration status of individuals within their jurisdiction as they determine eligibility for benefits, credentials, and licenses; and verify voter registration. The U.S. Citizenship and Immigration Services also uses the personally identifiable information for federal security background investigations and other lawful purposes.

The U.S. Citizenship and Immigration Services uses a variety of data for cross-referencing. In this way, the U. S. Citizenship and Immigration Services ensures that data is accurate and current, identifies inconsistencies between or among databases, and minimizes fraud. Additionally, the U.S. Citizenship and Immigration Services collects personally identifiable information from individual users of the system to provide accountability of system usage in the event of misuse and abuse of the system. Further, the U. S. Citizenship and Immigration Services use personally identifiable information to register SAVE user agencies and other administration functions.

The U. S. Citizenship and Immigration Services will use the Social Security number from

requesting agencies to query the Social Security Administration Enumeration System to assist in providing U.S. citizenship or immigration status of individuals. Federal, state, local, tribal, and territory governments generally use the SAVE Program to assist in awards of benefits, voter registration verification, as well as identifying fraud.

The U.S. Citizenship and Immigration Services will compare U.S. passport information against information available in U.S. Department of State accessed systems to verify a match or no match. Using a passport number, the SAVE Program will be able to verify acquired or derived citizenship for individuals with a U.S. passport directly from the source records. Images of the U.S. Passport document may also be submitted by agencies when applicable to be used by status verifiers as part of the verification process. This ensures that personally identifiable information contained on the document can be used to verify the document and subsequently the citizenship status of the individual. Additionally, the U.S. Citizenship and Immigration Services will use U.S. passport application information, specifically, the Certificate or Citizenship or Certificate of Naturalization, to quickly verify citizenship status in certain cases and reduce its response time to registered users.

**8. How long and under which retention schedule is the information retained?**

Pursuant to the National Archives and Records Administration Authority N1-566-08-07, the U.S. Citizenship and Immigration Services maintains records within the SAVE Program for ten years from the date of the completion of the verification, unless the records are part of an ongoing law enforcement investigation in which case the U.S. Citizenship and Immigration Services may retain them until completion of the investigation.

**9. With whom will personally identifiable information be shared?**

| | |
|---|---|
| ☐ Within the Component/Office | Specify: |
| ☒ Other-U.S. Department of Homeland Security Component(s)/Office(s) | Specify: When potential fraud or misuse is indicated by the SAVE Program information, this information may be shared, on a case-by-case basis, with U.S. Department of Homeland Security internal law enforcement organizations to include:<br>• U.S. Immigration and Customs Enforcement; and<br>• U.S. Customs and Border Protection. |

| | |
|---|---|
| ☒ State, local, tribal, or territorial entities | Specify: A list of all requesting agencies and their purpose for accessing the SAVE Program is accessible at https://www.uscis.gov/save/save-agency-search-tool. Additionally SAVE may retrieve information from state driver's license and identification issuing agencies (such as Department of Motor Vehicles). |
| ☐ Public | Specify: |
| ☐ Private sector | Specify: |
| ☐ Foreign governments | Specify: |
| ☐ Foreign entities | Specify: |
| ☒ Other: | Specify: Social Security Administration,<br>U.S. Department of State, and<br>National organizations maintaining driver's license and state identification information (such as the National Law Enforcement Telecommunications System). |

**10. How are individuals provided notice prior to the collection of information? If notice is not provided, explain why not.**

Each registered agency completes a Memorandum of Agreement with the U.S. Citizenship and Immigration Services and agrees to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Citizenship and Immigration Services. Additionally, the U.S. Citizenship and Immigration Services provides notice through this Privacy Impact Assessment as well as system of records notices mentioned in Section 4. Each state holds the responsibility to provide notice of their use of information at the time of their collection or additional use of the information.

**11. What opportunities are available for individuals to consent to uses, decline to provide information, or opt out?**

The U.S. Citizenship and Immigration Services does not provide opportunities to individuals within the jurisdiction of the registered agency to consent to the U.S. Citizenship and Immigration Services use of their information. Pursuant to the above-mentioned legal authorities

listed in Section 3, the U. S. Citizenship and Immigration Services must provide individual information to the Social Security Administration and the U.S. Department of State to allow the Requesting Agency to determine the immigration status of applicants and registrants of benefits, licenses, or for voter registration verification. Each registered agency holds the responsibility to provide opportunities for consent of their use of individuals' information. Additionally, each registered agency holds the responsibility to determine whether an individual has a legal right to decline providing information to them based on applicable law.

**12. What procedures are in place to allow individuals to correct inaccurate or erroneous information?**

Individuals may request access to their information maintained by the U.S. Citizenship and Immigration Services by submitting a request at https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act.

Requesters are required to provide their Alien Registration Number and/or full name, date, and place of birth, and return address.

Individuals should provide all written requests to contest or amend their information reviewed by the SAVE Program, with appropriate proof of identity, class of admission, and other relevant identifying information, as well as a statement about the incorrect. Depending on the originating source of information, the request may be satisfied within the U.S. Citizenship and Immigration Services, or the individual may be referred to the appropriate record holding agency. If the source of data is from a U.S. Citizenship and Immigration Services download and the SAVE Program confirms the data is incorrect, often by comparing the documents with the information in the program and cross-referencing other U.S. Citizenship and Immigration Services Verification Information System databases, the SAVE Program will contact the appropriate system owner recommending that the data be corrected.[22] Alternatively, the individual may make an appointment by calling the U.S. Citizenship and Immigration Services Contact Center at 800-375-5283 (TTY 800-767-1833). When appearing for the appointment, the person should provide accompanying supporting documentation, including proof of identity, class of admission, and other relevant identifying information. The SAVE Program customer agencies may change their profile information directly within the U.S. Citizenship and Immigration

[22] The Verification Information System is a composite information system incorporating data from various U.S. Department of Homeland Security and Social Security Administration databases and functions as the underlying information technology that supports the SAVE Program. The Verification Information System supports the U.S. Citizenship and Immigration Service's ability to verify whether a newly hired employee is authorized to work in the United States and the citizenship or immigration status verification of individuals seeking certain government benefits. The Verification Information System, including the services it houses, is in the Amazon Web Service cloud environment.

Services Verification Information System application. To correct typographic errors in your U.S. Citizenship and Immigration Services record or document, visit egov.uscis.gov/e-request.

**13. What administrative, technical, and physical controls are used to protect the information?**

The SAVE Program requires potential enrollees and customer agencies to register for participation in the program and sign an appropriate data sharing agreement. Once the enrollees submit the required documentation, all users must complete a web-based training course that explains functionality and security requirements.

The Systematic Alien Verification for Entitlements Program's internal users take the mandatory annual U.S. Department of Homeland Security Computer Security Training and the U.S. Citizenship and Immigration Services Privacy Awareness Training. Additionally, staff who administer the SAVE Program are required take special, role-based training. External SAVE Program users complete online tutorials. The tutorials also cover the procedures and policies associated with the use of the SAVE Program and includes privacy-related topics.

The Verification Information System, as the underlying technology supporting the SAVE Program has been Certified and Accredited and received a full authority to operate in April 2014. The system has been approved to participate in the Ongoing Authorization process and is continually monitored for compliance with the National Institute of Science and Technology policies to ensure compliance with the Federal Information System Management Act. The SAVE Program implements access controls for both internal and external customers, such as account names and passwords to access the program. The program has an automated mechanism to ensure that users change their passwords at specified intervals. Additionally, the program implements the following technical controls:

- Password data is encrypted within the system;
- The system is located within a multi-layered firewall architecture;
- The system follows a robust set of security controls that meet the U.S. Department of Homeland Security System Security Policy requirements. The certification and accreditation process ensures that the U.S. Citizenship and Immigration Services documents and verifies these security controls through the certification and accreditation process;
- The system uses secure hypertext transfer protocol protected communications during all data transmissions between the client workstation and the system;

- Passwords are encrypted when making database connections; and
- Procedures are in place to ensure that any potential breaches of information are reported within one hour of being found.

**14. How does the Component ensure that personally identifiable information is used appropriately?**

The SAVE Program has a comprehensive audit trail tracking and maintenance function that stores information about users who submit queries, when the query was processed, the query response, who received the query response, and when the user received the query response. The audit logs have restricted access based on user roles. These logs are external to system administration access methods and protected from modification. U.S. Citizen and Immigration Services personnel periodically review these audit logs to monitor user activity. Registered agencies must abide by all security requirements that they agreed to when they enrolled in the program. Attempts to evade the security controls can result in loss of access to the SAVE Program.

Some registered agencies use a single sign-on for all their individual users. In these cases, the SAVE Program will not collect information from individual users because individual users will appear as one agency user. In the case of single sign-on access to users, the U.S. Citizenship and Immigration Services requires the agency to sign an addendum to their Memorandum of Agreement which states that every user of the system must be assigned a unique identifier. If requested, the agency provides this information to the U.S. Citizenship and Immigration Services to allow for a clear audit trail for all transactions.

## Associated Privacy Risks and Mitigations

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services **partially mitigates** this risk. Generally, the SAVE Program has a 3-step process. The first step is a general query of the system. However, due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results. To mitigate this, the SAVE Program has a manual step process where a U.S. Citizenship and Immigration Services staff member will try to reconcile the request manually. The third step is for |

| | |
|---|---|
| | the U.S. Citizenship and Immigration Services to get additional documentation from the registered agency. However, this only partially mitigates the risk since the new request using Social Security numbers does not allow for a second and third step review. The U.S. Citizenship and Immigration Services does not have direct access to the Social Security Administration system to support these additional steps. Additionally, registered agencies may not go through all steps to ensure accuracy of information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that all United States citizens, including natural born U.S. citizens, have not been provided notice that the SAVE Program collects or maintains their information for citizenship and immigration status. |
| **Mitigation:** | The United States Citizenship and Immigration Services **partially mitigates** this risk. It is the responsibility of each registered agency to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Department of Homeland Security/U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services is publishing this privacy impact assessment and related System of Records Notice to provide transparency regarding the new categories of information collected and shared to assist registered agencies in verifying citizenship and immigration status of individuals applying for a benefit or license and voter registration verification. The SAVE Program's "Register an Agency for SAVE" explains how an eligible agency can create a Memorandum of Agreement with the U.S. Citizenship and Immigration Services. These agreements require registered user agencies to comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies. These policies include transparency and notice to individuals regarding agencies collection and use of personally identifiable information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the U.S. Citizenship and Immigration Services may use the information it obtains from registered agencies, the Social Security Administration, and the U.S. Department of State, for purposes not authorized by statute or for which it was originally collected. |
| **Mitigation:** | The United States Citizenship and Immigration Services **mitigates this risk** by only collecting information as authorized by the Immigration and Naturalization Act and other authorities mentioned within this Privacy |

| | |
|---|---|
| | Impact Assessment. The purpose for sharing Social Security numbers with the Social Security Administration and receiving information is to allow user agencies to verify the citizenship or immigration status of individuals applying for a benefit, license, or voter registration verification. The purpose for sharing and receiving U.S. passport information with the U.S. Department of State is to verify the citizenship or immigration status of individuals applying for a benefit, license or for voter registration verification. Also, each registered agency must execute a Memorandum of Agreement or Computer Matching Agreement with the U.S. Citizenship and Immigration Services that includes terms that the SAVE Program will be used in accordance with the law. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the new category individuals covered by this assessment/notice, specifically, United States born citizens do not have the opportunity to individually participate or consent in how the U.S. Citizenship and Immigration Services uses their information. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services **cannot mitigate** this risk. Each user agency is responsible for complying with federal and local authorities. The U.S. Citizenship and Immigration Services assumes that each user agency factors in the principles of notice, individual participation, and consent prior to providing information to the U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services only uses the information for the authorized purpose(s) identified within this Privacy Impact Assessment. Individuals should consult their local government agencies to determine the appropriate opt-in or opt-out statute, regulations and policies. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that individuals may access the SAVE Program that do not have a need to know of the information. |
| **Mitigation:** | The U.S. Citizenship and Immigration Services mitigates this risk by requiring the SAVE Program's potential enrollees and customer agencies to register for participation in the program and sign a Memorandum of Agreement or Computer Matching Agreement. After all required documentation is submitted, all users must complete a web-based training course that explains functionality and security requirements.<br><br>The SAVE Program's internal users complete the mandatory annual privacy |

| | |
|---|---|
| | and information technology training. External program complete take on-line tutorials explaining the program. The tutorials also cover the procedures and policies associated with the use of the program. |

## Contact Official

Brian Broderick
Division Chief (Acting)
Verification Division
U.S. Citizenship and Immigration Services

## Responsible Official

Angela Y. Washington
Component Privacy Officer
Office of Privacy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
USCIS.PrivacyCompliance@uscis.dhs.gov

## Approval Notice:

By signing below, the U.S. Department of Homeland Security Chief Privacy Officer approves this Privacy Impact Assessment for the SAVE Program. If, however, during the operational course of this program or U.S. Citizenship and Immigration Services' use of this technology changes from what has been documented or the U.S. Department of Homeland Security Privacy Office becomes aware of evidentiary changes to the intended use of the personally identifiable information or the scope of the personally identifiable information collected, of the program or technology is determined to be ineffective, the Chief Privacy Officer reserves the right to revoke approval of this Privacy Impact Assessment.

## Approval Signature

Original, signed copy on file with the U.S. Department of Homeland Security Privacy Office.

________________________________

Roman Jankowski
Chief Privacy Officer
U.S. Department of Homeland Security
Privacy@hq.dhs.gov

# EXHIBIT 6

PART OF STATES NEWSROOM

DEMOCRACY ELECTIONS VOTING

# DOJ is sharing state voter roll lists with Homeland Security

Justice demanded states turn over the lists. Homeland Security says it will comb through for 'illegal aliens.'

BY: **JONATHAN SHORMAN** - SEPTEMBER 12, 2025 12:38 PM



American flags hang alongside the official agency flag at the U.S. Department of Justice building in Washington, D.C., in August. The Justice Department is sharing state voter roll data with the U.S. Department of Homeland Security. (Photo by Jonathan Shorman/Stateline)

The U.S. Department of Justice is sharing state voter roll information with the Department of Homeland Security in a search for noncitizens, the Trump administration confirmed.

The data sharing comes after Justice Department attorneys this summer demanded that election officials in nearly two dozen states

turn over their voter lists, alarming some Democratic state secretaries of state and election experts. They have voiced fears about how the Trump administration planned to use the data. Even some Republican secretaries of state have declined to provide their full voter lists.

Homeland Security in an unsigned statement to Stateline called information sharing essential to "scrub aliens from voter rolls" and said the federal government was "finally doing what it should have all along – sharing information to solve problems."

**Trump wants states to feed voter info into powerful citizenship data program**



BILOXI, Miss. — The Trump administration is developing a powerful data tool it claims will let states identify noncitizens registered to vote. But Democratic critics and data experts warn it could allow the federal government to vacuum up vast quantities of information on Americans for unclear purposes. Some Democratic election officials and opponents of the … Continue reading

"This collaboration with the DOJ will lawfully and critically enable DHS to prevent illegal aliens from corrupting our republic's democratic process and further ensure the integrity of our elections nationwide. Elections exist for the American people to choose their leaders, not illegal aliens," the statement reads.

The Justice Department said in its own statement that state voter roll data provided in response to requests from the department's Civil Rights Division is "being screened for ineligible voter entries."

Noncitizen voting is extremely rare. One study of the 2016 election placed the prevalence of noncitizen voting at 0.0001% of votes cast.

The data sharing marks a next step in President Donald Trump's efforts to exert more federal influence over state-administered elections. Trump signed an executive order earlier this year that sought to require individuals to provide proof-of-citizenship documents to register to vote, a rule quickly blocked in federal court. He has also threatened to sign another executive order attempting to restrict mail ballots.

At least 10 states have either provided publicly available data or given the department directions on how to request public data. On Friday, Indiana Secretary of State Diego Morales, a Republican, confirmed to reporters that he had provided the Justice Department with all voter information requested, including driver's license and partial Social Security numbers – making Indiana the first known state to have supplied personally sensitive data.

While the administration didn't describe how Homeland Security will use the voter rolls to search for noncitizens, the agency operates a powerful program, Systematic Alien Verification for Entitlements, or SAVE, that can identify the immigration or citizenship status of an individual.

SAVE was originally intended to help state and local officials verify the immigration status of individual noncitizens seeking government benefits. But U.S. Citizenship and Immigration Services, which is part of Homeland Security, this spring refashioned it into a platform that can scan states' voter rolls if officials upload the data.

In the past, SAVE could only search one name at a time. Now it can conduct bulk searches, allowing officials to potentially feed into it information on millions of registered voters. SAVE checks that information against a series of federal databases and reports back whether it can verify someone's immigration status.

## Justice Department demand for state voter lists underscores their importance




Alabama resident Roald Hazelhoff treasures his newly won right to vote. When election officials flagged the naturalized U.S. citizen's voter registration for possible removal last August, the Dutch native fought back. Hazelhoff, then a 67-year-old college instructor, sued to stop Alabama Secretary of State Wes Allen, a Republican, from seeking to kick him and more … Continue reading

Since May, it also can draw upon Social Security data, transforming the program into a tool that can confirm U.S. citizenship because

Social Security records for many, but not all, Americans include the information.

As the Justice Department has sought state voter rolls this summer, letters from the department's attorneys to state officials in many instances have demanded full lists of registered voters that include sensitive personal information such as driver's license numbers and partial Social Security numbers. At least 22 states were asked for some data, according to the Brennan Center for Justice at New York University, which is tracking the requests.

Some states have turned over publicly available voter files or offered directions on how to request them. Others have flat-out refused the requests.

"The Department of Justice hasn't shown any good reason for its fishing expedition for sensitive voter information on every American," Maine Secretary of State Shenna Bellows, a Democrat, said in a news release Monday announcing that her office had rejected the Justice Department's second request for her state's voter data.

Justin Levitt, who served as senior policy adviser for democracy and voting rights in the Biden White House and is now a law professor at Loyola Marymount University, said that he has no confidence that Homeland Security would act carefully with any data received.

Levitt, speaking with Stateline on Wednesday before the data sharing was confirmed, voiced concern that the Justice Department was "serving as a stalking horse" for other entities within the government.

"The fact that they're having to sneak through the back door rather than knocking on the front door tells you that there's improper procedures going on," Levitt said.

*This story was updated to add information from Indiana Secretary of State Diego Morales confirming his state shared voter roll information with the U.S. Department of Justice.*

*Indiana Capital Chronicle's Whitney Downard contributed reporting. Stateline reporter Jonathan Shorman can be reached at jshorman@stateline.org.*

YOU MAKE OUR WORK POSSIBLE.

SUPPORT

MAINE UNITED STATES

REPUBLISH

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. AP and Getty images may not be republished. Please see our republishing guidelines for use of any other photos and graphics.*



## JONATHAN SHORMAN

Jonathan Shorman covers democracy for Stateline, including elections, voting rights, fights over state vs. federal power, civil liberties and more.

Stateline is part of States Newsroom, the nation's largest state-focused nonprofit news organization.

MORE FROM AUTHOR

## MORE FROM OUR NEWSROOM



**DOJ files suit against six states that refused to share voter data**

BY **BARBARA BARRETT**

September 25, 2025



**Some Republican states resist DOJ demand for private voter data**

BY **JONATHAN SHORMAN**

September 18, 2025

50 STATES, ONE PLACE

Stateline reports on the big challenges that cross state borders.

We're part of States Newsroom, the nation's largest state-focused nonprofit news organization.

DEIJ Policy | Ethics Policy | Privacy Policy

Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. (See full republishing guidelines.)

© Stateline, 2025

v1.94.2

STATES NEWSROOM

FAIR. FEARLESS. FREE.

# EXHIBIT 7

Case 2:25-cv-01439-MAD-PJE Document 87 Filed 01/20/26 Page 33 of 34

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff,**<br><br>**vs.**<br><br>**SHIRLEY WEBER ET AL.,**<br>**Defendants.** | **Case No. 2:25-cv-09149-DOC-ADS**<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [37] AND INTERVENORS' MOTIONS TO DISMISS [62-1], [67]** |

Before the Court is Defendants Shirley Weber and the State of California's (collectively, "Defendants" or "California") Motion to Dismiss ("California Motion" or "Cal. Mot.") (Dkt. 37). Also before the Court is Intervenors' the NAACP, the NAACP California-Hawaii State Conference, Services Immigrant Rights and Education Network's Motion to Dismiss ("NAACP Motion") (Dkt. 62-1). Finally, before the Court is League of Women Voters of California's Motion to Dismiss ("LWVC Motion") (Dkt. 67). For the reasons below, the Court **GRANTS** the motions to dismiss.

## I. INTRODUCTION

Even after 250 years, the American experiment in democracy remains fragile. It has always been so. When asked after the Constitutional Convention what form of government he and his colleagues had created, Benjamin Franklin famously replied, "A Republic, if you can keep it." History demonstrates that democracy can be lost in a generation.

The foundation upon which American democracy has been built is the right to vote. Brave Americans have given their lives for more than two hundred years to protect this right. Now it seems the Executive Branch of the United States government wants to abridge the right of many Americans to cast their ballots. This is what this case is grounded in—the right to vote and the government's obligation to protect that right. The United States Department of Justice (DOJ) seeks an unprecedented amount of personal information related to California voters from California's unredacted voting rolls. The requested information includes the names, social security numbers, home addresses, voting history and other sensitive information of nearly 23 million Californians. The people of California resist this effort.

The issue presented to this court is animated by a well-established principle, long recognized by the Supreme Court: the right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The government's request is unprecedented and illegal.

Congress' purpose in passing the civil rights laws the DOJ now invokes for its extraordinary request was to protect hard won civil rights victories allowing access to the ballot

box. The franchise was not freely given. Rather, the right to vote was won through generations of sacrifices from marginalized communities the American political system devalued, but who were determined to make the promise of democracy real. The pieces of legislation at issue in this litigation were not passed as an unrestricted means for the Executive to collect highly sensitive information about the American people. It is not for the Executive, or even this Court to authorize the use of civil rights legislation as a tool to forsake the privacy rights of millions of Americans. That power belongs solely to Congress.

Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot. Black Americans risked intimidation and violence every time they tried to access the polls. To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register. The bipartisan Commission on Civil Rights lamented in 1958 that even when records were not destroyed, states refused to turn them over, thwarting efforts by the federal government to investigate whether there was a pattern and practice of disenfranchising Black Americans.[1] Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes. The Constitution gives states the right to control elections, but Congress was tasked with balancing state power against the Executive branch's role in protecting the voting rights of all Americans. In the present case, the DOJ cites no disenfranchisement concerns for their extraordinary request for the personally identifying information of millions of Californians.

The National Voter Registration Act (NVRA) was similarly enacted by Congress in 1993 to combat the effects of discriminatory and unfair registration laws that cheapened the right to vote. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012).

---

[1] *Report of the United States Commission on Civil Rights* (Sept. 9, 1959), usccr.gov/files/historical/1959/59-001-U.pdf.

Congress understood that unfair registration laws have a "damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." *Id.* Likewise, the Help America Vote Act (HAVA) was passed in 2002 to help prevent election failures and improve voting accessibility. Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145). In passing Title III of the Civil Rights Act ("Title III"), the NVRA, and HAVA, Congress' intent was clear—ensuring that all Americans, regardless of race, are able to vote without fear or distress.

The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution. It is Congress' role to determine the purpose and use of legislation. Should Congress want to enable the Executive to centralize the private information of all Americans within the Executive Branch, Congress will have to clearly say so.

There is an inherent level of trust that comes along with Americans voting locally. This is why, since the founding of our nation, the Elections Clause has constitutionally prevented the centralization of election management in the Executive by affording states the power to determine the "times, places and manner of holding elections."[2] U.S. Const., art I, sec. 4, cl. 1. State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for. The DOJ's request for the sensitive information of Californians stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used. There cannot be unbridled consolidation of all elections power in the Executive without action from Congress and public debate. This is antithetical to the promise of fair and free elections our country promises and the franchise that civil rights leaders fought and died for.

---

[2] The Elections Clause simultaneously gives Congress the power to "make or alter such [r]egulations." U.S. Const., art I, sec. 4, cl. 1; *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1413–14 (9th Cir. 1995).

## II. BACKGROUND

### A. Facts

On July 10, 2025 the United States Department of Justice's Civil Rights Division (DOJ) sent a letter to Shirley Weber ("Secretary"), California's Secretary of State. (Dkt. 37, Ex. 1).[3] Within fourteen days the DOJ demanded an electronic, unredacted, copy of California's statewide voter registration list that is maintained under HAVA, steps the Secretary takes to ensure compliance with the NVRA, a list of election officials responsible for maintaining California's voter registration list, and a list of follow-up questions to the information provided by California in its response to the U.S. Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS).[4] The information requested by the DOJ was a litany of sensitive, personally identifying information such as social security numbers linked to voters' names, voters' addresses, voters' phone numbers, methods of voter registration, voter participation history, political party registration, driver's license numbers, language preference for ballots, ID numbers if no driver's license, emails, and current voter registration status. Dec. 4, 2025 Hearing Transcript ("Hr'g Tr"), (Dkt. 100) at 17-21. All of this information would be neatly packaged in one tranche of data, organized by the name of the voter.

On July 22, 2025 the Secretary responded saying that she was identifying the requested information and sought to provide it as soon as possible, but that it could take up to ninety days (Dkt. 37, Ex. 2). The DOJ responded on July 29, 2025 saying that the additional requested time was "not acceptable" for requests such as the voter registration list and reiterated that that an unredacted statewide voter registration list needed to be provided to the DOJ by August 8, 2025, citing the NVRA. (Dkt. 37, Ex. 3). Additional time until August 29, 2025 was given for a few additional requests. *Id.*

The Secretary replied on August 8, 2025. (Dkt. 4, Ex. 4). The Secretary did not make electronically available California's unredacted statewide voter registration list citing California law as a prohibition. However, the Secretary did make California's voter registration list

[3] All docket numbers refer to the instant case unless otherwise stated.

[4] An example of the questions asked by the DOJ was, "A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant." (Dkt. 37, Ex. 1).

available to the DOJ for inspection at the Secretary's office in Sacramento, California. The Secretary clarified that in accordance with California and federal law, sensitive information like voters' driver's license numbers and social security numbers would be redacted. The Secretary also responded to two of the six questions asked by the DOJ regarding California's responses to the EAVS report.

On August 13, 2025 the DOJ renewed its request for an unredacted electronic copy of California's voter registration list, claiming that inspection of the list in Sacramento was not enough. (Dkt. 37, Ex. 5). The DOJ also invoked HAVA and Title III of the CRA, in addition to the NVRA, in its quest for the sensitive information of California voters. In response to any federal privacy concerns the Secretary had with the requested information, the DOJ cited to Section 304 of the CRA which states:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.[5]

52 U.S.C. § 20704.

The Secretary was additionally asked to provide an electronic voter registration list to the DOJ within seven days (August 21, 2025). The DOJ warned the Secretary that failure to do so might result in legal action. (Dkt. 37, Ex. 5).

On August 21, 2025 the Secretary responded reiterating that the DOJ was welcome to inspect a copy of California's voter registration list at her office in Sacramento with appropriate redactions of private, identifying information. (Dkt. 37, Ex. 6). The Secretary explained that Title III of the CRA and HAVA did not authorize the DOJ's broad sweeping request for an

[5] It is important to note, that Section 304 of the CRA does not assuage all privacy concerns because it leaves open the possibility that sensitive information collected from voting rolls could be shared with other federal agencies such as the Department of Homeland Security.

unredacted copy of California's voter registration list. Further, the Secretary stated that the DOJ's nationwide effort for requesting identical information from several other states did not support the DOJ's claim that a good faith investigation of California specifically was needed regarding NVRA compliance. Finally, the Secretary reiterated her concerns that the records requested were subject to the Privacy Act of 1974.

The Secretary sent a list of election officials responsible for implementing California's general program of voter registration list maintenance to the DOJ in response to its earlier request on August 29, 2025. Furthermore, the Secretary reiterated that additional responses would be provided to the DOJ by September 12, 2025. (Dkt. 37, Ex. 7).

As promised, on September 12, 2025 the Secretary sent a letter with comprehensive responses to the remaining questions posed in the DOJ's July 10 letter. However, the Secretary did not provide an unredacted copy of every original and completed voter registration application dating back two years due to the aforementioned concerns regarding privacy and the lack of legal authority for such a wide sweeping request. (Dkt. 37, Ex. 8).

There was no response to the Secretary's August 21, August 29, or September 12 letters by the DOJ. And on September 25, 2025 the DOJ sued the state of California for failure to produce their statewide voter registration lists. The DOJ stated during oral arguments on December 4, 2025 that the purpose behind their requests to California was "voter roll maintenance enforcement and compliance." Dec. 4, 2025 Hr'g Tr, (Dkt. 100) at 82, 19-21. On the same day the DOJ sued California, the DOJ also sued an additional five states—Michigan, Minnesota, New York, New Hampshire, and Pennsylvania—for the states' refusal to turn over sensitive voter data.[6] So far the DOJ has sued a total of 23 states and Washington, D.C in an effort to receive the full voter registration files of millions of voters across the entire country.[7] The DOJ has sent demands for complete copies of statewide voter registration files to at least

[6] *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls,* U.S. Dep't of Justice (Sept. 25, 2025), https://www.justice.gov/opa/pr/justice-department-sues-six-states-failure-provide-voter-registration-rolls.

[7] The states by sued by DOJ include Arizona, California, Colorado, Connecticut, Delaware, Georgia, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Wisconsin, and Washington. Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Justice (updated Jan. 9, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

43 states and Washington, DC. *Id.* These nationwide efforts point at a larger pattern than the DOJ's stated purpose—one that involves collecting sensitive, personally identifying information of nearly every voter in America on an unprecedented scale and then utilizing that information in a completely different context than what the information was provided for.

**B. Procedural History**

The Court finds it necessary to summarize the events of the related *USA v. Robert Page* case in conjunction with the procedural history of the instant case. The Court will discuss the history of the two cases together.

On June 25, 2025, the United State of America filed a lawsuit against Robert Page, the Orange County Registrar of Voters in the case, *United States v. Robert Page* (the "County Case" or "Orange County Case"), Case No. 8:25-cv-01370-DOC-ADS (C.D. Cal.). In that lawsuit, DOJ claimed that it "recently received a complaint from the family member of a non-citizen in Orange County indicating that the non-citizen received an unsolicited mail-in ballot from the Defendant, despite lack of citizenship." Complaint ¶ 18 (Dkt. 1), *County Case.* Based on this allegation DOJ sought the following:

> 1. Records from January 1, 2020, to the present showing the number of voter registration records in Orange County cancelled because the registrant did not satisfy the citizenship requirements for voter registration.
>
> 2. Records from January 1, 2020, to the present related to each cancellation described in Request No. 1, including copies of each registrant's voter registration application, voter registration record, voting history, and related correspondence sent or received by the County of Orange Registrar of Voters in regard to the registration.
>
> *Id.* ¶ 19; *see also id.*, Ex. 1.

Orange County responded to the request, but redacted driver's license and identification card numbers, social security numbers, voter identification numbers, language preference, and voter signatures. Complaint ¶ 20 (Dkt. 1), *County Case.* DOJ then filed suit claiming that

Case 8:25-cv-01370-JVS-PJE Document 87-8 Filed 01/20/26 Page 10 of 34

Orange County was violating HAVA, the NVRA, and seeking unredacted copies of the above information. *See generally id.*

On July 23, 2025, Page filed an Answer to the Complaint (Dkt. 9), *County Case*. The Court held a scheduling conference on September 15, 2025 (Dkt. 18), *County Case*, and issued a scheduling order on the same day (Dkt. 19), *County Case*, setting a trial date for March 31, 2026. Then, on September 25, 2025, the instant case was filed (Dkt. 1), *United States v. Shirley Weber et al* ("State Case" or "California Case"), Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal.). A Notice of Related Cases (Dkt. 4), *State Case*, was filed on the same day, relating the *County Case* and *State Case*. After both cases were transferred to the same Court (Dkt. 19), *State Case*, the *County Case* was stayed pending the resolution of the *State Case* pursuant to a stipulation by the parties (Dkt. 49), *County Case*.

Next, in the midst of the government funding shutdown[8], DOJ filed a motion to stay on October 1, 2025 citing to the funding issues as the reasons for its motions (Dkt. 6).[9] The *State Case* proceeded despite this motion to stay, and DOJ withdrew this motion on November 13, 2025 (Dkt. 50) when restored appropriations rendered it moot (Dkt. 115).

On October 7, 2025, the NAACP, the NAACP California-Hawaii State Conference (collectively, "NAACP"), and Services, Immigrant Rights and Education Network ("SIREN") filed a motion to intervene as defendants (Dkt. 14). On October 20, 2025 the League of Women Voters of California ("LWVC") moved to intervene as a defendant (Dkt. 24). After completion of briefing, the Court granted both motions to intervene on the record on November 19, 2025 (Dkt. 70).

California filed a motion to dismiss on November 7, 2025 (Dkt. 37). DOJ requested on November 14, 2025, to extend its briefing deadline for an opposition to the motion to dismiss in light of the aforementioned government shutdown (Dkt. 57). However, this request was mooted when the DOJ filed its opposition brief on November 18, 2025 ("First Opp.") (Dkt. 64). The Court then issued an order setting the remainder of the briefing schedule on November 21, 2025

[8] The shutdown lasted from October 1, 2025 to November 12,2025 for a record 43 days. Diana Stancy, *Trump signs bill ending longest government shutdown in US history*, Fox News (Nov. 12, 2025 10:24 p.m. EST), https://www.foxnews.com/politics/trump-signs-bill-ending-longest-government-shutdown-us-history.

[9] All subsequent docket numbers reference the *State Case*, unless otherwise noted.

Case 2:25-cv-09149-DOC-ADS JE Document 87-8 Filed 01/15/26 Page 10 of 34 Page

(Dkt. 71). California filed its reply brief on November 25, 2025 (Dkt. 78). California also lodged amicus briefs from other cases in past years demonstrating allegedly contrary positions of DOJ from the instant case on December 5, 2025 (Dkt. 96).

NAACP and SIREN filed a motion to dismiss[10] on November 17, 2025 (Dkt. 62-1). LWVC filed a separate motion to dismiss on November 20, 2025 (Dkt. 67). DOJ filed a combined opposition to both of Intervenors' motions to dismiss on November 26, 2025 (Dkt. 81). The NAACP and SIREN then filed its reply on December 1, 2025 (Dkt. 86) and LWVC filed its reply on the same day (Dkt. 85).

The Court also has the benefit of numerous amicus briefs. The first amicus brief was filed on November 13, 2025 by the Democratic National Committee (Dkt. 44). A second amicus brief was filed by sixteen states[11] on November 26, 2025 (Dkt. 83). A third amicus brief was filed by a "bipartisan group of former state secretaries of state"[12] on November 26, 2025 (Dkt. 84). On December 8, 2025, after a stipulation of the parties, further amicus briefs were invited from all viewpoints for a specifically delineated period of 14 days (Dkt. 98). Nevada filed a joinder to the sixteen states' amicus brief on December 22, 2025 (Dkt. 120), and another amicus brief was filed on the same day by "former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ)" (Dkt. 121). The Court accepted these amicus briefs on January 14, 2026 (Dkt. 127). Finally, the Court heard oral argument on the motions to dismiss on December 4, 2025 and took the motions under submission (Dkt. 97). Amicus briefs were due to the Court by December 22, 2025.

The transcript for the oral argument on the motion to dismiss was released on December 8, 2025 (Dkt. 100). The Court has endeavored to make this and other transcripts from these proceedings publicly available without cost. These transcripts and other filings can be accessed without payment here: https://www.cacd.uscourts.gov/newsworthy/cases-of-interest-all?field_case_name_tid=%22USA%20v.%20Shirley%20Weber%20et%20al%22.

---

[10] The Court accepted this motion to dismiss as lodged in its November 21, 2025 scheduling order (Dkt. 71).

[11] These states are: Arizona, Colorado, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

[12] The former Secretary of States served in Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the complainant to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555, n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

When a motion to dismiss is granted, the court must decide whether to grant leave to amend. The Ninth Circuit has a liberal policy favoring amendments, and thus leave to amend should be freely granted. *See, e.g.*, *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th

Cir. 1992). However, a court need not grant leave to amend when permitting a plaintiff to amend would be an exercise in futility. *See, e.g.*, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## IV. DISCUSSION

First, California argues that this Court lacks jurisdiction to adjudicate the claim for violation of Title III of the Civil Rights Act of 1960 ("CRA") because DOJ's demand was made to the California Secretary of State's Sacramento address and the records sought are located there.[13] Cal Mot. at 6 (citing 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.")). The Court finds this argument persuasive.

However, at oral argument California provided that "even though we raised that jurisdictional argument, we invite a decision on all of the merits in this case." Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 123:8-12. As noted above, this case concerns matters of national importance. It is thus critical that a decision is rendered on the merits, so that voters know when they next go to the polls whether their voting records are private, or are subject to prying eyes.

Furthermore, this case was transferred to this Court because it is related to the *County Case*, *United States v. Robert Page*, Case No. 8:25-cv-01370 (Dkt. 19). The *County Case* was filed in June 25, 2025 making it the first-filed case. According to DOJ, "[b]oth the Orange County Action and the California Action arise out of the authority of the Attorney General of the United States to enforce requirements" of elections laws "with respect to the conduct of elections in Orange County, and the State of California." Notice of Related Cases (Dkt. 4) ¶ 5.

Once the State Case was filed, DOJ opined that "without getting into any litigation strategy, we do have a plan to bring substantive dispositive issues to Your Honor in that [State] case very, very quickly, unlike this [County] case." Oct. 23, 2025 Hr'g Tr. (Dkt. 105) at 15:5-8.

---

[13] Sacramento is located within the Eastern District of California.

Later, when the Court asked DOJ how it would like to handle the County and State cases given their overlapping issues, the DOJ offered that "I just think at this point it does make sense to allow…a ruling on the state case and that that would be dispositive for the county case" because "the county case sort of is subservient to the state case and the state case is what's going to get reviewed first." Nov. 19, 2025 Hr'g Tr. (Dkt. 111) at 8:5-9, 9:22-10:7. However, for the *State Case* to control the *County Case*, it must be resolved on the merits. DOJ has agreed that this will likely dispose of the *County Case*. Because the Court wishes to resolve the *County Case* that has been languishing since Summer 2025, a decision on the merits is also necessary.

Accordingly, the Court now proceeds with its merits analysis.[14]

**A. The DOJ's claim fails under the Title III of the CRA.**

The Court has the authority to dismiss the DOJ's case in the present motion—Title III of the CRA does not require special procedures. DOJ's Title III claims must be dismissed because the DOJ's proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived.

**1. This Court can evaluate the DOJ's records requests under the Title III of the CRA without special procedure.**

Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause. First Opp. at 11. Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures.[15] The Supreme Court has also affirmed that the federal government's demands for documents are governed by the Federal Rules of Civil Procedure (FRCP). *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981); *see also* Fed. R. Civ. P. 81(a)(5). Therefore, exercising "appropriate process" under the FRCP allows this Court to determine that the DOJ has not met Title III of the CRA's statutory requirements and the Motion to Compel filed by DOJ (Dkt. 87) is **DENIED**.

[14] The Court also **GRANTS** California's Request for Judicial Notice (Dkt. 37-3). The documents in this Request are properly subject of judicial notice.

[15] The Supreme Court found that courts should apply standard civil procedures in ensuring statuary prerequisites are satisfied under a similarly worded statute. *See United States v. Powell*, 379 U.S. 48, 57-58 & n.18 (1964).

**2. The DOJ's proffered statement and purpose does not suffice under Title III of the CRA.**

The DOJ is required to offer a written statement of *both* the purpose and basis for its demands to California. Title III imposes document retention requirements on elected officials "to secure more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). These document retention requirements for election officials require the retention and preservation of "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." for 22 months 52 U.S.C. § 20701; *id*. § 20706. In order to actually gain access to and inspect these documents, the Attorney General of the DOJ must make a "demand in writing" for requested records and that demand must include "a statement of the basis and the purpose therefore." 52 U.S.C. § 20703.

The purpose of Title III is to detect voting-related racial discrimination. In the past, the DOJ has routinely stated both a purpose and basis related to alleged civil rights violations and how their requested records would specifically assist in their investigation. For example, in *Lynd* the DOJ stated that its purpose for requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—referencing the Civil Rights Act of 1957—"have occurred." *Kennedy v. Lynd,* 306 F.2d 222, 231 (5th Cir. 1962). The DOJ's stated basis for this demand in *Lynd* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."[16] *Id.*

The DOJ claims that it has offered a statement of the basis and the purpose of its demand. In its August 13, 2025 letter to the Secretary, the DOJ wrote its demand was "to assist

[16] Other similar statements of basis and purpose have been made by DOJ in the past. For example, in *Kennedy v. Bruce*, the DOJ sought inspection of records and papers related to federal elections. *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962). The purpose of the request was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred" and the stated basis of the request was the DOJ's belief that "distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Id.*; *see also*, *In re Coleman*, 208F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom., Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

Case 2:25-cv-09149-DOC-ADS PJE Document 128 7-8 Filed 01/15/26 Page 15 of 33 Page

in our determination of whether California's list maintenance program complies with the NVRA." (Dkt. 37, Ex. 5). During oral arguments on December 4, 2025, the DOJ stated that the purpose behind their requests to the state of California was "voter roll maintenance enforcement and compliance." Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 82:19-21.

Though compliance with the NVRA was cited by the DOJ as the purpose of its request, Title III was not passed as a tool for NVRA compliance. The NVRA could never have been passed for this use case because the passage of Title III in 1960 preceded the NVRA by several decades which was passed in 1993. Uniform, centralized statewide voter registration lists—like the one the DOJ is seeking from California, were not even required until the passage of HAVA in 2002. This too points to the DOJ's stated purpose being outside of the scope of what Congress intended Title III to be used for.

Nonetheless, even if compliance with the NVRA was a valid purpose, the DOJ states no reason why an unredacted version of California's voter list is necessary under the NVRA. Title III was meant to provide the DOJ access to "public records which ought ordinarily to be open to legitimate reasonable inspection." *Kennedy v. Lynd,* 306 F.2d 222, 231 (5th Cir. 1962). Title III was not conceived by Congress to provide access to "confidential, private papers and effects." *Id.* Providing DOJ access to California's unredacted voter roll would provide the federal government access to information like millions of voters' social security numbers, addresses, phone numbers, method of voter registration, voter participation history, political party registration, driver's license numbers, language preference for ballots, ID numbers, emails, and current voter registration status. *See* Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 17-21.

This sensitive and identifying information is private and not open to inspection by federal officials. Particularly, driver's license numbers and partial social security numbers were not required for voter registration until the passage of HAVA in 2002 so Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior. *See* 52 U.S.C. § 21083(a)(5)(A)(i). As such, regardless of whether compliance with the NVRA is a valid purpose under Title III, DOJ's access to voters' sensitive information is not automatic.

Under the plain meaning of the word, the DOJ may have stated a purpose for its request to California.[17] However, in no circumstances has the DOJ established the basis for its request.[18] The purpose of a records request is the rationale for the request—in the present case compliance with the NVRA. The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law. Here, the DOJ failed to provide an explanation for why it believed the NVRA was violated in its letter to the Secretary. And there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation. The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute. Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand.

Therefore, the DOJ has not complied with Title III of the CRA and has provided an inadequate statement of basis and purpose. Because the DOJ has not complied with the CRA as a threshold matter, the Court will not be reaching the issue of whether the Secretary complied with the CRA by offering the opportunity to view redacted voting records in-person in Sacramento.

**3. The Court is not obliged to accept a contrived statement and purpose.**

While the DOJ has told this Court that its purpose for demanding the sensitive voter information of Californians is "voter roll maintenance enforcement and compliance," representations made by the DOJ elsewhere paint a starkly different picture that this Court cannot ignore. Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 82:19-21. It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database.

---

[17] Merriam-Webster describes the meaning of the word "purpose" as "the reason something is done or used." *Purpose*, Merriam-Webster, https://www.merriam-webster.com/dictionary/purpose.

[18] Merriam-Webster describes the meaning of the word "basis" as "something on which something else is established or based." *Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis.

A core principle of the United States is the separation of powers between branches to sustain the necessary checks and balances. This Court and the American people deserve to know what exactly the sensitive information of millions of Americans is going to be used for. The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom.[19] The Supreme Court reiterated in *Department of Commerce* that judicial review is not merely an empty ritual where courts accept rationales that seem "to be contrived." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). Opining further, the Supreme Court said it could not "ignore the disconnect between the decision made and the explanation given," nor was it "required to exhibit a naiveté from which ordinary citizens are free." *Id*; *United States v. Stanchich*, 550 F.2d 1294, 1300 (CA2 1977) (Friendly, J.).

Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection. Former Deputy Assistant Attorney General of the DOJ's Civil Rights Division Michael Gates said in September 2025 that the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number.[20] In a statement, the DOJ said that the state voter roll data provided to the Civil Rights Division is "being screened for ineligible voter entries"[21] and Assistant Attorney General for Civil Rights Harmeet Dhillon further confirmed that the DOJ had "checked 47.5 million voter records."[22]

But behind this screening, there appears to be a different purpose. A lawyer working in the DOJ's Voting Section tasked with obtaining states' voter rolls was concerned that "the data would be used not for purging voter rolls of people who aren't eligible to vote, but for broader

[19] In *Department of Commerce v. New York*, the Department of Commerce told the court it added a citizenship status question to the census at the behest of the DOJ for better enforcement of Section 2 of the Voting Rights Act. However, later evidence showed that the DOJ only made that request after they were asked by the Department of Commerce to do so. *See Dep't of Commerce v. New York*, 588 U.S. 752 (2019).

[20] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[21] Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Homeland Sec. Newswire (Sept. 13, 2025), https://www.homelandsecuritynewswire.com/dr20250913-doj-is-sharing-state-voter-roll-lists-with-homeland-security.

[22] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

immigration enforcement."[23] DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information.

In other similar cases involving two other states, the DOJ asked election officials to run their entire voter list through the SAVE database—a database housed in DHS and used as the central federal database for citizenship records.[24] These requests by the DOJ mirror requests by DHS itself to states like North Carolina, and complement an executive order by President Trump directing DHS to review publicly available voter registration lists against federal immigration databases.[25] DHS officials have confirmed that the federal government is "finally doing what it should have all along—sharing information to solve problems."[26]

Reports from other agencies also point to the federal government laying the groundwork to amass the personal information of millions of Americans in a centralized database. Technology company Palantir has been enlisted by the federal government to build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services.[27] States have also been pressured to turn over sensitive information from programs like the Supplemental Nutritional Assistance Program (SNAP), as well as data from Medicaid.[28] These programs and agencies have access to the most sensitive parts of Americans'

---

[23] The attorney interviewed went on to say, "I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division." Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department: Sixty Attorneys Describe a Year of Chaos and Suspicion*, N.Y. Times Mag. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

[24] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[25] Pres. Donald J. Trump, *Preserving and Protecting the Integrity of American Elections*, Exec. Order, Mar. 25, 2025, https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections/; *Id*.

[26] Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security. Reports indicate that noncitizen voting is exceedingly rare. For example, after a comprehensive review of voter rolls in April, the state of Michigan found that 0.00028% of the state's total votes were cast by noncitizens. Miles Parks, *Despite Grand Claims, a New Report Shows Noncitizen Voting Hasn't Materialized*, NPR (July 30, 2025), https://www.npr.org/2025/07/30/nx-s1-5462836/noncitizen-voting-trump-ceir-review. The risk of deportation, prison time, fines, and derailing of the naturalization process is a great deterrence to stay away from the polls for those unauthorized to vote. *Noncitizen Voting is Vanishingly Rare*, Brennan Ctr. for Justice (Jan. 25, 2017), updated Sept. 17, 2024, https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-vanishingly-rare.

[27] Priscilla Alvarez, Sunlen Serfaty, Marshall Cohen & Tami Luhby, *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration.

[28] U.S. Dep't of Agriculture, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/05/06/secretary-rollins-requires-

lives. Viewing the DOJ's campaign to collect sensitive voter data in the context of these agreements for other types of personal information paints an alarming picture regarding the centralization of Americans' information within the Executive Branch—without approval from Congress or Americans themselves.

The Court does not take lightly DOJ's obfuscation of its true motives in the present matter. Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose.

**B. The DOJ's claim fails under the NVRA**

Though the DOJ cites to the NVRA as the foundation for its demand for California's unredacted voter rolls, nothing in the NVRA requires California to fulfill this demand and disregard California privacy law. The NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from official lists" for reasons like the death or change of address of voters. 52 U.S.C. § 20507 (a)(4). The NVRA puts the onus on states to maintain voter rolls. Specifically, states are required to "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The NVRA does not distinguish between private parties and the government regarding the "public inspection" requirement.

Congress' objectives when creating the NVRA was to "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;" "to protect the integrity of the electoral process; and ... to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)-(4). To make these

---

states-provide-records-snap-benefits-ensure-lawful-use-federal-funds; Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, AP News (July 17, 2025), https://www.apnews.com/article/immigration-medicaid-trump-ice-ab9c2267ce596089410387bfcb40eeb7.

objectives achievable, Congress created Section 8(i)(1) along with a private right of action. 52 U.S.C. §§ 20507, 20510(b). Voting rights advocates have used the private right of action to achieve the statute's purpose of increasing the number of eligible voters through investigating the disfranchisement of marginalized voters, particularly concerning election officials' improper denial or cancellation of voter registrations. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating the improper rejection of voter registrations submitted by students at a historically Black university).

The DOJ seeks to surpass the scope of the NVRA and wield it to collect information beyond the scope and purpose of what Congress envisioned. However, the NVRA ultimately does not allow for the unjustified, wholesale disclosure of voters' sensitive information.

**1. California is not required to turn over unredacted voter information to the DOJ under the NVRA.**

There is longstanding precedent that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls. *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014).[29] The First Circuit held broadly in *Public Interest Legal Foundation* that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" for files like voter registration lists. 92 F.4th at 45–49. The First Circuit came to this conclusion understanding that the redaction of personal information in statewide voter registration lists could "assuage potential privacy risks." *Id.*

[29] *See Project Vote/Voting for Am., Inc.*, 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *N.C. State Bd. of Elections*, 996 F.3d at 268 (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1016 (D. Alaska 2023) (holding the NVRA permits "the exclusion of sensitive personal information" from disclosure); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F.Supp. 3d 1320, 1344–45 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birthdates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers).

The DOJ itself acknowledged these privacy risks itself in its *Public Interest Legal Foundation* amicus brief, conceding that "the NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters' Social Security Numbers before disclosing records." *See Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 27–30, PILF, 92 F.4th 36 (No. 23-1361), 2023* WL 4882397, at *27 (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)). The DOJ further conceded that the NVRA does not "prohibit [states from] redacting an even broader set of personal information in certain sensitive circumstances." *Id.* (citing *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021)).

The DOJ argues that it is entitled to the unredacted, sensitive information contained in California's voter rolls because there is a distinction between the government and a private individual using the "public disclosure" mechanism under the NVRA. The Court finds this distinction meaningless given that the statute itself makes no distinctions between the government and private individuals. This lack of distinction is particularly meaningful when taken to the logical conclusion that if the DOJ is entitled to unredacted voter information, private individuals should also be entitled to this information. This conclusion cannot be. Further, nothing in the text of the NVRA prohibits the redaction of personal voter information. Therefore, California was well within the directive of the NVRA when it offered the DOJ the ability to inspect redacted voter records.

The DOJ further argues that access to California voter rolls is necessary because "California's voter registration metrics are among the worst in the nation and are strongly suggestive of its list maintenance violations." (Dkt. 64 at 22). However, the NVRA only permits investigations into states' policies regarding reasonable voter roll maintenance. Nothing in the statute suggests as acceptable the deep level of intrusive digging DOJ is proposing in its request for line-by-line voter roll data. The DOJ makes no persuasive argument for why this large amount of unredacted voter information is necessary to evaluate state policies. Therefore, the DOJ's NVRA claims fail. California is not required to turn over unredacted voter information.

**2. California privacy laws are not preempted by the NVRA.**

As discussed above, the NVRA does not require the disclosure of unredacted California voter rolls. Under the Supremacy Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). Even if disclosure of records was required, California's privacy laws would not be preempted. California law requires that "the California driver's license number, the California identification card number, the social security number, and any other unique identifier used by the State of California for purposes of voter identification. . . , are confidential and shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(b)–(c). The Court agrees with Intervenors' analysis of *Public Interest Legal Foundation* that "the First Circuit effectively recognized that the NVRA's public inspection provisions did not preempt or circumvent the Maine legislature's lawfully enacted privacy requirements, which largely parallel California's state law protection for sensitive voter information and prohibit disclosure of the highly sensitive personal information DOJ seeks." NAACP and SIREN's Mot. (Dkt. 62-1) at 8; *see* Cal. Elec. Code § 2194(b)(1).

The NVRA and California's privacy protections can coexist because the latter does not obstruct the former. Nothing in the NVRA prevents redaction of sensitive voter information as California law requires. Furthermore, courts have routinely allowed for the redaction of sensitive voter information under the NVRA. Therefore, the DOJ's claim fails under the NVRA and the Court disavows the government's attempt at going beyond the scope of its previous position, as well as the will of Congress.

**C. The DOJ's claim fails under HAVA.**

The Help America Vote Act ("HAVA") was enacted "[i] n the wake of the 2000 presidential election." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012). It was signed into law by President George W. Bush on October 29, 2002. Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145). The purpose of HAVA is:

> To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Id.*

Congress opted to defer much of the program to the decision of the states: "The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C. § 21085. HAVA sets minimum requirements for voting systems and voter registration lists. 52 U.S.C. §§ 21081, 21083. It also provides federal funding to states for elections to meet these new standards, replace outdated voting systems, and improve future administration of elections. 52 U.S.C. § 20901.

HAVA shifted the aggregation of managing voter registration databases up one level from local governments to state governments. 52 U.S.C. § 21083(a); *see* Orion de Nevers, *What Happened to Hava? The Help America Vote Act Twenty Years on and Lessons for the Future*, 110 Geo. L.J. Online 168, 174-75 (2022). The law requires that all states create a "computerized statewide voter registration list." Nevers, *supra*, at 175 (quoting 52 U.S.C. § 21083(a)(1)(A)). In doing so, "the law targets both interjurisdictional and intra-jurisdictional problems. It addresses interjurisdictional issues by aggregating data at the state, rather than the local level and by requiring the new systems to be coordinated with other state agency databases," and it "provides an intra-jurisdictional solution by mandating that the database be immediately accessible to 'any local election official.' These measures target the interplay of statewide and site-specific problems that plagued the 2000 election." Nevers, *supra*, at 175 (citing 52 U.S.C. § 21083(a)).

The law also provides for a "fail-safe," by allowing voters to cast provisional ballots. Nevers, *supra*, at 175 (citing 52 U.S.C. § 21082(a)). This provision means that "a voter who

arrives at a polling place only to be told they are not on the site's voter roll is entitled to cast a provisional ballot." Nevers, *supra*, at 175 (citing 52 U.S.C. § 21082(a)). The state must then go on to "verify the voter's eligibility and, if the state determines the voter is in fact 'eligible under State law,' count the vote." Nevers, *supra*, at 175 (quoting 52 U.S.C. § 21082(a)). This measure was meant to "respond[] to the votes that were lost in the 2000 election when poll workers erroneously turned away voters from polling places due to inaccurate voter registration information." Nevers, *supra*, at 175.

Finally, HAVA also established the U.S. Election Assistance Commission (the "EAC"), an independent bipartisan commission established with the goal of strengthening electoral resilience. Hope C. Kashatus, *Ready to Roll: How the U.S. Election Assistance Commission Can Strengthen State Compliance with Federal Voter Roll Maintenance Requirements*, 73 Admin. L. Rev. 901, 904, 910 (2021) (citing Arthur L. Burris & Eric A. Fischer, Cong. Rsch. Serv., RS20898, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election* 4 (2016)). The EAC is manned by four commissioners with election administration experience who are nominated by the President, and confirmed by the Senate. Kashatus, *supra*, at 910-11. "The EAC's duties include dispersing election administration funds to states, serving as a clearinghouse of information on best practices for election administration, maintaining the mail voter registration form, developing voluntary voting system guidelines, and producing the biennial EAVS report." *Id.* at 912. Despite this, the "EAC demonstrates lawmakers' reluctance to grant broad federal authority over elections. HAVA limits the EAC's rulemaking authority and does not enable the EAC to enforce federal requirements." *Id.* at 904 (citing 52 U.S.C. §§ 20929, 20508(a); H.R. Rep. No. 107-30, at 13 (2001)).

**1. HAVA does not provide for disclosure in its provisions.**

California and Intervenors argue that HAVA does not contain any disclosure provisions in its statutory text. The Court agrees.

As LWVC notes, "[u]nlike the NVRA and CRA, HAVA does not have a disclosure provision." LWVC Mot. at 12. The NVRA includes a provision providing for "public

inspection." 52 U.S.C. § 20507(i)(1). So too does the CRA include a provision calling for "inspection, reproduction, and copying" under certain circumstances. 52 U.S.C. § 20703. HAVA includes no like provision. *See* 52 U.S.C. §§ 20901-21145.

Without a statutory provision allowing for disclosure or inspection authority, a government agency—like the DOJ—cannot claim to have that remedy tacked on to the text of the statute. *See Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) ("[W]e are reluctant to assume the existence of the power to issue third-party subpoenas directed at unidentified targets where Congress has not provided for them specifically, nor provided procedural safeguards."). HAVA simply contains no such provision. This ends the inquiry. And the fact that the NVRA and CRA *do* include such provisions signals that the omission in HAVA was intentional. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015) ("Congress acts intentionally when it omits language included elsewhere.").

DOJ claims that HAVA does not include a disclosure provision because there is no private right of action under HAVA. First Opp. at 20-21. DOJ claims that it thus follows logically that there would no attendant "public disclosure requirement." *Id.* This misses the mark. Congress not only omitted any "public disclosure requirement," it omitted any disclosure provision at all. This omission is intentional, and the Court declines to read in inspection authority that is missing from the statutory text. The fact that DOJ may be entitled to these inspection records through discovery is also irrelevant. As California notes: "That DOJ might receive information through discovery in litigation, does not create an independent violation of HAVA for refusing to turn over information prior to litigation—which is the HAVA violation DOJ alleged." Cal. Reply (Dkt. 78) at 7 (cleaned up) (citing Compl. ¶ 62).

**2. DOJ fails to allege any violations of HAVA.**

Putting aside HAVA's lack of any disclosure provisions, DOJ also simply fails to allege any violations of HAVA. Even the federal government is not permitted to sue first, obtain discovery, and finalize its allegations later. This appears to be a telltale "fishing expedition." District courts do not "condone the use of discovery to engage in 'fishing expeditions'" when the Plaintiff has no basis other than "gross speculation" to support their claims. *Webb v. Trader*

*Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021) (quoting *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004)).

First, the thrust of DOJ's HAVA claim in its Complaint is that California violated HAVA by failing to turn over the full unredacted voter list as requested. *See* Compl. ¶¶ 58-63. That claim fails for the reasons stated in the previous section: There is no disclosure provision in HAVA, and so California cannot have violated any such provision.

Turning to the substantive provisions of HAVA, DOJ has also failed to alleged any violations. HAVA sets standards for "maintenance" of a state's voter lists. *See* 52 U.S.C. § 21083. But California has standards for list maintenance and provided them to DOJ before the initiation of this litigation. Brudigam Decl. (Dkt. 37-2), Exs. 4. 6, 8. DOJ does not identify any deficiencies in these provided standards, and so the thrust of its list maintenance claim fails.

The basis of DOJ's argument appears to be that it has identified apparent anomalies with California's voter registration list—in terms of duplicate registrations, for example, and so California must not be meeting the minimum maintenance requirements.[30] First Opp. at 18-20. But this misses the mark. The fact that California *reported* duplicate registrations, *reported* removals of deceased registrants, and *reported* a change in inactive voters does not indicate that its list maintenance system is deficient. Indeed, the fact that California reported these numbers indicates that its system is properly serving as a net. A lack of reporting would be more telling than the de minimis numbers DOJ singles out.[31]

Furthermore, a lag in removals is not indicative of any wrongdoing: "[A] maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters," while "preventing the states from removing

---

[30] DOJ misconstrues the obligation to remove ineligible voters from voter rolls as arising from HAVA. The obligation actually arises under the NVRA. *See* a *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012) ("[T]he NVRA regulates voter registration, whereas HAVA is concerned with updating election technologies and other election-day issues at polling places."); *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations."). Nevertheless, the Court analyzes this claim here.

[31] The original request for the *County Case* concerned only 17 improper voters. Noah Biesiada, *OC Supervisors Reject Idea to Settle Voting Records Lawsuit with DOJ, Voice of OC* (Aug. 27, 2025), https://voiceofoc.org/2025/08/voter-data-lawsuit-orange-county/. Orange County has a population of 3,186,989 people, which means the 17 improper voters constitute only 0.00053% of the population. *See Orange County, California*, U.S. Census Bureau, https://data.census.gov/profile/Orange_County,_California?g=050XX00US06059. Furthermore, the 17 people in question have all since had their information "purged from voter rolls." *See* Biesiada, *supra*.

registrants altogether would ensure that no eligible voters are removed, but, at the same time, maximize the risks associated with inaccurate voter rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). As such, "Congress crafted a statute that sought to balance these competing interests" and in recognition that there may be some lag between maintenance efforts and effect. *Id.* Put simply, DOJ has not "alleged any specific breakdown in [California's] removal program." *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 792 (W.D. Mich. 2024). The fact that California has attempted to demonstrate how its list maintenance program is compliant with the strictures of HAVA, and DOJ continues to only point at "anomalies" is indicative of the deficiencies in DOJ's HAVA claim. Since DOJ has been unable to identify any actual issues with California's list maintenance standards (which is what HAVA actually governs, *see* 52 U.S.C. § 21083), it continues to point out "anomalies" that are not actually elements of a HAVA claim.

**3. HAVA does not preempt California law.**

Even if California had been alleged to violate HAVA and even if it was required to disclose its voter registration list, there is nothing in HAVA that would require California to produce an unredacted copy of this list. California law mandates that any such voter registration list be properly redacted and indeed prohibits the production of an unredacted voter list. HAVA contains no disclosure provision. 52 U.S.C. §§ 20901-21145. As such HAVA, cannot preempt California law and require California election officials to produce an unredacted voter list "in disregard of the law of their state." *Am. C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 186 (3d Cir. 2017).

**D. DOJ's demands violate federal privacy laws.**

The DOJ's request for California's unredacted voter rolls violates a plethora of federal privacy laws including the Privacy Act, E-Government Act, and Driver's Privacy Protection Act, by failing to meet the requirements under each statute.

**1. The DOJ's data requests violate the Privacy Act.**

The Privacy Act serves as a protection for Americans against the disclosure of information collected by the government. *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025).

The Act was passed in 1974 amidst concerns over the Executive accumulating and centralizing Americans' personal information in the wake of the Watergate and Counterintelligence Program scandals, both seen as threats to American democracy.[32] The Act creates "certain safeguards for an individual against an invasion of personal privacy." Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974). Unless narrow exceptions apply, agencies cannot collect or maintain records regarding Americans' First Amendment activities and agencies are required to follow specific procedures prior to maintaining, collecting, using or disseminating records.[33] 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f).

The Privacy Act applies to the voter records request by the DOJ because a "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). The DOJ's request for Californians' voting records includes a litany of personal and sensitive information that is governed by the Privacy Act.

The Privacy Act bars DOJ's request for California's unredacted voter roll because fulfillment of that request would include information regarding previous election participation and party affiliation. And voter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75–76 (1990). The Privacy Act prevents federal agencies from collecting records regarding Americans' First Amendment activities. 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). Further, none of the exceptions that would allow for agencies to collect information falling under the First Amendment apply in the present case.

Even if the DOJ successfully argued that its requests do not fall under the First Amendment bar of the Privacy Act, the DOJ fails to identify relevant System of Records

[32] See U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition*, https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/introduction#LegHistory.

[33] Exceptions include: express authorization by statute, the agency is given permission by the subject of the record, or retention is pertinent to and within the scope of an authorized law enforcement activity. § 552a(e)(7); *see also* 28 C.F.R. § 16.54(g) (imposing the same as a regulatory standard of conduct for all employees and contractors of the Department of Justice).

Notices (SORNs) as necessitated by the Privacy Act. The Privacy Act requires that a SORN be published in the Federal Register before "establish[ing] or revis[ing]" a "system of records." 5 U.S.C. § 552a(e)(4); *Brusseau v. Dep't of Homeland Sec.*, 2021 WL 3174248, at *5 (E.D. Va. July 27, 2021). If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs. 5 U.S.C. § 552a(e)(4)(D); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFLCIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 763 (D. Md. 2025), *appeal docketed*, No. 25-1411 (4th Cir. Apr. 18, 2025). The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records before they are collected by the federal government—especially given the federal government's subterfuge regarding why the data is being collected in the first place.

The DOJ identifies three potential SORNS to fulfill its requirement under the Privacy Act, claiming that the "full list of routine uses for this collection of information" can be found in the SORNS listed. First Opp. at 23-24. One SORN identified by the DOJ reads, "indicat[ing] a violation or potential violation of law," covers "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47,610, 47,611. This SORN does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity—some identified to this Court and others not. *Ruell v. McDonough*, 2024 WL 4771390, at *8 (E.D. Pa. Nov. 13, 2024). The second SORN identified by the DOJ, updating the first, allows public disclosure of information after "the investigation is closed." 70 Fed. Reg. 43,904, 43,904. This SORN again does not sufficiently alleviate concerns regarding what private and sensitive information will be shared and when. The third SORN is concerning disclosures after data breaches—also lacking relevance and specificity. 82 Fed. Reg. 24,147, 24,151. In conclusion, none of the SORNS identified give sufficient notice to the American public as required under the Privacy Act.

The Court is concerned that the very issues that animated Congress to pass the Privacy Act—threats to American democracy amidst erosion of public trust regarding the Executive's use of sensitive data—will play out again if the DOJ is given license to ignore the guardrails created by Congress in the Privacy Act. Congress passed the Privacy Act to prevent the creation of "formal or de facto national data banks" or "centralized Federal information systems" because of the risks posed to the privacy of individual Americans.[34] Congress wanted to prevent "interagency computer data banks" so it made it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for individual privacy, the confidentiality of data, and the security of the system." *Id.* at 884, 217. Now, the Executive stands at the precipice of making Congress' fears come to life. But the Privacy Act remains a protection for the American people. Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of Californians.

**2. The DOJ's data request violates the E-Government Act.**

The E-Government Act requires federal agencies to conduct a "privacy impact assessment" (PIA) prior to "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons." *Id.* § 208(b). The PIA and the E-Government Act's procedural requirements must be completed "*before* the agency initiates a new collection of information." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) (emphasis in original).

The information the DOJ seeks to collect from California—like names and addresses of voters—is personal information protected by the E-Government Act. The Court finds the DOJ's assertion that the E-Government Act is not applicable to the enforcement of HAVA and the NVRA unpersuasive because the plain text of the statute includes the very information the DOJ is trying to collect. First Opp. at 27. Additionally, the request made by the DOJ to California is a new one, thus initiating a new collection of data. DOJ cites to a PIA conducted when it began

[34] S. Comm. on Gov't Operations and H.R. Comm. On Gov't Operations, 94th Cong., 2d Sess., *Source Book on Privacy* at 168 (1976), https://www.justice.gov/d9/privacy_source_book.pdf.

using ServiceNow, but does not specify how this relates to its present request to California. First Opp. at 27. Since the DOJ does not cite to an applicable PIA, it has failed its requirements under the E-Government Act.

**3. The DOJ's data request violates the Driver's Privacy Protection Act.**

The Driver's Privacy Protection Act (DPPA) prevents the disclosure of "personal information" that is obtained by the California Department of Moter Vehicles (DMV) in connection with a "motor vehicle record." 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4); *Reno v. Condon*, 528 U.S. 141, 143 (2000). The DPPA is implicated by the DOJ's request for voting records because California's statewide voter registration database receives information directly from the DMV. The Secretary receives information from the DMV regarding whether a person has completed their voter registration, along with their completed voter registration when that person applies for a driver's license. Cal. Elec. Code § 2265(b); *see also* 52 U.S.C. § 20504. California's statewide voter registration system also pulls driver's license numbers from the DMV on a regular and ongoing basis. Cal. Code Regs. tit. 2, § 19074(a).

An exception to the DPPA is when information is disclosed "For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C.A. § 2721(b)(1). The DOJ claims that it falls under this exception. First Opp. at 10. The DOJ has not identified how the use of millions of Californians' driver's license numbers would help it understand whether California conducts a general program that makes a reasonable effort to remove persons from its voter rolls due to death or change in residence.[35] Therefore, the DOJ's request for this information violates the DPPA.

**E. District of Connecticut Decision**

On January 12, 2026, DOJ lodged an order by a sister court in the District of Connecticut, which it claims deals with identical claims and supports its position (Dkt. 124). NAACP and SIREN filed a response (Dkt. 126) on January 13, 2026, which distinguished the Connecticut filing and argued it does not support DOJ's position. The Court has reviewed the

[35] *See Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) ("When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party.").

District of Connecticut order and agrees that it amounts to nothing more than a scheduling order delineating a briefing schedule. In any case, the District of Connecticut is a sister court from another circuit. This Court has the benefit of fully completed briefing and oral argument, so it need not rely on persuasive authority in making its ruling.

## V. CONCLUSION

The taking of democracy does not occur in one fell swoop; it is chipped away piece-by-piece until there is nothing left. The case before the Court is one of these cuts that imperils all Americans. The erosion of privacy and rolling back of voting rights is a decision for open and public debate within the Legislative Branch, not the Executive. The Constitution demands such respect, and the Executive may not unilaterally usurp the authority over elections it seeks to do so here.

The Department of Justice seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data. This effort goes far beyond what Congress intended when it passed the underlying legislation. The centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy.

Abraham Lincoln once said "the ballot is stronger than the bullet." One hundred years later, Dwight Eisenhower observed, "A people that values its privileges above its principles soon loses both." Both principles are applicable here. But, more critically, the Constitution requires that any decision which might erode fundamental privacy and voting rights must be subjected to the crucible of public debate through the Legislative Branch of the American government. It cannot be the product of an executive fiat.

For the reasons discussed above, Defendant and Intervenors' motions to dismiss are **GRANTED**. Given that the DOJ's request violates federal privacy laws, leave to amend would be futile. Therefore, the motions are **DISMISSED WITHOUT LEAVE TO AMEND**.

DATED: January 15, 2026

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

# EXHIBIT 8

Oregon **Capital Chronicle**

# Oregon not required to give feds voter data, judge rules

BY: **JULIA SHUMWAY** - JANUARY 14, 2026 3:46 PM *UPDATED 5:50 PM*



Ryan Patraw process ballots at the Marion County Clerk's Office in Salem on Monday, May 16. Each ballot goes through several steps before it is scanned to have the vote tabulated. (Photo by Ron Cooper/Oregon Capital Chronicle)

A federal judge tentatively ruled Wednesday that Oregon does not have to hand over personally identifiable data of more than 3 million Oregon voters to the federal government.

In an oral ruling Wednesday evening, U.S. District Court Judge Mustafa Kasubhai said he plans to dismiss the U.S. Justice Department's lawsuit against Oregon and Secretary of State Tobias Read. Kasubhai, appointed by former President Joe Biden, allowed that his final written decision may be different.

Read welcomed the ruling in a statement, calling it a big win for Oregonians' privacy and the rule of law.

"The federal government tried to abuse their power to force me to break my oath of office and hand over your private data," he said. "I stood up to them and said no. Now, the court sided with us. Tonight, we proved, once again, we have the power to push back and win."

The U.S. Department of Justice demanded last summer that Oregon and other states hand over a wide range of information, including the full name, date of birth, residential address and driver's license number or partial Social Security number for every registered voter.

Read refused, saying that doing so would violate Oregonians' privacy rights and that the federal government has no authority to demand that data.

The federal government responded by suing the state in September. Kasubhai heard arguments Wednesday over whether to dismiss the case in U.S. District Court in Eugene.

"I'm very cautious and doubtful that what you're asking for, which is an unredacted list, is actually going to give you the information that you need to establish a violation" of two voting-related laws, Kasubhai said.

The lawsuit alleges the state violated the National Voter Registration Act, the Help America Vote Act and Title III of the Civil Rights Act of 1960 by not turning over voter data.

Oregon regularly provides a redacted version of its voter registration list to political parties and voter outreach groups, and the state has maintained that it will provide that redacted list to the federal government. That list includes voters' names, addresses, political parties and birth years, but not birth dates or months, Social Security numbers or driver's license numbers.

"The list itself is not an uncommon thing to be requested, but the (National Voting Rights Act) doesn't distinguish between the special list that you have to provide the federal government with this additional private information," said Thomas Castelli, an attorney for the state. "It's just not in there."

State leaders and the nonprofit group Our Oregon, which intervened in the case, have cited concerns that the Department of Justice wants to use voter data for immigration enforcement. It's both illegal and extremely rare for noncitizens to vote: One study of the 2016 election found just 30 incidents nationwide of suspected noncitizen voting, or 0.0001% of votes cast.

Oregon last year found more than 1,800 people were registered to vote in error despite not providing documents indicating they were citizens while at the state's Motor Vehicle Services Division. Only 39 of those people voted, and several of them later established that they were citizens when they voted.

The state did not pursue criminal charges against any of those voters because none knowingly broke the law, and the Secretary of State's Office added guardrails to prevent similar mistakes.

Branden Lewiston, an attorney representing Our Oregon and several Oregon voters who intervened in the lawsuit, said reporting and public statements from U.S. Department of Justice officials indicated that the federal government is trying to create a national voter registration

list and run it through databases held by the Department of Homeland Security and the U.S. DOGE Service, an initiative formerly led by Trump campaign donor Elon Musk.

The federal government would then use that data to identify people it wants to remove from voter rolls, Lewiston said.

A few days before the federal government sued Oregon, an unnamed spokesperson for the Department of Justice told Stateline that the department is sharing voter information with the Department of Homeland Security to search for noncitizens to "scrub aliens from voter rolls."

The federal government is suspicious of Oregon's voter rolls in part because the state succeeded in registering more eligible voters than the national average. More than 95% of U.S. citizens aged 18 or older in Oregon were registered to vote ahead of the November 2024 election, compared to 73.6% of adult citizens nationwide.

"When you see a state that's consistently above 90% of the citizen voting age population, it's a potential yellow flag," federal attorney James Thomas Tucker said. "When the state goes above the 95% threshold, that's a red flag."

Oregon was the first state in the nation to automatically register adult citizens to vote when they obtain or renew driver's licenses or state ID cards at the Motor Vehicle Services Division, and the number of registered voters rose to more than 3 million in the decade since that law took effect.

The state also automatically restores voting rights to people convicted of felonies after they complete their sentences, while other states restrict voting rights in perpetuity or until someone convicted of a crime pays fines and petitions the government to have their voting rights restored.

Oregon also regularly leads the nation in voter turnout, though rates have declined since automatic voter registration added more voters to the rolls. Last year's presidential election had a 75.4% turnout in Oregon, down from the 2004 peak of 86.5%, but well above the national 65.3% turnout.

Oregon and Maine were the first two states the Trump administration sued on Sept. 16, though it has now sued at least 23 states. Kasubhai's early questions of Tucker centered on differences between the Oregon lawsuit and subsequent complaints against other states.

The lawsuits against Oregon and Maine allege the states violated the National Voter Registration Act, the Help America Vote Act and Title III of the Civil Rights Act of 1960 by not turning over voter data. More recent lawsuits, including two filed against Arizona and Connecticut last week, rely only on the Civil Rights Act.

That law requires all election officers to maintain, for 22 months after a federal election, all records, including voter registrations, for everyone who voted in that election and make those documents available for the U.S. attorney general to inspect and copy.

“There was certainly a realization within the department that we were making our jobs more difficult than we needed to make them,” Tucker said.

But Kasubhai was skeptical that the Civil Rights Act, which passed as part of a series of laws targeting discrimination including disenfranchisement of Black voters, was relevant to the federal government’s argument.

“I can appreciate that the context in which the Civil Rights Act was promulgated was because of the historical exclusion of people on the basis of race from voting,” he said. “And so I think exclusion was the primary consideration, not over-inclusion.”

**5:50 PM**

*Updated with decision from U.S. District Court Judge Mustafa Kasubhai.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**1:25-CV-1338**
**(MAD/PJE)**

**BOARD OF ELECTIONS OF THE STATE OF NEW YORK, *et al.*,**

**Defendants.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
| --- | --- |
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>150 M St. NE - Ste 8-139<br>Washington, District of Columbia 20002<br>Attorney for Plaintiff | **ERIC NEFF, ESQ.** |
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>950 Pennsylvania Avenue, NW<br>Washington, District of Columbia 20530<br>Attorneys for Plaintiff | **GREGORY DOLIN, ESQ.**<br>**JAMES T. TUCKER, ESQ.** |
| **OFFICE OF THE UNITED**<br>**STATES ATTORNEY**<br>James T. Foley U.S. Courthouse<br>445 Broadway<br>Albany, New York 12207<br>Attorney for Plaintiff | **JOHN A. SARCONE, III, First Assistant United States Attorney** |
| **HARRIS BEACH MURTHA**<br>**CULLINA PLLC**<br>445 Hamilton Avenue, Suite 1206<br>White Plains, New York 10601<br>Attorney for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola | **BRIAN GINSBERG, ESQ.** |
| **HARRIS BEACH MURTHA**<br>**CULLINA PLLC** | **THOMAS J. GARRY, ESQ.** |

333 Earle Ovington Blvd, Suite 901
Uniondale, New York 11553
Attorney for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola

**HARRIS BEACH MURTHA CULLINA PLLC**
677 Broadway - Suite 1101
Albany, New York 12207
Attorneys for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola

**DANIEL R. LECOURS, ESQ.**
**ELLIOT AARON HALLAK, ESQ.**
**LISA A. LECOURS, ESQ.**

**NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**
28 Liberty Street
New York, New York 10005
Attorney for Defendant State of New York

**YUVAL RUBINSTEIN, AAG**

**EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
Attorneys for Intervenor Defendants National Association for the Advancement of Colored People and National Association for the Advancement of Colored People New York State Conference

**ANDREW G. CELLI , JR., ESQ.**
**CLAIRE ABBADI, ESQ.**
**DANIEL M. EISENBERG, ESQ.**
**KATHERINE R. ROSENFELD, ESQ.**

**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Washington, District of Columbia 20001
Attorneys for Intervenor Defendants National Association for the Advancement of Colored People and National Association for the Advancement of Colored People New York State Conference

**ARIA BRANCH, ESQ.**
**CHRISTOPHER D. DODGE, ESQ.**
**TINA MENG MORRISON, ESQ.**

**BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW**
120 Broadway, Suite 1750
New York, New York 10271
Attorney for Intervenor Defendant League of Women Voters of New York State

**PATRICK BERRY, ESQ.**

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER**<br>1101 14th St. NW - Suite 400<br>Washington, District of Columbia 20005<br>Attorneys for Intervenor Defendant League of Women Voters of New York State | **ALEXIS D. GRADY, ESQ.**<br>**DANIEL S. LENZ, ESQ.**<br>**HEATHER J. SZILAGYI, ESQ.**<br>**KATE R. HAMILTON, ESQ.**<br>**RENATA O'DONNELL, ESQ.**<br>**ROBERT B. FERGUSON, ESQ.**<br>**SEJAL JHAVERI, ESQ.** |
| **BRENNAN CENTER FOR JUSTICE**<br>777 6th St. NW - Suite 1100<br>Washington, District of Columbia 20001<br>Attorney for Intervenor Defendant League of Women Voters of New York State | **MAURA E. O'CONNOR, ESQ.** |
| **JOHN L. O'KELLY**<br>339 Richard Avenue<br>Hicksville, New York 11801-1248<br>Attorney for Amicus NY Citizens Audit Civic Fund, Inc. d/b/a RealAmerica.Vote | **JOHN L. O'KELLY, ESQ.** |
| **DEMOCRATIC NATIONAL COMMITTEE**<br>430 South Capitol St SE #3<br>Washington, District of Columbia 20003<br>Attorney for Amicus Democratic National Committee | **DANIEL J. FREEMAN, ESQ.** |
| **OFFICE OF THE ATTORNEY GENERAL STATE OF MARYLAND**<br>Civil Litigation Division<br>200 Saint Paul Place, 20th Floor<br>Baltimore, Maryland 21202<br>Attorney for Amicus Maryland | **DANIEL M. KOBRIN, AAG** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff United States of America ("Plaintiff" or the "Government") brings this civil action to compel the production of the State of New York's complete and unredacted computerized voter registration list against Defendants the Board of Elections of the State of New

York (the "BOE"); Co-Executive Directors of the BOE Kristen Zebrowski Stavisky, Raymond Riley, III, and Peter Kosinski; Commissioners of the BOE Henry Berger, Anthony Casale, and Essma Bagnuola; and the State of New York ("New York" or the "State"). *See* Dkt. No. 1. This case mirrors dozens of similar actions brought by the Government in district court across the country, seeking the production of state voter registration lists.

Presently before the Court are (1) motions to intervene filed by the National Association for the Advancement of Colored People and the National Association for the Advancement of Colored People New York State Conference ("NAACP Intervenors"), and the League of Women Voters of New York State ("LWV Intervenors") (collectively, "Intervenor Defendants"), *see* Dkt. Nos. 7, 20; (2) motions to dismiss filed by (a) the State, (b) Defendants Essma Bagnuola, Henry Berger, Kristen Zebrowski Stavisky,[1] and (c) Intervenor Defendants, *see* Dkt. Nos. 73, 74, 76, 77; (3) amicus briefs filed by amici NY Citizens Audit Civic Fund, Inc. d/b/a RealAmerica.Vote ("NYCA"), the Democratic National Committee, and the states of Arizona, California, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, by and through their respective Attorneys General (the "Seventeen Amici States"), *see* Dkt. Nos. 46, 51, 78, 79; (4) Plaintiff's cross-motion to compel, *see* Dkt. No. 81; and (5) numerous notices of supplemental authority and responses thereto, *see* Dkt. Nos. 64, 91, 92, 94, 95, 96, 97, 98.

For the reasons that follow, the motions to intervene and motions to dismiss are granted, and Plaintiff's cross-motion to compel is denied.

---

[1] As explained in Plaintiff's briefing, Defendants Bagnuola, Berger, and Zebrowski Stavisky are the Democratic appointees to the BOE. *See* Dkt. No. 81-1 at 6 n.1. Defendants Anthony Casale, Peter Kosinski, Raymond Riley, III, the remaining defendant members of the BOE, answered the complaint and have not moved to dismiss. *See* Dkt. No. 75. For ease of reference, Defendants New York, Bagnuola, Berger, and Zebrowski Stavisky will be referred to as "Defendants" herein.

## II. BACKGROUND

### A. Relevant Legal Background

At the forefront of the discussion of this lawsuit are the Constitutional principles of federalism and the separation of powers. Pursuant to the Elections Clause of the United States Constitution, the States are empowered, in the first instance, to regulate and administer elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1. As the Supreme Court has explained,

> times, places and manner . . . [are] comprehensive words [that] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932).

It has long been recognized that the Elections Clause entrusts the administration of federal elections to the States. *See United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day, with the exception, as we have seen, of twenty-four years, was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . ."). "In practice, the [Elections] Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted).

Among those statutes enacted by Congress to regulate elections are Title III of the Civil Rights Act of 1960 ("Title III" or the "CRA"), the National Voter Registration Act (the "NVRA"),and the Help America Vote Act ("HAVA")[2]—the statutes the Government now invokes in its pursuit to compel disclosure of New York's unredacted voter registration list.

***1. Title III***

As relevant here, Title III requires state election officials to "retain and preserve, for a period of twenty-two months from the date of [certain elections], all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." 52 U.S.C. § 20701.[3] Section 20703 permits the Attorney General to demand production of § 20701 documents:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

52 U.S.C.A. § 20703. Additionally, § 20703 requires that "[t]his demand shall contain a statement of the basis and the purpose therefor." *Id.*

***2. The NVRA***

Congress enacted the NVRA in 1993 with "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). The NVRA states four purposes: (1) "to

---

[2] *See* 52 U.S.C. § 20701 *et seq.*; 52 U.S.C. § 20501 *et seq.*; 52 U.S.C. § 20901 *et seq*.

[3] The Court will refer the records and papers subject to § 20701 as "§ 20701 documents" for purposes of this Memorandum-Decision and Order.

establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;" (2) "to enhance[ ] the participation of eligible citizens as voters in elections for Federal office;" (3) "to protect the integrity of the electoral process;" and (4) "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

"The NVRA 'erect[s] a complex superstructure of federal regulation atop state voter-registration systems.'" *Husted*, 584 U.S. at 761 (quoting *Arizona*, 570 U.S. at 5). Among other directives, the NVRA "'requires States to provide simplified systems for registering to vote in federal elections,'" *Arizona*, 570 U.S. at 5 (citation and emphasis omitted), and to "'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason of' death or change in residence[,]" *Husted*, 584 U.S. at 761 (quoting 52 U.S.C. § 20507(a)(4)). As relevant here, the NVRA contains a disclosure provision which requires that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with certain exceptions. 52 U.S.C. § 20507(i)(1). The Attorney General, as well as private individuals, may bring civil actions "in an appropriate district court for declaratory or injunctive relief" to enforce the NVRA. *See id.* § 20510(a)-(b).

***3. HAVA***

HAVA requires states to implement, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" containing the names of all registered voters and their pertinent personal information. 52 U.S.C. § 21083(a)(1)(A). Under HAVA, states must "make[ ] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A). Further,

HAVA requires states "to ensure that voter registration records . . . are accurate and are updated regularly," *id.* § 21083(a)(4), including implementing "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters," *id.* § 21083(a)(4)(B). "The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [§ 21083]." *Id.* § 21111.

***4. New York's voter registration list***

New York's "[v]oter registrations are actively maintained through the statewide system known as NYSVoter, the 'official' registration database for all of New York." *Tenney v. Oswego Cnty. Bd. of Elections*, 142 N.Y.S.3d 288, 294 (N.Y. Sup. Ct. 2021) (citations omitted); *see* N.Y. Elec. Law § 5-614. The NYSVoter List contains "the name and registration information of every legally registered voter in [New York]," as well as "a unique identifier for each legally registered voter . . . ." N.Y. Elec. Law § 5-614(3)(b)-(c). The NYSVoter List is in the "custody" of the BOE, and is "administered and maintained" by the BOE. *Id.* § 5-614(1).

**B. Factual Background**

On June 30, 2025, the Government sent a letter to Defendants Stavisky and Riley, Co-executive directors of the BOE. *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3.[4] In the June 30, 2025

[4] Defendants have submitted copies of the June 30, 2025 letter, a subsequent letter from the United States dated August 14, 2025, as well as letters from the BOE dated July 24 and August 29, 2025. *See* Dkt. Nos. 74-3, 74-4, 74-5, 74-6, 74-7, 76-2, 76-3, 76-4, 76-5. This correspondence between the Government and the BOE is expressly referenced and quoted in the complaint. *See* Dkt. No. 1 at ¶¶ 42-48. As such, the letters are incorporated in the complaint by reference and the Court will consider them in deciding the present Rule 12(b)(6) motions. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference[,]'" and "[e]ven where a document is not incorporated

letter, the Government requested certain information pertaining to the NYSVoter List and New York's compliance with HAVA. *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3 at 2-3. The BOE acknowledged the June 30, 2025 letter in a letter dated July 24, 2025. *See* Dkt. No. 1 at ¶ 44. On August 14, 2025, the Government sent another letter to "clarify" the scope of the June 30, 2025 letter. *See id.* at ¶¶ 45-47; Dkt. No. 74-4 at 2. The August 14, 2025 letter stated that the requested NYSVoter List disclosure "should contain all fields, which means, [it] must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under [§ 21083(a)(5)(A)(i) of HAVA]." Dkt. No. 74-4 at 2.

The August 14, 2025 letter also asserted that the Government sought to "assess [New York's] compliance with the statewide maintenance provisions" of the NVRA, referenced the Attorney General's authority to bring enforcement actions pursuant to 52 U.S.C. § 20501(a), and stated that "the Attorney General is also empowered by Congress to request records" pursuant to Title III of the Civil Rights Act of 1960" under 52 U.S.C. §§ 20701 and 20703. *Id.* at 2-3. Although the final sentence of § 20703 requires that the Attorney General's "demand shall contain a statement of the basis and the purpose therefor," the August 14, 2025 letter did not explicitly state a "basis" and asserted that the "purpose" of the demand was "to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3.

On August 29, 2025, the BOE replied to the Government's letters. *See* Dkt. No. 1 at ¶ 48. The BOE's response reflects a partisan split regarding disclosure of an unredacted version of the NYSVoter List; the Democratic counsel's position was that only the public list without certain

---

by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint") (citations omitted).

identifying information such as last four digits of social security numbers and/or driver's licenses should be shared, while "the Republican counsel maintained that the entire list should be shared with the United States." *Id.* "Given the split, the State . . . only shared the public version of the [NYSVoter List] with the Attorney General." *Id.* The Government claims that the public NYSVoter List disclosed does not contain "information that is necessary for the Attorney General to carry out its duties of NVRA and HAVA enforcement" and prevents the Government from determining whether "New York is conducting effective list maintenance to ensure that the [NYSVoter List] is free of errors such as duplicitous registrations, deceased and noncitizen voters, and voters who have moved." *Id.* at ¶ 49.

Through the present action, the Government claims that it is entitled to New York's unredacted NYSVoter List pursuant to Title III, the NVRA, and HAVA. *See id.* at ¶¶ 1-7. Specifically, the complaint asserts claims pursuant to § 20703 of the CRA, § 20507(i) of the NVRA, and § 21083 of HAVA. *See id.* at ¶¶ 53-70. The Government requests a declaratory judgment as well as an order that "Defendants . . . provide to the United States the current electronic copy of [the NYSVoter List], with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number[,]" pursuant to 52 U.S.C. § 20703. *See id.* at 17-18.[5] Although the Government also alludes to its pursuit of information regarding New York's compliance with the NVRA and HAVA's "list maintenance requirements," *id.* at 17, the only data that the Government seeks to compel disclosure of through this action is the NYSVoter List, *see id.* at 17-18.

[5] This citation is to the pagination generated by CM/ECF, instead of paragraph numbers, as the Court is referring the section of the complaint titled "Prayer for Relief." Unless otherwise noted, citations to documents filed on the docket are to the pagination on the heading such documents, which is generated by CM/ECF, the Court's electronic filing system.

## III. DISCUSSION

### A. Motions to Intervene

The Court will begin by addressing the motions to intervene. *See* Dkt. Nos. 7, 20. NAACP Intervenors contend that they are entitled to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure (or, alternatively, should be permitted to intervene pursuant to Rule 24(b)) because (1) they have significant interests in, *inter alia*, ensuring that the personal information of their members is not disclosed; and (2) the existing parties do not adequately represent those interests. *See* Dkt. No. 7-1 at 9-11. LWV Intervenors also move pursuant to Rules 24(a) and 24(b), arguing that its members are at risk of having their sensitive data disclosed and the existing Defendants do not adequately represent LWV's interests. *See* Dkt. No. 20-1 at 11-20. On December 12, 2025, Plaintiff filed a letter which indicates, *inter alia*, that it "takes no position on any motions to intervene and submits to the court's discretion." Dkt. No. 66 at 1. Defendants have not opposed either motion to intervene.

Rule 24(a) provides that courts must permit a nonparty to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2) And, under Rule 24(b), even if a nonparty is not entitled to intervene as a matter of right, a court may grant permissive intervention where the movant "has a claim or defense that shares with the main action a common question of law or fact" and intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3).

The Second Circuit has held that an applicant seeking intervention as of right or by permission, "must (1) timely file an application, (2) show an interest in the action, (3) demonstrate

that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (citation and internal quotation marks omitted). Courts also consider the following factors in determining whether to grant permissive intervention:

> (1) whether the applicant will benefit by intervention, (2) the nature and extent of the intervenors' interests, (3) whether [the intervenors'] interests are adequately represented by the other parties, and (4) whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*Kearns v. Cuomo*, No. 19-CV-00902, 2019 WL 5060623, *4 (W.D.N.Y. Oct. 9, 2019) (quoting *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 102 (D. Conn. 2007)).

Although the Court has some doubt about whether intervention as of right is available under Rule 24(a)(2) (particularly with respect to whether Intervenor Defendants' interests are protected adequately by the parties), permissive intervention is nonetheless appropriate. Indeed, it appears that Intervenor Defendants have "a claim or defense that shares with the main action a common question of law or fact," the motions to intervene were timely filed within thirty days of the commencement of this action, no prejudice would stem from granting these unopposed motions, and Intervenor Defendants have submitted proposed briefing that significantly contributes to the development of the factual and legal issues presented. Fed. R. Civ. P. 24(b); *see Kearns*, 2019 WL 5060623, at *4. Accordingly, both motions to intervene are granted and the Court will consider the Intervenor Defendants' filings.[6]

---

[6] Because the Court grants the motions to intervene, the Court also grants Intervenor Defendants' motions for leave to file motions to dismiss. *See* Dkt. No. 73 at ¶¶ 7-14; Dkt. No. 77 at 1-2; *see also* Wright & Miller, Federal Practice and Procedure § 1920 (3d ed. 2021) ("[T]he intervenor is entitled to litigate fully on the merits once intervention has been granted . . . [and] may move to dismiss the proceeding"). Intervenor Defendants properly filed their respective proposed motions

## B. Appropriate Legal Standard

### *1. Judicial Review of a Title III Demand*

The parties dispute the applicable standard of review for this case. According to Plaintiff, it is entitled under Title III to a "special statutory proceeding," under which the Court's review is restricted to a "severely limited" inquiry. Dkt. No. 81-1 at 11-15. Defendants and Intervenor Defendants contend that the Court should apply the motion to dismiss standard as contemplated by the Federal Rules of Civil Procedure. *See* Dkt. No. 74-1 at 13-14; Dkt. No. 76-6 at 11; Dkt. No. 73-2 at 19; Dkt. No. 77-1 at 14-15.

Plaintiff's only support for its position is a series of Fifth Circuit cases from the early 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Dkt. No. 81-1 at 14. In *Lynd*, the Fifth Circuit considered its role in evaluating a Title III demand by the Attorney General for voter records, made to investigate the "infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. The court reasoned that Title III creates a "special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26. The Fifth Circuit concluded that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226.

Here, the Court joins the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited. *See United States v. Fontes*, No. 26-CV-00066, 2026 WL 1177244, *1 (D. Ariz. Apr. 28, 2026) ("Each court which addressed the issue

---

to dismiss in accordance with the parties' so-ordered scheduling request. *See* Dkt. No. 68. Thus, the Court accepts NAACP Intervenors' motion to dismiss filed at Dkt. No. 77 and LWV Intervenors' motion to dismiss filed at Dkt. No. 73.

found that the Federal Rules of Civil Procedure apply to the Attorney General's lawsuit") (collecting cases); *see, e.g.*, *United States v. Benson*, 819 F. Supp. 3d 753, 766 (W.D. Mich. 2026) ("Here, the procedural circumstances are somewhat abnormal because the United States brings its CRA records request alongside claims under the NVRA and HAVA, which do not confer administrative subpoena authority. The United States' complaint thus takes the form of a traditional civil complaint, not a petition for summary enforcement. Accordingly, the Court will apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim"); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026) ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures") (footnote omitted); *United States v. Amore*, No. 25-CV-00639, 2026 WL 1040637, *4 (D.R.I. Apr. 17, 2026) ("[T]he appropriate standard of review for this case is that common to motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6)"); *United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402, *8 (D. Or. Feb. 5, 2026) ("[T]he Court applies the Federal Rules of Civil Procedure as in any other case. There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place"); *cf. United States v. Wis. Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354, *2 (W.D. Wis. May 21, 2026) (declining to resolve dispute regarding whether Rule 12(b)(6) or a summary proceeding standard is appropriate because "the court's analysis of the dispositive issue would be the same either way").

Plaintiff cites no binding authority for its position that the Federal Rules of Civil Procedure (including the motion to dismiss standard) are inapplicable. Indeed, the text of Title III does not expressly provide for the type of proceeding proposed by Plaintiff. Rather, Title III

provides that district courts have jurisdiction over voting records demands "by appropriate process." 52 U.S.C. § 20705. Although the statute does not define "appropriate process," the Supreme Court's holding in *United States v. Powell*, 379 U.S. 48 (1964) categorically contradicts Plaintiff's reliance on *Lynd*. In *Powell*, the Supreme Court interpreted 26 U.S.C. § 7604(a), a statute similar to 52 U.S.C. § 20705, and explained that "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." *Powell*, 379 U.S. at 58 & n.18.

Moreover, "*Lynd* appears to contemplate an application directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1 (citing *Lynd*, 306 F.2d at 225). Here, Plaintiff commenced the instant action by filing a complaint and proceeding through ordinary litigation. *See* Dkt. No. 1. Perhaps recognizing that other district courts have rejected the characterization of nearly identical actions brought by the United States as "special proceedings," Plaintiff asserts through its cross-motion that "it is unnecessary for the Court to address [the Government's] claims under the NVRA and HAVA, which mandate production through the normal litigation process" and instead, Plaintiff's "CRA claim is dispositive of all the relief that it seeks through Title III's 'severely limited inquiry' in a 'summary proceeding.'" Dkt. No. 81-1 at 11. The Court rejects Plaintiff's belated attempt to recharacterize this matter. *See Weber*, 816 F. Supp. 3d at 1182 ("Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause").

For these reasons, the Court finds that the Federal Rules of Civil Procedure provide "appropriate process" and will apply Rule 12(b)(6) standards in evaluating the sufficiency of Plaintiff's allegations.

***2. Rule 12(b)(6) Standard***

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement of relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a

plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

In deciding a motion to dismiss, the court may consider "documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken[.]" *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted). "Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)).

**C. The Motions to Dismiss**

Defendants and Intervenor Defendants contend that the Government's complaint must be dismissed for the following reasons: (1) a voter registration list is not a record subject to production under Title III or the NVRA; (2) Plaintiff failed to provide an adequate statement of basis and purpose, as statutorily required under Title III; (3) the NVRA does not require the disclosure of an electronic version the NYSVoter List and, even if it did, the redaction of highly sensitive voter registration information does not violate the NVRA; (4) HAVA provides no statutory basis for Plaintiff's demand because it contains no inspection or disclosure provisions; (5) New York is not a proper party because it does not possess the NYSVoter List; and (6) Plaintiff's demand is barred by state and federal privacy laws and the complaint fails to allege compliance with federal privacy statutes. *See* Dkt. No. 73-2 at 19-33; Dkt. No. 74-1 at 13-25; Dkt. No. 76-6 at 11-34; Dkt. No. 77-1 at 15-29. Defendants' amici echo these arguments. *See*

Dkt. No. 78-2 at 6-15; Dkt. No. 79-1 at 11-16.[7] Amicus curiae NYCA voices its support for the Government's position. *See* Dkt. No. 51.[8]

**D. A Voter Registration List is Not a Record Subject to Production Under Title III**

Some district courts analyzing the Government's invocation of Title III in similar demands for voter registration lists have focused on the "basis" and "purpose" requirements imposed by 52 U.S.C. § 20703. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86; *Oregon*, 2026 WL 318402, at *8-10. This Court observes the same deficiencies in Plaintiff's demand to New York; Plaintiff's demand states no basis and the purported "purpose" of "ascertain[ing] New York's compliance with the list maintenance requirements of the NVRA and HAVA" lacks any relation to the purposes for which Title III was enacted. *See Oregon*, 2026 WL 318402, at *9-10 (concluding that "Plaintiff's August 14 Letter contains no statement of a factual basis for believing Oregon

[7] The Seventeen Amici States also present arguments regarding to the Government's purported motivations for demanding the NYSVoter List in light of similar demands the Government has made for personal data collected by various states in administering the Supplemental Nutrition Assistance Program and Medicaid. *See* Dkt. No. 79-1 at 6-9. Faced with analogous arguments, some district courts have noted their concern regarding the Government's potential ulterior motives for seeking sensitive voter data. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1186; *Oregon*, 2026 WL 318402, at *11. The Court understands these critical privacy considerations, and does not take them lightly. However, whatever motivations the Government may have is not dispositive of the issues presently before the Court (i.e, whether the allegations in complaint, taken as true, can survive the pending motions to dismiss). *See United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *3 n.6 (D. Me. May 21, 2026) (acknowledging that "Defendants, Defendant-Intervenors, and various *amici curiae* have repeatedly and loudly cast aspersions on the Department of Justice's reasons for seeking so many states' [voter registration lists]," but reiterating that "this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true") (citations omitted).

[8] NYCA provides an impassioned account of the reasons why it believes Plaintiff is "the only party left in the nation with the right to enjoin election administrators in defense of fair elections." Dkt. No. 51 at 17-18. In terms of substance, however, NYCA does not raise any arguments that alter the Court's decision herein.

violated the NVRA or HAVA" and "Plaintiff's stated purpose [of] investigat[ing] list maintenance procedures . . . lack[s] any reference or relation to the purposes for which Title III was enacted").

However, the Court need not even reach § 20703's basis and purpose requirements because Plaintiff's CRA claim fails at the outset for an even more fundamental reason—the Attorney General is simply not entitled to the NYSVoter List under Title III. This conclusion is supported by six recent district court decisions which have determined that voter registration lists are not records subject to retention and preservation under § 20701. *See Benson*, 819 F. Supp. 3d at 770;[9] *United States v. Scanlan*, No. 25-CV-371, 2026 WL 1864054, *6 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. 25-CV-3934, 2026 WL 1780586, *5 (D. Md. June 18, 2026); *Wis. Elections Comm'n*, 2026 WL 1430354, at *3; *United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *6-7 (D. Me. May 21, 2026); *Fontes*, 2026 WL 1177244, at *7. Indeed, although the briefing before the Court is primarily concerned with whether the Government's demand contained an adequate "statement of the basis and the purpose therefor" under § 20703, "this issue is moot if the [NYSVoter List] is not a § 20701 document in the first instance." *Fontes*, 2026 WL 1177244, at *3.

To reiterate the statutory framework which forms the basis of Plaintiff's CRA claim: "under § 20703, the Attorney General may only request documents that are 'required by [§ 20701] to be retained and preserved.'" *Id.* (quoting 52 U.S.C. § 20703). These § 20701 documents are those "'which come into [a state officer of election's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in' certain federal elections." *Id.*

---

[9] The Sixth Circuit recently affirmed the district court's decision in *Benson*, agreeing that "Title III's narrow text cannot withstand the weight of the government's broad request." *United States v. Benson*, No. 26-1225, 2026 WL 1815425, *1 (6th Cir. June 24, 2026).

(quoting 52 U.S.C. § 20701). The Attorney General must make a demand for § 20701 documents in writing, containing a statement of "the basis and the purpose therefor." 52 U.S.C. § 20703.

Whether the NYSVoter List is a § 20701 document is a question of statutory interpretation. *See Wis. Elections Comm'n*, 2026 WL 1430354, at *3. "As in any statutory construction case, '[courts] start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91 (2006)). "Statutory language, however, 'cannot be construed in a vacuum.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dept. of Treasury,* 489 U.S. 803, 809 (1989)). "'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting *Davis*, 489 U.S. at 809). Another "longstanding canon[] of statutory construction" is that courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

As first articulated in *Benson* and reiterated in *DeMarinis*, a voter registration list is not a § 20701 document because it is created by state officials and, therefore, "does not 'come into [their] possession.'" *DeMarinis*, 2026 WL 1780586, at *4; *see Benson*, 819 F. Supp. 3d at 768-69. "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 819 F. Supp. 3d at 768 (collecting sources) (emphasis in original). "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." *Id.* (collecting sources) (emphasis in original).

Congress chose to qualify what records were subject to a demand under Title III; "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," but it did not. *Id.* Thus, to give effect to the phrase "come into [their] possession" and prevent it from being surplusage, this Court joins the district courts that interpret "the phrase as referring to only those documents that state election officials receive from prospective voters." *Id.*; *see Bellows*, 2026 WL 1430481, at *6 n.10 ("Coming into possession of something most naturally implies receipt from an external source. Congress could have required the retention and production of all election-related records and papers 'in the possession of' the state election official but did not. The 'natural implication' of the failure to adopt this 'obvious alternative' is that Congress did not intend the alternative") (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)) (other citation omitted).

In *Benson*, the district court bolstered this interpretation of "come into [their] possession" by looking to the next phrase in the statute: "'relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.'" *Id.* at 768 (quoting 52 U.S.C. § 20701). "Each of these terms refers to something that the voter submits or does as part of the registration process," and, as such, refers to "records that election officials *receive*, rather than *create*." *Id.* at 768-69 (emphasis in original). "Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Id.* at 769 (citation omitted). "The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create." *Id.*

Moreover, looking at the statutory scheme, interpreting § 20701 to include the NYSVoter List would not be harmonious with an adjacent provision, 52 U.S.C. § 20702, and would place

Title III in conflict with the NVRA and HAVA. Section 20702 prohibits, *inter alia*, the alteration of any § 20701 document. *See* 52 U.S.C. § 20702 ("Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both"). "[A voter registration list], unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered." *DeMarinis*, 2026 WL 1780586, at *5. "The NVRA was enacted, in part, to 'ensure that accurate and current voter registration rolls are maintained[,]'" and "creates a scheme, under which, states are required to 'protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll.'" *Fontes*, 2026 WL 1177244, at *4 (quoting 52 U.S.C. § 20501(b)) (emphasis in original). Similarly, "HAVA requires state[s] to 'perform list maintenance with respect to the computerized list *on a regular basis*.'" *Id.* at *5 (quoting 52 U.S.C. § 21083(a)(2)(B)) (emphasis in original).

Therefore, if the NYSVoter List were deemed a § 20701 document, "then § 20702 would prohibit the [NYSVoter List] from being altered." *Id.* "This conclusion would directly conflict with both the NVRA and the HAVA, which affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Id.* Interpreting § 20701 in this manner would produce an absurd result. Thus, based on the text of § 20701, this Court finds that the NYSVoter List is not a document subject to demand by the Attorney General pursuant to § 20703.

The Government's arguments to the contrary are unpersuasive. *See* Dkt. No. 81-1 at 18-20. The Government contends that "the federal courts that have applied [§ 20701] have concluded that . . . [i]t does not exclude electronic records or records created by the officer of election," relying on *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) and

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *Id.* at 19. However, neither of these cases contain any affirmative findings that bind this Court's interpretation of § 20701. *See Fontes*, 2026 WL 1177244, at *5 (observing that both *Gallion* and *Lynd* "essentially reiterate the plain text of § 20701 and do not make any affirmative findings which would suggest that the [voter registration list] is covered by § 20701"). *Gallion* concerned the constitutionality of the CRA, and the court explained that "[t]here is nothing uncertain about that part of the [CRA] requiring the preservation and production of all records and papers which are in the possession of an election official . . . *if those records and papers relate to the acts requisite to voting*." *Gallion*, 187 F. Supp. at 855 (emphasis added). "Similarly, *Lynd* merely recognized that the documents covered by § 20701 are 'sweeping,' but did not make any additional finding which would suggest that § 20701's 'sweeping' language includes the [voter registration list]." *Fontes*, 2026 WL 1177244, at *5 (quoting *Lynd*, 306 F.2d at 226).

The Government also references its 2006 consent judgment with Georgia, as well as a 2008 Memorandum of Understanding with Texas, wherein those states agreed to provide their voter registration lists. *See* Dkt. No. 81-1 at 20 n.10. However, the Government provides no authority that would support a conclusion that these agreements between the United States and states that are not party to the present action are binding here. *See Taylor v. Sturgell*, 553 U.S. 880, 898 (2008) ("[O]ur decisions emphasize the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party") (collecting cases); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings") (footnote omitted). And, of course, the mere fact that other states agreed to provide their voter registration lists two decades ago is entirely irrelevant to a statutory interpretation of § 20701.

Additionally, the Government relies on *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312, 2025 WL 1503937, *2 (D.N.H. May 27, 2025) ("*Open Democracy*"), asserting that "private parties have been granted access to even more detailed voter data than what the [the Government] has requested where necessary to bring actions to enforce federal rights." Dkt. No. 81-1 at 26. In *Open Democracy*, the district court ordered disclosure of New Hampshire's voter registration list during discovery in a lawsuit challenging the constitutionality of a bill that made "changes to New Hampshire's voter registration and identification requirements" *Open Democracy*, 2025 WL 1503937, at *1. As Defendants correctly note, *Open Democracy* is inapposite because "disclosure was not pursuant to Title III or an investigative demand, nor was the recipient a federal agency." Dkt. No. 87 at 18 n.6. As such, nothing in *Open Democracy* bears on this Court's analysis of whether the NYSVoter List is a § 20701 document.

Finally, in a supplemental filing, the Government submits an opinion published by the Department of Justice's Office of Legal Counsel ("OLC") on May 12, 2026, which determined that the CRA authorizes the Government to compel production of the NYSVoter List. *See* Dkt. No. 97-1. The Sixth Circuit explicitly rejected the Government's reliance on the OLC opinion in *Benson*, noting that the Government's interpretation is "not contemporaneous with the passage of Title III[,]" does not adhere "to some earlier Executive Branch interpretations of Title III[,]" and "conflicts with the plain language of Title III." *Benson*, 2026 WL 1815425, at *8. Indeed, OLC opinions "are not binding [on the courts]," *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023), and "[t]his Court will not interpret the CRA contrary to its text simply because an office of the party advancing that interpretation has adopted it," *DeMarinis*, 2026 WL 1780586, at *5.

For these reasons, this Court joins every district court to have addressed this issue in concluding that a voter registration list is not a record or paper that a state must produce to the Government under Title III. *See Benson*, 819 F. Supp. 3d at 770; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5. Accordingly, the Government's CRA claim is dismissed and its cross-motion to compel is denied as moot.[10]

**E. The NVRA**

As for the Government's claim that it is entitled to the NYSVoter List under the NVRA, the Government focuses on the statute's public disclosure provision, arguing that New York violated § 20507(i) by refusing to disclose its full voter registration list. *See* Dkt. No. 81-1 at 35. Defendants contend that the NYSVoter List is not a record subject to a demand under the NVRA and, even if it were, sensitive voter information can be omitted or redacted. *See* Dkt. No. 74-1 at 20-23; Dkt. No. 76-6 at 20-25.

Many courts analyzing § 20507(i) have concluded that the statute does not require states to disclose the sensitive information of voters. *See Benson*, 819 F. Supp. 3d at 760 (collecting cases). In so holding, some courts have reasoned that the NVRA does require the disclosure of

[10] On April 9, 2026, NAACP Intervenors filed a notice of supplemental authority regarding *United States v. Galvin*, No. 25-CV-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026). *See* Dkt. No. 92. In *Galvin*, the District of Massachusetts ruled that the Attorney General's written demand letters did not provide an adequate factual basis as required under § 20703. *See Galvin*, 2026 WL 972129 at *6. In response to this notice of supplemental authority, Plaintiff requests that, if the Court were to come to the same conclusion as *Galvin*, Plaintiff be permitted leave to send the Defendants "a curing elaboration letter" (presumably containing some factual basis for its Title III demand). Dkt. No. 94 at 2. However, the Court dismisses the CRA claim on the grounds that the NYSVoter List is not a record or paper subject to demand under Title III, and does not reach the basis of Plaintiff's demand. As such, Plaintiff's request is denied as moot.

voter registration lists, but that states may redact voters' "uniquely or highly sensitive personal information." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

However, this Court finds it unnecessary to read a privacy exception into the NVRA that would permit limited disclosure of the NYSVoter List. Indeed, similar to the CRA claim, the Government's NVRA claim fails for a much simpler reason: § 20507(i) does not require the disclosure of voter registration lists at all. *See Benson*, 819 F. Supp. 3d at 762 ("[I]f § 20507(i) does not require disclosure of voter registration lists (or other information regarding individual voters), then there is no need to graft on an atextual privacy exception"). This Court finds itself in agreement with at least two other federal courts which recently determined that a voter registration list does not fall under § 20507(i) because Congress intended the statute to apply only to records pertaining to the NVRA's required list maintenance process (not the lists themselves). *See Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 679-83 (9th Cir. 2026); *Benson*, 819 F. Supp. 3d at 762. In reaching this conclusion, the Court utilizes the same tools for statutory interpretation described above.

To begin, § 20507(i) states in its entirety:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507 (emphasis added).

The phrase "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," *id.*. § 20507(i)(1), is important because it "narrows the scope of materials subject to public disclosure," *Nago*, 174 F.4th at 679. In order to "give effect, if possible, to every clause and word of" the statute, *Williams v. Taylor*, 529 U.S. 362, 404 (2000), the Court must determine whether the NYSVoter List is in fact a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," 52 U.S.C. § 20507(i)(1). "[A] natural reading of that language encompasses only records about the *process* that a state uses to maintain their voter list—not the underlying list itself." *Benson*, 819 F. Supp. 3d at 762 (emphasis added).

To be sure, "several courts have rejected this interpretation of § 20507(i) and adopted a broader reading under which any documents related to the maintenance process—including voter registration lists—must be disclosed." *Id.* (collecting cases). For example, in *Pub. Int. Legal Found., Inc. v. Bellows*, the District of Maine reasoned that a voter registration list is a record "concerning" the activities used to maintain the voter registration list because that list is "the output and end result of such activities." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th at 47. However, this Court agrees with *Benson*'s conclusion that *Pub. Int. Legal Found., Inc. v. Bellows* and other non-binding cases are unpersuasive. *See id.*

Instead, in addition to *Benson*, this Court is persuaded by the Ninth Circuit's recent interpretation of § 20507(i) in *Nago*:

> The phrase "concerning the implementation of" provides an initial limitation. Contemporaneous dictionaries state that "implement" connotes execution or administration—"to give practical effect to." *See Implement*, Webster's Third New International Dictionary (1993); *see also Implement*, Webster's Dictionary of English *680

> Usage (1989) (stating that "implement" "typically describes the taking of concrete measures to carry out an official policy or program"). The inclusion of that word suggests that covered records are those that describe measures to maintain the accuracy and currency of voter lists, not the lists themselves . . . . "Concerning" does have a "broadening effect," *see Patel v. Garland*, 596 U.S. 328, 339 (2022), but its sole object here is the word "implementation," not "all records." The category of "records concerning . . . implementation" therefore encompasses materials documenting each step a state undertakes when actively implementing relevant programs. Examples of records that would "concern[ ] implementation" might include duplicate-removal reports, procedural manuals about list maintenance tasks, or correspondence with voters, but not the very voter-registration lists that the implemented efforts seek to update and maintain. *See* 52 U.S.C. § 20507(d)(1)-(2) (requiring states to send confirmation notices before removing voters for changing their residence); *id.* at § 20507(c)(2)(A).
>
> The next clause—"programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"—further cabins the disclosure requirement. A "program" is "a proposed project or scheme," *Program*, Webster's Third New International Dictionary, and an "activity" is a "natural or normal function or operation," *Activity*, Webster's Third New International Dictionary. Both terms relate to active processes or the plan for carrying them out, not the outcome of those processes.

*Nago*, 174 F.4th at 679-80 (internal citation omitted).

Moreover, the Ninth Circuit reasoned that although the phrase "all records" broadens the scope of records subject to disclosure under the statute, courts "construe statutory language in context and 'limit otherwise capacious terms when that context "tug[s] . . . in favor of a narrower reading."'" *Id.* at 680 (quoting *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 953 (9th Cir. 2020)). "Here, Congress drafted a nuanced disclosure provision that includes qualifying language. If Congress had wanted to require that states make a statewide voter list public, it could have just said so." *Id.* at 680-81 (citing *Biden v. Texas*, 597 U.S. 785, 798 (2022)).

Some courts also reason that § 20507(i)(2) implies that "that the records required to be disclosed in paragraph (1) encompass information regarding individual voter applicants." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1339 (N.D. Ga. 2016) (citations omitted). But this Court reads § 20507(i)(2) differently. Reading the statute as a whole, the records referenced by § 20507(i)(2) "are administrative records relating to a discrete program for 'ensuring the accuracy and currency' of the voter lists, . . . which suggests that other covered records would also concern the active implementation of such programs." *Nago*, 174 F.4th at 681 (quoting 52 U.S.C. § 20507(i)(1)) (internal citation omitted).

In sum, this Court finds the Ninth Circuit's and Western District of Michigan's thorough analyses and statutory interpretation to be the most persuasive.[11] The Court agrees that "a natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself. " *Benson*, 819 F. Supp. 3d at 764. This interpretation "avoids the implausible suggestion that Congress intended for every member of the public to access voters' sensitive information" and also "avoids reading into § 20507(i) a privacy exception that appears nowhere in the text." *Id.*

Accordingly, the Court finds that the Government cannot obtain the NYSVoter List under § 20507(i) and the Government's NVRA claim is dismissed for failure to state a claim.[12]

---

[11] In *Nago* a private organization, as opposed to the Government, sought Hawaii's voter registration list. *See Nago*, 174 F.4th at 667. Plaintiff is correct that cases involving "efforts by private organizations to obtain" voter registration lists are distinguishable from cases where the Government seeks the lists, such as here. Dkt. No. 81-1 at 36 (emphasis omitted). Nevertheless, *Benson* is factually analogous to the present matter; there the Government sought Michigan's voter registration list under the NVRA and the district court also concluded that such data was not subject to disclosure under § 20507(i). *See Benson*, 819 F. Supp. 3d. at 757-65. The Court finds that, together, *Nago* and *Benson* offer ample support for the conclusions herein.

[12] The Court's conclusion that the NYSVoter List is not subject to disclosure under Title III or the NVRA obviates the need to reach the parties' arguments related to state and federal privacy laws.

**F. HAVA**

Finally, the Government claims that it is entitled to the NYSVoter List under HAVA, *see* Dkt. No. 1 at ¶¶ 65-70, but concedes that HAVA lacks any inspection or disclosure provisions, *see* Dkt. No. 81-1 at 34. Indeed, courts have explicitly recognized that HAVA has no disclosure provision. *See Oregon*, 2026 WL 318402, at *6 ("HAVA grants the Attorney General the ability to bring a civil action for enforcement, not disclosure. Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist") (citing *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988)).

The complaint states that Defendants' refusal to disclose the unredacted NYSVoter List "prevents the Attorney General from determining New York's compliance with the list maintenance requirements of HAVA." Dkt. No. 1 at ¶ 69. Of course, the Attorney General has the ability to bring a civil action to enforce HAVA's requirements. *See* 52 U.S.C. § 21111. But the Government does not allege New York actually violated any of HAVA's substantive provisions—it merely wishes to "evaluat[e]" and "ensure" New York has not done so. Dkt. No. 1 at ¶¶ 67-68.

The Government's position is that it may "seek list maintenance records under HAVA . . . through the ordinary discovery process necessary to prosecute its [HAVA] claim." Dkt. No. 81-1 at 34. But this argument inverts civil procedure; the Government cannot use discovery in hopes of finding an unpled HAVA violation. *See Jones v. Cap. Cities/ABC, Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y. 1996) ("'[T]he purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists'") (quoting *Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991)).

"To state a claim, 'a complaint must allege sufficient facts . . . to state a plausible claim for relief.'" *Romanova v. Amilus Inc.*, 138 F.4th 104, 108-09 (2d Cir. 2025) (citation omitted). "There is simply no basis in the Federal Rules of Civil Procedure for the [Government's] suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery." *Benson*, 819 F. Supp. 3d at 759 (citations omitted); *see Iqbal*, 556 U.S. at 678-79 ("[O]nly a complaint that states a plausible claim for relief" can "unlock the doors of discovery").

Accordingly, the Government's HAVA claim is dismissed for failure to state a claim.

**IV. CONCLUSION**

After carefully considering the parties' submissions, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Intervenor Defendants' motions to intervene (Dkt. Nos. 7, 20) are **GRANTED**; and the Court further

**ORDERS** that Defendants' and Intervenor Defendants' motions to dismiss (Dkt. Nos. 73, 74, 76, 77) are **GRANTED**; and the Court further

**ORDERS** that the Government's complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Government's cross-motion to compel (Dkt. No. 81-1) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court is directed to enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: July 10, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge

*UNITED STATES DISTRICT COURT*
*NORTHERN DISTRICT OF NEW YORK*

**JUDGMENT IN A CIVIL CASE**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

**vs.** **1:25-CV-1338 (MAD/PJE)**

**BOARD OF ELECTIONS OF THE STATE OF NEW YORK; KRISTEN ZEBROWSKI STAVISKY; RAYMOND RILEY, III; PETER KOSINSKI; HENRY BERGER; ANTHONY CASALE; ESSMA BAGNUOLA; STATE OF NEW YORK,**
**Defendants.**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE NEW YORK STATE CONFERENCE; LEAGUE OF WOMEN VOTERS OF NEW YORK STATE;**
**Intervenor Defendants.**

---

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Intervenor Defendants' motions to intervene (Dkt. Nos. 7, 20) are **GRANTED**; and the Court further **ORDERS** that Defendants' and Intervenor Defendants' motions to dismiss (Dkt. Nos. 73, 74, 76, 77) are **GRANTED**; and the Court further **ORDERS** that the Government's complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further **ORDERS** that the Government's cross-motion to compel (Dkt. No. 81-1) is **DENIED as moot**; and the Court further **ORDERS** that the Clerk of the Court is directed to enter judgment in Defendants' favor and close this case, all of the above pursuant to the Memorandum-Decision and Order of the Honorable Mae A. D'Agostino, dated the 11th day of May, 2026.

DATED: July 10, 2026

Clerk of Court

s/Britney Norton

Britney Norton
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

BOARD OF ELECTIONS OF THE STATE OF NEW YORK; RAYMOND RILEY, III and KRISTEN ZEBROWSKI STAVISKY, in their official capacities as Co-Executive Directors of the Board of Elections of the State of New York; ESSMA BAGNUOLA, HENRY BERGER, ANTHONY CASALE, and PETER KOSINSKI, in their official capacities as Commissioners of the Board of Elections of the State of New York; and the STATE OF NEW YORK,

Defendants.

No. 1:25-CV-1338 (MAD/PJE)

**NOTICE OF APPEAL**

Plaintiff United States of America, by and through the Attorney General, appeals to the United States Court of Appeals for the Second Circuit from this Court's Memorandum-Decision and Order granting the Motions to Dismiss by Defendants and Intervenors and denying the United States' Cross-Motion to Compel (ECF 101) and final judgment (ECF 102) entered in this action on July 10, 2026.

Dated: July 23, 2026

Respectfully submitted:

JOHN A. SARCONE III
First Assistant U.S. Attorney
Northern District of New York

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

GREGORY DOLIN
Senior Counsel
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

*/s/ James Thomas Tucker*
JAMES THOMAS TUCKER
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

Respectfully submitted,

*/s/ James Thomas Tucker*
James Thomas Tucker