# 26-2060

## United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

NEW YORK STATE BOARD OF ELECTIONS, KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co−Executive Director of the Board of Elections of the State of New York, RAYMOND J. RILEY III, in his official capacity as Co−Executive Director of the Board of Elections of the State of New York, PETER S. KOSINSKI, in his official capacity as Commissioner of the Board of Elections of the State of New York, HENRY T. BERGER, in his official capacity as Commissioner of the Board of Elections of the State of New York, ANTHONY J. CASALE, in his official capacity as Commissioner of the Board of Elections of the State of New York, ESSMA BAGNUOLA, in her official capacity as Commissioner of the Board of Elections of the State of New York, STATE OF NEW YORK,

*Defendants-Appellees,*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE NEW YORK STATE CONFERENCE, LEAGUE OF WOMEN VOTERS OF NEW YORK STATE,

*Intervenor-Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of New York

**BRIEF FOR DEFENDANT-APPELLEE STATE OF NEW YORK**

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellee State of New York
350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8407

BARBARA D. UNDERWOOD
*Solicitor General*
JEFFREY W. LANG
*Deputy Solicitor General*
SARAH L. ROSENBLUTH
*Assistant Solicitor General*
*of Counsel*

Dated: September 29, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iv

PRELIMINARY STATEMENT ........ 1

QUESTIONS PRESENTED ........ 3

STATEMENT OF THE CASE ........ 4

A. National Context ........ 4

B. Constitutional Background ........ 9

C. Statutory Background ........ 11

1. Civil Rights Act of 1960 ........ 11

2. National Voter Registration Act of 1993 ........ 13

3. Help America Vote Act of 2002 ........ 15

4. New York State Law ........ 16

D. Factual Background ........ 18

E. Procedural History ........ 20

STANDARD OF REVIEW ........ 22

SUMMARY OF ARGUMENT ........ 22

ARGUMENT ........ 24

POINT I

PLAINTIFF'S COMPLAINT IS NOT EXEMPT FROM THE FEDERAL RULES OF CIVIL PROCEDURE ........ 24

**Page**

POINT II

THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S COMPLAINT ON THE MERITS.................................................26

A. The SVRL is not a covered "record or paper" under the Civil Rights Act of 1960. ......................................................26

1. The SVRL does not "come into possession" of the State Board of Elections; rather, it is created by the Board in the first instance.............................................28

2. The SVRL is a continuously updated, dynamic database that is outside the scope of the Civil Rights Act. ....................................................................37

B. Plaintiff failed to set forth a basis or purpose for its demand for the production of the SVRL................................40

1. Plaintiff failed to set forth a basis for its demand for the production of the SVRL. ..........................................41

2. Plaintiff failed to set forth a cognizable purpose for its demand for the production of the SVRL. ...................45

POINT III

AS AN ALTERNATIVE GROUND TO AFFIRM, PLAINTIFF'S COLLECTION OF THE SVRL IS BARRED BY MULTIPLE FEDERAL AND STATE PRIVACY LAWS ......................................................................49

A. Plaintiff's collection of the SVRL is barred by the federal Privacy Act. ...................................................................50

B. Plaintiff's collection of the SVRL is barred by the federal Driver's Privacy Protection Act. ............................................54

**Page**

C. Plaintiff's collection of the SVRL is barred by the federal E-Government Act. ..... 55

D. The State's production of the SVRL is barred by state law, which is not preempted. ..... 58

CONCLUSION ..... 60

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) .............................................................. 9-10, 13, 58

*Borden v. United States*,
593 U.S. 420 (2021) .............................................................. 34

*Brown v. Davenport*,
596 U.S. 118 (2022) .............................................................. 34

*California v. Trump*,
835 F. Supp. 3d 288 (D. Mass. 2026) .............................................................. 6

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) .............................................................. 42

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .............................................................. 58

*Dep't of Homeland Sec. v. League of Women Voters*,
609 U.S. ---, 2026 WL 2879700 (Sept. 25, 2026) .............................................................. 5-6

*Dept. of Commerce v. New York*,
588 U.S. 752 (2019) .............................................................. 47

*Dieujuste v. Sin*,
125 F.4th 397 (2d Cir. 2025) .............................................................. 22

*Donaldson v. United States*,
400 U.S. 517 (1971) .............................................................. 26

*Fed. Aviation Admin. v. Cooper*,
566 U.S. 284 (2012) .............................................................. 50

*Fontanez v. Skepple*,
563 F. App'x 847 (2d Cir. 2014) .............................................................. 54

**Cases** **Page(s)**

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 48-49

*Foster v. Love*,
522 U.S. 67 (1997) .......... 10

*Gerlich v. U.S. Dep't of Justice*,
711 F.3d 161 (D.C. Cir. 2013) .......... 52

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 29

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 42

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) .......... 42

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... 25, 42, 45

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549, 2026 WL 2620871 (D. Mass. Sept. 4, 2026) .......... 6

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
835 F. Supp. 3d 79 (D.D.C. 2026) .......... 5, 51

*Pub. Interest Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026) .......... 35

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 35

*Reno v. Condon*,
528 U.S. 141 (2000) .......... 54

*Rivera-Perez v. Stover*,
171 F.4th 196 (2d Cir. 2026) .......... 30

**Cases** **Page(s)**

*Roudebush v. Hartke*,
405 U.S. 15 (1972) ............ 10

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) ............ 52

*Schneiderman v. Am. Chem. Soc'y*,
172 F.4th 158 (2d Cir. 2026) ............ 28

*Senne v. Vill. of Palatine, Ill.*,
695 F.3d 597 (7th Cir. 2012) ............ 55

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ............ 33-34

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) ............ 24

*United States v. Adams*,
837 F. Supp. 3d 881 (E.D. Ky. 2026) ............ 8

*United States v. Aguilar*,
No. 25-cv-000728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026) ............ 8

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ............ 8

*United States v. Bd. of Elections of the State of New York*,
No. 25-cv-01338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ............ 8

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ............ 8, 48-49

*United States v. Benson*,
179 F.4th 470 (6th Cir.) ............ 9, 11, 15, 25, 29

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ............ 8

**Cases** **Page(s)**

*United States v. Bormes*,
568 U.S. 6 (2012) .......... 48

*United States v. Caldwell*,
No. 26-cv-02025, 2026 WL 2186515 (D.N.J. July 29, 2026) .......... 8

*United States v. DeMarinis*,
No. 25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026) .......... 8

*United States v. Evans*,
No. 25-cv-04403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026) .......... 8, 28

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) .......... 8, 35

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .......... 8, 41, 43-44

*United States v. Griswold*,
No. 25-cv-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026) .......... 8

*United States v. Hanzas*,
No. 25-cv-00903, 2026 WL 2754349 (D. Vt. Sept. 17, 2026) .......... 8

*United States v. Hobbs*,
No. 25-cv-06078, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026) .......... 8

*United States v. Koski*,
No. 26-cv-00042, 2026 WL 2032532 (E.D. Va. July 14, 2026) .......... 8

*United States v. Matthews*,
No. 25-cv-03398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) .......... 8

*United States v. Oliver*,
No. 25-cv-01193, 2026 WL 2031479 (D.N.M. July 14, 2026) .......... 8

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) .......... 8, 59

**Cases** **Page(s)**

*United States v. Powell*,
379 U.S. 48 (1964) ........................................................ 25-26

*United States v. Scanlan*,
--- F. Supp. 3d ----, 2026 WL 1864054 (D.N.H. June 29, 2026) ........................................................ 8, 31, 38-39

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026) ........................................................ 8

*United States v. Simon*,
No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) ...... 8, 30

*United States v. Thomas*,
No. 26-cv-00021, 2026 WL 2070437 (D. Conn. July 17, 2026)....... 8, 39

*United States v. Warner*,
--- F. Supp. 3d ----, 2026 WL 2018877 (S.D. W.Va. July 13, 2026) ........................................................ 8

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .............8, 25, 41, 53, 55, 57, 59

*United States v. Wis. Election Comm'n*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) ........................................ 8, 39

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) ........................................................ 53

**Constitutions**

U.S. Const.
art. I, § 2, cl. 1 ........................................................ 10
art. I, § 4, cl. 1 ........................................................ 9
amend. XVII ........................................................ 10

New York Const.
art. II, § 8 ........................................................ 19

**Federal Statutes** **Page(s)**

Pub. L. No. 85-315, 71 Stat. 634 (1957) ... 11

Pub. L. No. 107-347, 116 Stat. 2899 (2002)
§ 208(b)(1)(A)(ii) ... 56-57
§ 208(b)(1)(A)(ii)(II) ... 56
§ 208(b)(1)(B)(i) ... 56

5 U.S.C.
§ 552a(a)(5) ... 50
§ 552a(e)(4) ... 51-52
§ 552a(e)(7) ... 51-52

8 U.S.C.
§ 1229(a)(1)(B) ... 43
§ 1454(a) ... 31-32

18 U.S.C.
§ 663 ... 31
§ 2721 ... 54
§ 2721(a)(1) ... 54
§ 2721(b)(1) ... 55
§ 2721(c) ... 54
§ 2725(3) ... 54

38 U.S.C.
§ 8303 ... 31

44 U.S.C.
§ 2910(1) ... 38
§ 3502(3)(B) ... 56
§ 3518(c)(1)(B)(ii) ... 57
§ 3518(c)(2) ... 57

46 U.S.C.
§ 10705 ... 31

49 U.S.C.
§ 1134(b)(2) ... 38

**Federal Statutes** **Page(s)**

52 U.S.C.
§ 20501(b)(2) ... 13
§ 20501(b)(4) ... 14
§ 20505(a) ... 14
§ 20507(a)(3)(A) ... 14
§ 20507(a)(3)(B) ... 14
§ 20507(a)(4) ... 14, 47
§ 20507(*i*)(1) ... 15
§ 20508(b)(2) ... 14
§ 20510(a) ... 15, 48
§ 20701 ... 3, 13, 27-28, 36, 38
§ 20702 ... 13, 27, 39
§ 20703 ... 13, 22, 27, 40
§ 20705 ... 25
§ 21083(a)(1)(A) ... 15
§ 21083(a)(1)(A)(viii) ... 15
§ 21083(a)(2) ... 47
§ 21083(a)(2)(A) ... 16
§ 21083(a)(2)(B) ... 16
§ 21083(a)(5)(A)(i) ... 15
§ 21085 ... 16
§ 21111 ... 16, 48

**State Statutes**

N.Y. Election Law
§ 3-212(2) ... 19
§ 3-220(1) ... 17, 58
§ 5-210(5)(f) ... 17
§ 5-210(5)(k) ... 17
§ 5-210(5)(k)(iii) ... 17
§ 5-500 ... 17
§ 5-500(4) ... 17
§ 5-500(4)(k) ... 17
§ 5-614(1) ... 16, 36
§ 5-614(2) ... 16
§ 5-614(3)(b) ... 17

**State Statutes** **Page(s)**

N.Y. Pub. Officers Law
§ 96-a(1)(a) .......... 17, 58

**State Regulations**

9 N.Y.C.R.R.
§ 6217.1(a) .......... 16
§ 6217.1(c) .......... 17
§ 6217.4(c) .......... 17
§ 6217.5(b) .......... 17
§ 6217.10 .......... 17

**Rules**

Fed. R. Civ. P.
1 .......... 24

**Miscellaneous Authorities**

*Acquire*, Webster's Seventh New Collegiate Dictionary (1963) .......... 29

Office of Legal Counsel, Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. --- (May 12, 2026) .......... 1, 4-6, 46

*Basis*, Webster's Seventh New Collegiate Dictionary (1963) .......... 41

*Come into*, Webster's Seventh New Collegiate Dictionary (1963) .......... 29

Corasaniti, Nick & Aleaziz, Hamed, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sept. 2, 2026), *available at* https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html .......... 7

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) .......... 1, 4, 46

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) .......... 6

**Miscellaneous** **Page(s)**

Fifield, Jen & Despart, Zach, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), *available at* https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion ........ 5

Martinez-Ochoa, Kaylie, O'Connor, Eileen, & Berry, Patrick, *Tracker of Justice Department Requests for Voter Information*, Brennan Center (Sept. 23, 2026), *available at* https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information........ 7

*Preserve*, Webster's Seventh New Collegiate Dictionary (1963) ........ 38

Rep. of the U.S. Comm'n on Civ. Rights (1959) ........ 11-12

Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47,610 (Aug. 11, 2003) ........ 53

## PRELIMINARY STATEMENT

This appeal concerns plaintiff United States's demand for New York's statewide voter-registration list. The demand arose out of an executive order that President Trump signed shortly after he took office, which directed the Attorney General to prioritize enforcement of laws "that restrict non-citizens from registering to vote or voting," including through the use of "State-issued identification records and driver license databases." Exec. Order No. 14,248, 90 Fed. Reg. 14,005, 14,007 (Mar. 25, 2025). In response to this executive order, the U.S. Department of Justice (DOJ) "proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ('HSI') or another unit within DHS [Department of Homeland Security]." Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. --- (May 12, 2026) (slip op. at 1). According to the opinion of the Office of Legal Counsel within the DOJ, this activity may result in "immigration consequences." *Id.* at 5.

Following the executive order, plaintiff demanded statewide voter-registration lists (SVRLs) from nearly every State in the country plus Washington, D.C. The New York State Board of Elections (Board) was

ready and willing to produce the public version of its SVRL, which contains a list of registered voters but omits their drivers' license numbers and the last four digits of their social security numbers. But plaintiff insisted that it was entitled to this sensitive personal information as well—even though federal law prohibits States from disclosing it. In spite of the federal government's public statements linking the demand for the SVRLs to an effort to compile citizenship-related data, plaintiff claims merely to be enforcing federal statutes that require States to maintain complete and accurate lists of voters.

Federal courts around the country have uniformly rejected plaintiff's unprecedented attempt to obtain complete and unredacted SVRLs from the States. All 25 district courts to have considered the issue have ruled against plaintiff, as has the Sixth Circuit, the only appellate court to have reached a decision so far.

This Court should follow suit and affirm the well-reasoned decision of the district court. The district court correctly determined, as a threshold matter, that plaintiff's lawsuit is subject to the ordinary pleading standards of the Federal Rules of Civil Procedure, rejecting the government's plea for special treatment. The court also correctly dismissed

plaintiff's claim for disclosure of the State's SVRL, rejecting its reliance on the Civil Rights Act of 1960. That statute requires state election officials to preserve certain voting-related records and papers that "come into [their] possession." 52 U.S.C. § 20701. But because New York's SVRL is *created* by election officials in the first instance, the court reasoned, it does not come into their possession, and is therefore outside the scope of the statute. Although this interpretive point was the primary ground for the court's ruling, the court additionally suggested that plaintiff's demand was invalid because it failed to set forth an adequate basis or purpose.

Finally, although the district court did not reach this issue, production of the SVRL is prohibited by a number of federal and state privacy laws, thus providing alternative grounds for affirming the judgment of the district court.

## QUESTIONS PRESENTED

1. Whether the district court correctly determined that plaintiff's complaint is not exempt from the Federal Rules of Civil Procedure.

2. Whether the district court correctly dismissed plaintiff's complaint on the merits, either because (a) New York's SVRL is not a covered

"record or paper" under the Civil Rights Act of 1960, or (b) plaintiff failed to set forth an adequate basis or purpose for the request.

3. Whether this Court may affirm on the alternative ground, raised below but not reached by the district court, that production of the SVRL is barred by various federal and state privacy laws.

## STATEMENT OF THE CASE

### A. National Context

Shortly after taking office, President Trump signed an executive order focused on the supposed problem of "illegal dilution" of citizens' votes caused by non-citizens voting. Exec. Order No. 14,248, 90 Fed. Reg. 14,005, 14,005 (Mar. 25, 2025). The order directed the Attorney General to prioritize enforcement of laws "that restrict non-citizens from registering to vote or voting," including through the use of "databases or information maintained by the Department of Homeland Security" and "State-issued identification records and driver license databases." *Id.* at 14,007.

In response to this executive order, the DOJ "proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ('HSI') or another unit within DHS." Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. --- (May 12, 2026)

(slip op. at 1) (hereinafter "OLC Op."). Specifically, the DOJ plans to upload the lists to a DHS database called Systematic Alien Verification for Entitlements (SAVE), *id.* at 29, a database that government agencies (including States and localities) may query to confirm individuals' citizenship status prior to granting benefits or allowing them to vote.

The SAVE database has been hurriedly overhauled since the beginning of the second Trump administration, raising questions about its accuracy. As a federal district court recently found, federal agencies working on the database "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and States currently using the database are "actively removing United States citizens from voter rolls based on inaccurate information."[1] *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 95, 113 (D.D.C. 2026).[2] Nonetheless, President

[1] *See also* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026). (For sources available on the internet, full URLs appear in the Table of Authorities.)

[2] The Supreme Court recently granted the federal government's application to stay the district court's injunction pending appeal, though did not address the district court's factual findings. *See Dep't of Homeland Sec. v. League of Women Voters*, 609 U.S. ---, 2026 WL 2879700 (Sept. 25, 2026).

Trump, in another executive order, has directed the DHS Secretary to use the SAVE database to compile "State Citizenship Lists," to be transmitted to States before each federal election. Exec. Order No. 14,399, 91 Fed. Reg. 17,125, 17,125 (Mar. 31, 2026).[3]

Plaintiff acknowledges that feeding SVRLs into DHS's database could very well have "immigration consequences," including by providing DHS with updated information regarding the location of persons unlawfully present in the country, and by subjecting those individuals to a risk of prosecution. OLC op. at 5. Indeed, plaintiff has devoted significant manpower to scouring state voter rolls for noncitizens to be prosecuted,

---

[3] A federal district court declared this provision of the executive order—along with another provision of the order that directed the United States Postal Service (USPS) to promulgate a rule regarding the mailing of absentee ballots—to be ultra vires and permanently enjoined its implementation. *See California v. Trump*, 835 F. Supp. 3d 288 (D. Mass. 2026). However, the Supreme Court subsequently granted the federal government's application to stay the injunction pending appeal, determining that the plaintiff States' challenge to the executive order was not yet ripe. *See Trump v. California*, 609 U.S. ---, 2026 WL 2473573 (Aug. 24, 2026). The district court later entered a new injunction preliminarily barring the USPS from implementing its rule, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549, 2026 WL 2620871 (D. Mass. Sept. 4, 2026), and the Supreme Court denied the federal government's application for a stay pending appeal, determining that it was unlikely to succeed on the merits and that the balance of the equities did not favor granting a stay, *U.S. Postal Serv. v. California*, 609 U.S. ---, 2026 WL 2687160 (Sept. 14, 2026).

even reassigning agents to the task who are normally responsible for investigating crimes such as human trafficking and terrorism. *See* Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sept. 2, 2026).

Plaintiff has now demanded SVRLs from nearly every State in the country plus Washington, D.C. While some States have voluntarily provided this information, most have declined to comply with what they view as illegal requests—leading to plaintiff's commencement of 30 lawsuits around the country seeking to compel production of the information. *See generally* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center (Sept. 23, 2026).

As of the date of this filing, *every* court that has ruled on the matter has dismissed plaintiff's lawsuit, resulting in 25 dismissals (including in

this case),[4] with five cases still pending in district court.[5] So far, the only appellate court to have decided an appeal (the Sixth Circuit) has affirmed

---

[4] *See United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Griswold*, No. 25-cv-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Thomas*, No. 26-cv-00021, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Evans*, No. 25-cv-04403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Matthews*, No. 25-cv-03398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Adams*, 837 F. Supp. 3d 881 (E.D. Ky. 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. DeMarinis*, No. 25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-000728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Scanlan*, --- F. Supp. 3d ----, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Caldwell*, No. 26-cv-02025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Oliver*, No. 25-cv-01193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Bd. of Elections of the State of New York*, No. 25-cv-01338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Koski*, No. 26-cv-00042, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Hanzas*, No. 25-cv-00903, 2026 WL 2754349 (D. Vt. Sept. 17, 2026); *United States v. Hobbs*, No. 25-cv-06078, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026); *United States v. Warner*, --- F. Supp. 3d ----, 2026 WL 2018877 (S.D. W.Va. July 13, 2026); *United States v. Wis. Election Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026).

[5] *See United States v. Albence*, No. 25-cv-01453 (D. Del.); *United States v. Raffensperger*, No. 26-cv-00485 (N.D. Ga.); *United States v. Nago*, No. 25-cv-00522 (D. Haw.); *United States v. McGrane*, No. 26-cv-00197 (D. Idaho); *United States v. Henderson*, No. 26-cv-00166 (D. Utah).

the district court's dismissal of the complaint;[6] appeals are currently pending in every Circuit except the Fifth and Eleventh.[7]

### B. Constitutional Background

The Elections Clause of the Constitution entrusts the States with the primary authority for regulating congressional elections, providing that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. While Congress may "make or alter such Regulations," *id.*, Congress's power to preempt state election laws goes only "so far as it is exercised, and no farther," *Arizona v. Inter Tribal*

---

[6] *See United States v. Benson*, 179 F.4th 470 (6th Cir.), *reh'g denied*, 187 F.4th 462 (6th Cir. 2026).

[7] *See United States v. Galvin*, No. 26-1657 (1st Cir.); *United States v. Amore*, No. 26-1665 (1st Cir.); *United States v. Bellows*, No. 26-1676 (1st Cir.); *United States v. Scanlan*, No. 26-1783 (1st Cir.); *United States v. Thomas*, No. 26-2064 (2d Cir.); *United States v. Schmidt*, No. 26-2684 (3d Cir.); *United States v. Caldwell*, No. 26-3085 (3d Cir.); *United States v. DeMarinis*, 26-1878 (4th Cir.); *United States v. Koski*, No. 26-2002 (4th Cir.); *United States v. Adams*, No. 26-5657 (6th Cir.); *United States v. Wis. Election Comm'n*, No. 26-2217 (7th Cir.); *United States v. Matthews*, No. 26-2695 (7th Cir.); *United States v. Simon*, No. 26-2679 (8th Cir.); *United States v. Oregon*, No. 26-1231 (9th Cir.); *United States v. Weber*, No. 26-1232 (9th Cir.); *United States v. Fontes*, No. 26-2609 (9th Cir.); *United States v. Aguilar*, No. 26-5375 (9th Cir.); *United States v. Griswold*, No. 26-1326 (10th Cir.); *United States v. Oliver*, No. 26-2126 (10th Cir.); *United States v. Evans*, No. 26-5296 (D.C. Cir.).

*Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) (internal quotation marks omitted). Thus, the Elections Clause "invests the States with responsibility for the mechanics of congressional elections," *Foster v. Love*, 522 U.S. 67, 69 (1997), including the authority to regulate "in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices," and other matters, *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972) (internal quotation marks omitted).

In addition to assigning to the States primary authority for regulating *how* congressional elections take place, the Constitution also assigns to the States sole authority for determining *who* can vote in such elections: electors for both House and Senate elections "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1; *see also id.* amend. XVII. The Supreme Court has accordingly rejected "the view that voting qualifications in federal elections are to be set by Congress," emphasizing that "[p]rescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *Inter Tribal Council of Arizona*, 570 U.S. 16-17 (quoting The Federalist No. 60, at 371 (A. Hamilton)).

### C. Statutory Background

#### 1. Civil Rights Act of 1960

The primary statute at issue in this appeal is the federal Civil Rights Act of 1960, and the following historical context of its enactment informs the dispute at hand.

The Civil Rights Act of 1960 was preceded by the Civil Rights Act of 1957, the first federal civil-rights law since Reconstruction. *United States v. Benson*, 179 F.4th 470, 475 (6th Cir. 2026). Enacted in response to de jure discrimination against black voters in the South, the Civil Rights Act of 1957 established the U.S. Commission on Civil Rights, responsible for collecting information concerning the problem of race-based denials of the right to vote. *Id.*; *see* Pub. L. No. 85-315, 71 Stat. 634 (1957).

On the ground in southern States, the Commission attempted to collect available statistical information on voting. Rep. of the U.S. Comm'n on Civ. Rights, at 40 (1959). The main documents the Commission inspected were voter-registration applications, which revealed a pattern of racially disparate treatment. For example, applications from black voters were routinely rejected for ministerial errors, while appli-

cations from white voters that contained similar errors were accepted. *E.g.*, *id.* at 87-91.

However, the Commission's effort to obtain a complete picture of voting in the South was stymied by local officials' recurrent destruction of relevant records. *E.g.*, *id.* at 89, 93, 137. The State of Alabama went so far as to pass a law—while the Commission was in the middle of its investigation—permitting the destruction of application forms of individuals denied registration. *Id.* at 137. The Commission therefore found that "lack of uniform provision for the preservation and public inspection of all records pertaining to registration and voting hampers and impedes investigation of alleged denials of the right to vote by reason of race, color, religion, or national origin." *Id.* The Commission accordingly recommended that Congress "require that all State registration and voting records shall be public records and must be preserved for a period of 5 years." *Id.* at 138.

Congress heeded this call. The ensuing Civil Rights Act of 1960 included a provision addressing the specific problem of the destruction of voter-registration applications. Section 301—the key provision at issue in this appeal—requires that "[e]very officer of election shall retain and

preserve, for a period of twenty-two months from the date of [certain elections], all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Congress backed up this requirement with substantial penalties, providing that any person who "willfully steals, destroys, conceals, mutilates, or alters" any record or paper covered by section 301 shall be subject to a maximum fine of $1,000 and/or up to one year of imprisonment. *Id.* § 20702. And covered records and papers must be made available for inspection by the Attorney General "upon demand in writing," which "shall contain a statement of the basis and the purpose therefor." *Id.* § 20703.

**2. National Voter Registration Act of 1993**

Decades after the enactment of the Civil Rights Act of 1960, Congress passed the National Voter Registration Act (NVRA) in 1993. The NVRA "requires States to provide simplified systems for registering to vote in federal elections," *Inter Tribal Council of Arizona*, 570 U.S. at 5 (emphasis deleted) (internal quotation marks omitted), "in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. § 20501(b)(2).

The NVRA also requires States to "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). To that end, States must establish "a general program that makes a reasonable effort" to remove voters from official lists of registered voters (generally referred to as a "list-maintenance program") when they are no longer eligible to vote in the jurisdiction for one of two reasons—death or a change in residence. *Id.* § 20507(a)(4). Although States must use prescribed mail voter-registration forms that require applicants to attest to their citizenship, *id.* §§ 20505(a), 20508(b)(2), citizenship status—unlike death or change of residence—is not one of the targets of the list-maintenance programs that States are required to establish. States are thus required to remove voters from official lists when the list-maintenance program reveals a voter to be ineligible. States are otherwise prohibited from removing voters from official lists, except at the request of the voter, or "as provided by State law, by reason of criminal conviction or mental incapacity." *Id.* § 20507(a)(3)(A), 20507(a)(3)(B).

States must make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible

voters." *Id.* § 20507(*i*)(1). The Attorney General is authorized to bring a civil action to enforce the requirements of the NVRA. *Id.* § 20510(a).

### 3. Help America Vote Act of 2002

Congress passed the Help America Vote Act (HAVA) "following the contentious 2000 presidential election," aiming to alleviate the problem of "eligible voters being turned away at the polls because their names were missing from voter registration lists." *Benson*, 179 F.4th at 476 (internal quotation marks omitted).

To that end, HAVA requires States to generate the databases that are the subject of this litigation, *i.e.*, a "single, uniform, official, centralized, interactive computerized statewide voter registration list," which "contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). This registration information must include the voter's driver's license number or the last four digits of his or her social security number. *Id.* § 21083(a)(5)(A)(i). The computerized list "shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(viii). States are required to "perform list maintenance

with respect to the computerized list on a regular basis" so as to ensure that all registered voters appear on the list, duplicate names are removed, and only unregistered or ineligible voters are removed from the list. *Id.* § 21083(a)(2)(A), 21083(a)(2)(B).

The Attorney General is authorized to bring a civil action for such declaratory and injunctive relief "as may be necessary to carry out the uniform and nondiscriminatory technology and administration requirements" under certain sections of the Act. *Id.* § 21111. However, "[t]he specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." *Id.* § 21085.

### 4. New York State Law

In accordance with its obligations under HAVA, New York keeps a statewide voter-registration list (SVRL) in a system called NYSVoter. N.Y. Election Law § 5-614(1); 9 N.Y.C.R.R. § 6217.1(a). The SVRL is "administered and maintained" by the New York State Board of Elections (Board), N.Y. Election Law § 5-614(1), which creates it by combining the voter-registration lists maintained by local boards of elections into a single integrated list, *id.* § 5-614(2). Each entry in the SVRL contains, among other things, the voter's name, address, email address, telephone

number, date of birth, party affiliation, and driver's license number or last four digits of his or her social security number.[8] *Id.* §§ 5-210(5)(k), 5-500(4), 5-614(3)(b).

Local boards of elections are responsible for maintaining their local voter-registration lists and updating them when voters pass away, move, and the like. 9 N.Y.C.R.R. §§ 6217.1(c), 6217.10. Changes made by local boards are automatically reflected on the statewide list. *Id.* § 6217.4(c). Local boards are also responsible for processing voter-registration applications in the first instance and maintaining such records. N.Y. Election Law § 5-500; 9 N.Y.C.R.R. § 6217.5(b).

Under New York law, all registration records and lists are public records open to public inspection—with the exception of a voter's driver's license number and social security number. These records are not public, and "[n]o such records shall be handled at any time by any person other than" certain state and local elections officials. N.Y. Election Law § 3-220(1); *see also* N.Y. Pub. Officers Law § 96-a(1)(a).

---

[8] Email address, telephone number, and party affiliation are optional to provide, *see* N.Y. Election Law §§ 5-210(5)(k)(iii), 5-210(5)(f), 5-500(4)(k), but if voters elect to provide this information on their registration forms it will be included in the SVRL, *see id.* § 5-614(3)(b).

### D. Factual Background

On June 30, 2025, plaintiff sent a letter to the two co-executive directors of the New York State Board of Elections (Board), requesting 15 categories of information, including the State's "current statewide voter registration list." (Joint Appendix (J.A.) 53-55.) The letter characterized the information sought as "information regarding the State's HAVA compliance" and recited various HAVA requirements. (J.A. 53.) The letter contained no other information, other than a note of appreciation for the State's "cooperation in our nationwide efforts to monitor HAVA compliance." (J.A. 55.)

On August 14, 2025, plaintiff followed up with another letter clarifying that it was requesting a copy of the SVRL that included "*all fields*," including "the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number." (J.A. 60.) The letter asserted that "[t]he purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA"—though it provided no facts suggesting a lack of compliance—

and that the request was authorized under those two statutes as well as the Civil Rights Act of 1960. (J.A. 61.)

On August 29, 2025, the Board provided a response to 14 of the 15 categories of information sought. (J.A. 64-70.) However, with respect to the category that sought production of New York's SVRL, the Board explained that it lacked consensus among its bipartisan commissioners on responding to that request and thus could not take action. (J.A. 67.) *See* New York Const. art. II, § 8 (requiring equal bipartisan representation on boards of elections); N.Y. Election Law § 3-212(2) (requiring that Board take action by majority vote).

The Board's August 29 response appended separate letters from the Democratic and Republican commissioners. The Democratic commissioners explained that they were ready and willing to provide plaintiff with the public version of the SVRL, but that state law barred the release of the unredacted SVRL containing driver's license and social security numbers, and that nothing in federal law required production of this sensitive information. (J.A. 71-72.) The Republican commissioners stated their belief that neither state nor federal law precluded them from turning

over the unredacted SVRL, but that they could not do so without consensus on the Board. (J.A. 73-74.)

### E. Procedural History

Plaintiff commenced this lawsuit in the United States District Court for the Northern District of New York on September 25, 2025, seeking to compel New York to produce its complete and unredacted SVRL. The complaint asserted that the Board's failure to produce that information violated the Civil Rights Act of 1960, NVRA, and HAVA.[9] (J.A. 35-38.) All defendants (except the Board's Republican commissioners) moved to dismiss the complaint, and plaintiff cross-moved to compel production of the SVRL. (J.A. 17-18 (Dist. Ct. Dkt. Nos. 73, 74, 76, 77, 81).) In opposition to the motions to dismiss, plaintiff argued, among other things, that the lawsuit was a "special statutory proceeding" to which the Federal Rules of Civil Procedure did not apply. (Dist. Ct. Dkt. No. 81-1 at 10.)[10]

[9] On appeal, plaintiff has abandoned its claims under the NVRA and HAVA. (*See* Br. 3 n.2.) This brief accordingly does not discuss those claims further.

[10] Page references to documents filed in the district court refer to numbers in the document's footer.

The district court (D'Agostino, J.) granted the motions to dismiss, denied plaintiff's cross-motion, and dismissed the complaint in its entirety. (Special Appendix (S.A.) 1-32.)

The court first determined, as a threshold matter, that the Federal Rules of Civil Procedure did indeed apply to plaintiff's complaint and thus the complaint would be reviewed for its compliance with Rule 12(b)(6). (S.A. 13-16.) As to the merits of plaintiff's claim, the court concluded that the State's SVRL was not a covered document under the Civil Rights Act of 1960 as to which plaintiff was entitled to demand production. Because the SVRL is created by state officials, the court reasoned, it does not "come into [their] possession" within the meaning of the Civil Rights Act. (S.A. 20 (internal quotation marks omitted).) The court further reasoned that a contrary conclusion would put the Civil Rights Act in tension with the NVRA and HAVA: while the Civil Rights Act imposes criminal penalties on anyone who "alters" covered records, both the NVRA and HAVA *require* regular alteration of the SVRL to ensure that it is up to date. (S.A. 21-22.)

Because the court ruled on this ground, it did not thoroughly examine New York's argument that plaintiff's demand for production of

the SVRL lacked an adequate "statement of the basis and the purpose therefor." 52 U.S.C. § 20703. (S.A. 19.) However, the court nonetheless observed that plaintiff's demand "states no basis," and that the purported purpose of ascertaining New York's compliance with the NVRA and HAVA "lacks any relation to the purposes for which Title III [of the Civil Rights Act of 1960] was enacted." (S.A. 18.)

This appeal followed.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a motion to dismiss. *Dieujuste v. Sin*, 125 F.4th 397, 399 (2d Cir. 2025).

## SUMMARY OF ARGUMENT

First, the district court correctly determined that plaintiff's complaint is subject to the ordinary pleading standards of the Federal Rules of Civil Procedure. Those rules are the default rules in civil litigation. While Congress may override those rules by statute, it has not done so in the Civil Rights Act of 1960.

Second, the district court correctly dismissed plaintiff's complaint under the Civil Rights Act on the merits. New York's SVRL is not a

covered "record or paper" under that statute for either of two reasons: it is created by state election officials and thus does not "come into their possession," and it is a dynamic database that is fundamentally different from the static documents contemplated by the statute. Plaintiff's Civil Rights Act claim fails as a matter of law for the alternative reason that plaintiff's written demand failed to set forth an adequate basis or purpose. The demand provided no factual basis whatsoever, and the cited purpose of enforcing the NVRA and HAVA was plainly pretextual and not a cognizable purpose under the Civil Rights Act in any event.

Finally, the judgment of the district court may be affirmed on the alternative grounds that plaintiff's remarkable request for the sensitive personal information of millions of voters is barred by a number of federal and state laws, including the federal Privacy Act, federal Driver's Privacy Protection Act, federal E-Government Act, and state Election Law, which is not preempted by federal law.

# ARGUMENT

## POINT I

### PLAINTIFF'S COMPLAINT IS NOT EXEMPT FROM THE FEDERAL RULES OF CIVIL PROCEDURE

As a threshold matter, plaintiff is mistaken in arguing that its complaint is somehow exempt from ordinary pleading standards. (Br. 38.) Plaintiff's position is an odd one: having voluntarily invoked the jurisdiction of the federal courts, plaintiff now argues that its action under the Civil Rights Act of 1960 is not subject to ordinary Federal Rules of Civil Procedure (FRCP) that govern civil litigation in federal courts, and that the court's role in resolving the dispute is a "limited" one. (Br. 38.) Nothing in the Civil Rights Act supports that unusual proposition.

The FRCP "are the default rules in civil litigation," *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023), and "govern the procedure in all civil actions and proceedings in the United States district courts," subject to exceptions not relevant here, Fed. R. Civ. P. 1. "Of course, Congress may override that command when it wishes. But we do not lightly infer that Congress has done so; and silence on the subject is seldom enough." *Polansky*, 599 U.S. at 436.

As other courts have concluded, Congress has not overridden the application of the FRCP to actions under the Civil Rights Act of 1960, or otherwise set forth any abbreviated procedures. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026). To the contrary, the Civil Rights Act provides, in unremarkable jurisdictional language, that federal district courts "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. Nothing in this provision purports to insulate Civil Rights Act claims from routine judicial review in accordance with the standard procedures of the FRCP.

Plaintiff misplaces its reliance on the Fifth Circuit's 1962 decision in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), which suggested that an action to compel production of documents under the Civil Rights Act is a "special statutory proceeding" that "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." (Br. 38-39 (quoting *Lynd*, 306 F.2d at 225-26).) As the Sixth Circuit has observed, this language has been undermined by subsequent binding precedent from the Supreme Court. *Benson*, 179 F.4th at 483 n.2. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court analyzed

a statute that, like the Civil Rights Act, authorized federal courts to enforce IRS summonses "by appropriate process," *id.* at 52; the Court noted that, because the statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," *id.* at 58 n.18. Plaintiff cites *Donaldson v. United States*, 400 U.S. 517 (1971) (Br. 40 n.11), as qualifying *Powell* with its observation that the FRCP are "not inflexible" in their application to summons proceedings. In *Donaldson*, however, the Court noted that any such flexibility derives from Rule 81(a)(3) (now numbered 81(a)(5)), which "recognize[s] that a district court, by local rule or by order, may limit the application of the rules in a summons proceeding." 400 U.S. at 528-29. The district court has not done so here. In short, the ordinary rules that govern civil litigation in federal courts apply here.

## POINT II

### THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S COMPLAINT ON THE MERITS

### A. The SVRL is not a covered "record or paper" under the Civil Rights Act of 1960.

To reiterate, § 301 of the Civil Rights Act of 1960 provides that:

> Every officer of election *shall retain and preserve*, *for a period of twenty-two months* from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, *all records and papers which come into his possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .

52 U.S.C. § 20701 (emphasis added). Section 302 imposes penalties on anyone who "willfully steals, destroys, conceals, mutilates, or alters" any record or paper covered under § 301. *Id.* § 20702. And, under § 303, any covered record or paper must be made available to the Attorney General upon a proper written demand. *Id.* § 20703.

The district court correctly concluded that New York's SVRL is not a record or paper covered by the Civil Rights Act of 1960. At least two considerations support this conclusion. First, the State Board of Elections does not "come into possession" of the SVRL from an outside source; rather, the Board creates the SVRL in the first instance. Second, the SVRL is a dynamic database that is continuously updated, not a static document that can be preserved in an unaltered form, as contemplated by the Civil Rights Act. Nothing in the Civil Rights Act authorizes the Attorney General to inspect such state-generated work product.

### 1. The SVRL does not "come into possession" of the State Board of Elections; rather, it is created by the Board in the first instance.

The Civil Rights Act requires retention and preservation only of those documents "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" that "come into [the] possession" of designated election officials. 52 U.S.C. § 20701. Even giving the term "relating to" an expansive definition, as plaintiff argues for (Br. 17), plaintiff's claim fails at the threshold: because the State Board of Elections *creates* the SVRL, rather than receiving it from an outside source, the SVRL cannot be said to "come into" the Board's possession. The SVRL thus is not covered by the Civil Rights Act even if it does "relate to" voter registration or another act requisite to voting. *See, e.g.*, *United States v. Evans*, No. 25-cv-04403, 2026 WL 2267774, at *8 (D.D.C. Aug. 6, 2026) (declining to read "relating to" "in a manner that swallows and nullifies 'come into his possession'").

The statute does not define the term "come into possession," but, in construing an undefined word in statutory text, courts "assume that Congress intended for the word to have its 'ordinary meaning,' particularly where the word is a 'term of everyday usage.'" *Schneiderman v. Am.*

*Chem. Soc'y*, 172 F.4th 158, 169 (2d Cir. 2026) (quoting *Envtl. Prot. Agency v. Calumet Shreveport Refining, L.L.C.*, 605 U.S. 627, 643 (2025)).

As the Sixth Circuit concluded when considering this issue, and as many district courts have concluded as well, the ordinary meaning of "come into possession," according to both contemporaneous dictionary definitions and common parlance, is to acquire—a meaning distinct from *creating* something in the first instance. *See, e.g.*, *Benson*, 179 F.4th at 478. The dictionary defines "come into" as "to acquire as an inheritance"; it defines "acquire" as "to come into possession of often by some uncertain or unspecified means." *Come into*, Webster's Seventh New Collegiate Dictionary 165 (1963); *Acquire*, Webster's Seventh New Collegiate Dictionary 8 (1963); *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (quoting 1933 dictionary definition of to "obtain" as "to come into the possession or enjoyment of (something) by one's own effort, or by request; to procure or gain, as the result of purpose and effort").

This definition accords with the term's use in common parlance. The Sixth Circuit used the example of a baker baking a cake—it would be strange to say that the baker "came into possession" of the cake after taking it out of the oven. *Benson*, 179 F.4th at 479. Or consider another

example: a client hires a genealogist to construct a family tree, and provides some birth certificates and marriage records for the genealogist to begin her research. While the genealogist certainly "came into possession" of those client-provided documents, it would be very odd to say that she also "came into possession" of the ultimate family tree that she created as the product of her research.

Likewise here, voters submit applications and supporting documents to local boards of elections, who can be said to "come into possession" of those documents. But local boards then use those documents to generate county-level lists, and the State Board in turn aggregates those lists to create the SVRL. The *generation* of these lists is distinct from *coming into possession* of the underlying documents that have been provided by third parties. Indeed, the records mentioned by name in the statute—those relating to "any application, registration, payment of poll tax, or other act requisite to voting"—are all documents that are provided by third parties (voters or prospective voters) rather than created by election officials. *See, e.g.*, *United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778, at *9 (D. Minn. Aug. 17, 2026) (making this point); *see also Rivera-Perez v. Stover*, 171 F.4th 196, 202 (2d Cir. 2026) ("[A] phrase

gathers meaning from the words around it.") (internal quotation marks omitted).

This understanding of the meaning of "come into possession" accords with the term's usage across numerous federal statutes: "Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source." *United States v. Scanlan*, --- F. Supp. 3d ----, 2026 WL 1864054, at *5 (D.N.H. June 29, 2026) (citing examples).[11] This is true even of the statutes cited in plaintiff's brief. (*See* Br. 25-26.) For example, 8 U.S.C. § 1454(a), which governs applications for replacement certificates of naturalization if the original one has been lost, provides, "If the certificate or declaration has been lost, the applicant or any other person who shall have, or may come into possession of it is required to surrender it to the Attorney General." The natural reading of this provision is that

---

[11] *See also, e.g.*, 18 U.S.C. § 663 (criminalizing embezzlement or stealing by one who has "come into possession of any money or property which has been donated by the owner thereof for the use of the United States"); 38 U.S.C. § 8303 (if testator or donor of gift to Department of Veterans Affairs indicates that gift shall be for benefit of persons in non-VA hospitals, "net proceeds thereof which may come into possession of the Secretary" shall be disbursed to appropriate institution); 46 U.S.C. § 10705 (specifying permissible actions "[w]hen money, property, or wages of a deceased seaman comes into possession of a consular officer").

the original certificate that was once lost must be surrendered in either of two situations: the applicant finds it after reporting it lost, and thus "had" it all along; or another person finds or retrieves it from a source other than himself, and thereby "comes into possession" of it.

Plaintiff's contrary arguments are not persuasive. First, relying on 8 U.S.C. § 1454(a), plaintiff argues that the phrase "come into possession" signifies only a "temporal change in circumstances." (Br. 25.) According to this view, "come into possession" implies that a person did not have something at first but later gained possession of it. (Br. 25-26.) That is true so far as it goes, but the account is not sufficient: it strains ordinary usage to say that a person "came into possession" of something he personally created, even though creation reflects a temporal change in circumstances. Going back to the example of the lost certificate of naturalization, plaintiff argues that if, in addition to a temporal change in circumstances, "come into possession" also implied a distinction between items created versus those received from an outside source, 8 U.S.C. § 1454(a) would make no sense, because "no applicant or private person can create a certificate of naturalization." (Br. 26.) But defendants' interpretation implies only a contrast between someone, on the one hand, who originally

had a certificate, lost it, and then found it themselves; and, on the other hand, someone who may "come into possession" of a certificate by finding the certificate that had been lost by another person. Nothing in defendant's interpretation of the phrase implies that the first person "created" the certificate of naturalization.

Second, plaintiff argues that the term "come into possession" can "encompass both self-generation and receipt from an outside source" (Br. 19 n.4), but the examples it provides do not support that proposition. Plaintiff first quotes language in the Civil Rights Cold Case Records Collection Act of 2018 referring to a document that "was *created* or made available for use by, obtained by, or otherwise *came into possession of*" a government agency. (Br. 19 n.4 (emphasis added).) There, however, the phrase "come into possession" is not being used to refer to documents created by a government agency—because the statute already uses the word "created" to cover that situation. The same is true of the provision of the Freedom of Information Act (FOIA) that was at issue in *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), on which plaintiff relies (Br. 20). In that case (in which the Court was analyzing requirements arising from case law rather than statutory

text), the Court observed that, for a document to qualify as an "agency record" under FOIA, "an agency must either create or obtain" it, and must also control it at the time the FOIA request is made, *i.e.*, "the materials have come into the agency's possession in the legitimate conduct of its official duties." 492 U.S. at 144-45 (internal quotation marks omitted). Plaintiff is mistaken in arguing (Br. 20) that this shows that the Supreme Court has definitively recognized "that an agency record created by the agency can be said to have 'come into the agency's possession'"—because an agency record, per *Tax Analysts*, is a record that is either created *or* obtained from an outside source.

In any event, the Supreme Court in *Tax Analysts* merely used the phrase "come into possession" in the course of a general discussion; it was not construing its meaning. The Court has repeatedly cautioned that "the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (internal quotation marks omitted). "And that is most obviously true when an opinion's language revises (for easier reading) the statute's own. Better to heed the statutory language proper." *Borden v. United States*, 593 U.S. 420, 443 n.9 (2021) (plurality opinion).

Third, plaintiff is mistaken in arguing that the First Circuit's decision in *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), has any bearing on the proper interpretation of "come into possession." (Br. 21.) In that case, the court held that a private party was entitled to demand production of Maine's SVRL (albeit in redacted form) under a provision of the NVRA—a provision that contains no language analogous to the one at issue here.[12] 92 F.4th at 49, 56; *see United States v. Fontes*, 832 F. Supp. 3d 944, 952-53 (D. Ariz. 2026) (distinguishing *Bellows*).

Fourth, plaintiff advances the theory that the Civil Rights Act of 1960 imposes an "officer-specific duty" to retain and preserve certain records; accordingly, any time a Board employee receives the SVRL from someone else in the office, that employee "comes into possession" of it within the meaning of the statute. (Br. 24, 31 (emphasis deleted).) But even assuming that this argument makes sense in the abstract, it fails

[12] Plaintiff also neglects to mention that the Ninth Circuit has come to the opposite conclusion regarding whether SVRLs are subject to production in some form under the NVRA; a cert. petition on this issue is currently pending at the Supreme Court. *See Pub. Interest Legal Found., Inc. v. Nago*, 174 F.4th 664 (9th Cir. 2026), *petition for cert. filed* (U.S. July 17, 2026) (No. 26-98).

as applied to the New York SVRL in particular. That is because § 301 of the Civil Rights Act recognizes that States may "designate[ ] a custodian to retain and preserve these records and papers at a specified place," and, if they do so, the retention and preservation duties "shall devolve upon such custodian." 52 U.S.C. § 20701. New York law stipulates that the SVRL "shall be in the custody of the state board of elections." N.Y. Election Law § 5-614(1). Thus, only the Board itself is the custodian of the SVRL, and only the Board itself is under a duty to retain and preserve records that come into its possession—thereby rendering irrelevant whether any particular employee can be said to "come into possession" of the SVRL if he or she receives it from a colleague.

Fifth, plaintiff falls back on the policy argument that SVRLs must covered by the Civil Rights Act because they are too important not to be; "[a]bsent this record," plaintiff says, "conducting federal elections is simply not possible." (Br. 36.) But whether *States* can conduct elections without SVRLs—and it is States that are constitutionally entrusted to run elections—is irrelevant to the question whether the *federal government* is entitled to demand these records wholesale.

At bottom, as the district court found, "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, but it did not." (S.A. 21 (internal quotation marks omitted).) Plaintiff cites a piece of legislative history stating that § 301 "would include all records and papers in the possession of election officers"—but that is not the language that Congress ultimately wrote into the statute. (Br. 19 (quoting H.R. Rep. No. 946, 86th Cong., 1st Sess. 6, 37, 39 (1959)) (emphasis deleted).) Thus, in order to give effect to the plain meaning of the statutory text, the Court should follow the Sixth Circuit and hold that SVRLs, as documents that are generated by election officials, do not "come into" officials' possession and are consequently not covered by the Civil Rights Act.

#### 2. The SVRL is a continuously updated, dynamic database that is outside the scope of the Civil Rights Act.

Not only do SVRLs not "come into the possession" of election officials, they are also dynamic, continuously updated databases that are fundamentally different from the static documents contemplated by the Civil Rights Act of 1960, and therefore outside the statute's scope. At least three textual indicators support this conclusion.

First, the duty to "preserve" records and papers under the Civil Rights Act suggests a duty that extends to static documents only. 52 U.S.C. § 20701. To "preserve" means "to keep safe from injury, harm, or destruction," and as applied to a document or evidence, to maintain in its current form and protect from modification or damage. *Preserve*, Webster's Seventh New Collegiate Dictionary 673 (1963). The word is used in this way consistently across the United States Code.[13] As another district court has observed, a preservation obligation "makes sense when applied to discrete records and papers submitted by voters and other outside sources but could produce absurd results when applied to a state's own evolving work product, like a database that is constantly being revised as election officials add, change, and correct voter data." *Scanlan*, 2026 WL 1864054, at *5. Interpreting the Civil Rights Act to cover such a dynamic system "would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static

[13] *See, e.g.*, 44 U.S.C. § 2910(1) (requiring national archivist to "preserve" records of Freedmen's Bureau by using "microfilm technology for preservation of the documents comprising these records so that they can be maintained for future generations"); 49 U.S.C. § 1134(b)(2) ("Any civil aircraft, aircraft engine, propeller, appliance, or property on an aircraft involved in an accident in air commerce shall be preserved, and may be moved, only as provided by regulations of the Board.").

version of the database with every single edit," which would be "impractical to the point of impossible." *Id.* (internal quotation marks omitted); *see also United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949, 955 (W.D. Wis. 2026).

Second, the fact that the obligation to preserve documents pertaining to an election applies only "for a period of twenty-two months" reinforces the view that the preservation obligation is a discrete duty to keep documents in an unaltered form before they can be discarded. Such a duty ill fits dynamic databases like SVRLs, which are continuously updated to reflect changes from election to election, rather than static documents pertaining to a single election.

And third, section 302 of the Civil Rights Act provides that anyone who "alters" a covered record or paper is subject to criminal penalty. 52 U.S.C. § 20702. This provision "clearly contemplates that the records subject to [section 301] are fixed in time when they 'come into possession' of state officials such that they cannot thereafter legally be altered, damaged or destroyed." *United States v. Thomas*, No. 26-cv-00021, 2026 WL 2070437, at *6 (D. Conn. July 17, 2026). SVRLs, which are regularly updated to ensure accuracy, are not fixed in time.

### B. Plaintiff failed to set forth a basis or purpose for its demand for the production of the SVRL.

Under section 303 of the Civil Rights Act of 1960, the Attorney General may "demand in writing" the production of covered documents; the demand "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. Plaintiff failed to satisfy this requirement.

Although plaintiff sent the Board two letters demanding the SVRL, plaintiff's argument on appeal (Br. 43) relies only on its second letter, dated August 14, 2025, in an apparent concession that its first letter—which did not purport to set forth either a basis or a purpose (J.A. 53-55)—lacked the requisite information. The August 14th letter asserted that "[t]he purpose of this request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA," and that the request was authorized under those two statutes as well as the Civil Rights Act. (J.A. 61.) The letter, however, offered no facts suggesting a lack of compliance with those statutes.

Although the district court rested its decision primarily on the "come into possession" ground and did not comprehensively analyze whether plaintiff's demand adequately set forth a "basis and purpose," it nonetheless suggested the demand failed to do so (S.A. 18-19), as the

State had argued (Dist. Ct. Dkt. No. 74-1 at 14). Plaintiff's failure to adequately set forth a basis and purpose for its demand for the production of the SVRL therefore constitutes an alternative ground for affirming the judgment of the district court.

### 1. Plaintiff failed to set forth a basis for its demand for the production of the SVRL.

As other courts have held, the Civil Right Act's requirement that a "basis" be provided in support of a demand for covered records means a factual, rather than a legal, basis. Plaintiff's demand failed to provide any factual support whatsoever.

"Basis" is defined as "foundation," *Basis*, Webster's Seventh New Collegiate Dictionary 72 (1963), or "chief supporting factor," *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026) (quoting *Basis*, Webster's New World Dictionary of American Language 122 (college ed. 1959)). Interpreting "basis" to refer to a factual basis or foundation makes sense in context because, without such a requirement, "the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand," *Weber*, 816 F. Supp. 3d at 1184—and agencies lack

"unfettered authority to cast about for potential wrongdoing," *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017) (internal quotation marks omitted).

Interpreting "basis" to refer to a factual basis also accords with historical practice under the Civil Rights Act, as reflected in the cases from the 1960s that plaintiff relies on. (Br. 41-43.) In its 1960s demands to jurisdictions in the South for production of voting records, the Attorney General stated that the demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 229 n.6; *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). Plaintiff argues, quoting *Lynd*, 306 F.2d at 226, that "'the factual foundation, or the sufficiency of,' this statement [is not] 'open to judicial review or ascertainment'" (Br. 39)—but the quoted passage takes as a given that the Attorney General's demand must include *some* "factual foundation." Plaintiff's August 14th letter contains no factual foundation whatsoever. (*See* J.A. 60-62.)

Resisting this conclusion, plaintiff argues that the "basis" required can simply be a legal basis, rather than a factual one. (Br. 41.) But "[i]f Congress sought to direct the Attorney General to include a citation to Title III in demand letters, requiring the letter to contain a 'statement of the basis and the purpose therefor' would not be the obvious way to do so." *Galvin*, 830 F. Supp. 3d at 130. Indeed, when Congress intends for agencies to provide the *legal* basis supporting their actions, it has expressly required agencies to identify the appropriate "legal authority." *Id.* (citing 5 U.S.C. § 553(b)(2) (requiring notice of proposed rulemaking to include "reference to the legal authority under which the rule is proposed"); 8 U.S.C. § 1229(a)(1)(B) (requiring notice to appear for removal proceedings to specify "the legal authority under which the proceedings are conducted").

Plaintiff asserts that, in any case, the August 14th letter does set forth a factual basis for the demand, namely, that "New York's list maintenance program may violate the NVRA and HAVA." (Br. 43.) But nowhere does the letter say that; it states only that "[w]e have requested New York's VRL to assess your state's compliance with the VRL maintenance provisions" of those statutes. (J.A. 60.) This statement does not

assert that New York may be in violation of those statutes, much less provide a factual basis for believing that to be the case. Plaintiff additionally contends that the basis for the demand is encompassed within the letter's statement that "[t]he purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." (Br. 43 (quoting J.A. 61).) But this conflates the "basis" with the "purpose"—two "conceptually distinct" statutory requirements. *Galvin*, 830 F. Supp. 3d at 128. "Construing 'the basis and the purpose' as satisfied by a statement of either the basis or the purpose would render part of the statutory text superfluous." *Id.*

Plaintiff additionally argues, citing *Lynd*, that the requirement to set forth a "basis" for the demand is merely a "basic notice requirement" that ensures that recipients have "'reasonable notice' of what the United States is demanding and why." (Br. 42.) That is not what *Lynd* says. Rather, *Lynd* invokes the concept of "reasonable notice" only in stating that, in a disputed proceeding to enforce a demand for records, it is incumbent upon the court to determine whether the custodians of the records "have been given reasonable notice of the pendency of the

proceeding." 306 F.2d at 226. As discussed, *Lynd* still contemplates that the demand will set forth "the factual foundation" supporting it. *Id.*

Plaintiff finally falls back on the proposition that "federal agencies may 'investigate merely on suspicion that the law is being violated, or even just because [they] want[ ] assurance that it is not." (Br. 43-44 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (alterations in original).) That may be so in cases where no statute enumerates specific requirements that a demand for records must satisfy. But whatever inherent authority the federal government may possess to demand records, it cannot override the express language of the statute.

#### 2. Plaintiff failed to set forth a cognizable purpose for its demand for the production of the SVRL.

Unlike the complete absence of any basis for the demand, the August 14th letter does purport to provide a purpose—"to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." (J.A. 61.) However, that is not a cognizable purpose under the Civil Rights Act of 1960.

At the outset, this proffered purpose is plainly not the real reason for the demand. As discussed above (Statement of the Case, Part A,

*supra*), President Trump's own executive order is explicit about why state records should be sought: so as to address the purported problem of "illegal dilution" of citizens' votes caused by non-citizens voting, the order directs the Attorney General to prioritize enforcement of laws "that restrict non-citizens from registering to vote or voting," including through the use of "State-issued identification records and driver license databases." Exec. Order No. 14,248, 90 Fed. Reg. 14,005, 14,005, 14,007 (Mar. 25, 2025). And as recounted in the OLC opinion that plaintiff itself cites (Br. 19), "[i]n response to the President's order," the DOJ "proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ('HSI') or another unit within DHS." OLC op. at 1. Specifically, the DOJ plans to upload the lists to the DHS's SAVE database, *id.* at 29, a database used for querying individuals' citizenship status. The OLC opinion acknowledges the likely "immigration consequences" of this activity. *Id.* at 5.

The August 14th letter, by contrast, makes no mention at all of any purpose relating to verifying voters' citizenship. While it does cite New York's list-maintenance obligations under the NVRA and HAVA (J.A. 60-61), these obligations do not include the obligation to verify citizenship,

as citizenship status is not an enumerated ground for removing a voter under a list-maintenance program. *See* 52 U.S.C. §§ 20507(a)(4), 21083(a)(2).

In response, plaintiff cavalierly insists that even an allegedly pretextual purpose satisfies the Civil Rights Act, because courts lack authority to "second-guess" the stated purpose for the demand. (Br. 51.) But the pretextual nature of the demand is not just a matter of allegation based on "out-of-court statements and news articles." (Br. 52.) It is conclusively established by the President's own executive order and the OLC opinion on which plaintiff itself relies, and which openly references the DOJ's proposal to obtain SVRLs as a means to carry out the executive order. Just as when reviewing administrative decisions, here too the Court should not "ignore the disconnect between the decision made and the explanation given." *Dept. of Commerce v. New York*, 588 U.S. 752, 785 (2019). As the Supreme Court said, quoting a former judge of this Court, while judicial review is deferential, "we are not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

In any event, even taking the August 14th letter at face value, it still fails to set forth a cognizable purpose for the demand. While the letter claims that the purpose is to ascertain New York's compliance with the NVRA and HAVA (J.A. 61), enforcing those statutes is not a proper purpose of a demand under the Civil Rights Act of 1960, which was enacted at least 30 years before them.

Moreover, the NVRA and HAVA contain their own enforcement mechanisms; together, they constitute a "comprehensive scheme" governing the administration and maintenance of SVRLs. *United States v. Bellows*, 834 F. Supp. 3d 113, 125 (D. Me. 2026). That scheme authorizes the Attorney General to bring a civil action against a State that has violated those provisions, 52 U.S.C. §§ 20510(a), 21111, but it "does not contemplate the line-by-line audit of each State's computerized SVRL by the federal government." *Bellows*, 834 F. Supp. 3d at 125. The Supreme Court has "consistently held that statutory schemes with their own remedial framework exclude alternative relief under the general terms" of other statutes. *United States v. Bormes*, 568 U.S. 6, 13 (2012). And "the implications of a statute may be altered by the implications of a later statute." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 143 (2000) (internal quotation marks omitted). "That is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* Here, the NVRA and HAVA, not the Civil Rights Act, specifically address the topic of list maintenance. Plaintiff's "undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce"—having abandoned on appeal its independent claims under the NVRA and HAVA—"is in direct contravention of these principles." *Bellows*, 834 F. Supp. 3d at 126.

## POINT III

### AS AN ALTERNATIVE GROUND TO AFFIRM, PLAINTIFF'S COLLECTION OF THE SVRL IS BARRED BY MULTIPLE FEDERAL AND STATE PRIVACY LAWS

Even if New York's SVRL were covered under the Civil Rights Act, and even if plaintiff had set forth a proper basis and purpose for its demand, plaintiff still would not be entitled to production of the complete, unredacted SVRL containing sensitive voter information such as driver's license and (partial) social security numbers. Multiple state and federal privacy laws prevent the production of this information. Although the district court did not reach the argument, it was raised below (Dist. Ct.

Dkt. No. 74-1 at 9-12) and thus provides an alternative ground for affirming the judgment of the district court.

### A. Plaintiff's collection of the SVRL is barred by the federal Privacy Act.

Passed in response to "the illegal surveillance and investigation of individuals by federal agencies that had been exposed during the Watergate scandal," *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 315 (2012) (Sotomayor, J., dissenting) (internal quotation marks omitted), the federal Privacy Act "contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies," *id.* at 287 (majority opinion). In particular, the Act attaches a number of prerequisites to agencies' maintenance of any "system of records," *i.e.*, "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). It is undisputed that an SVRL constitutes a "system of records" within the meaning of the Privacy Act.

Two provisions of the Privacy Act are relevant to this appeal. First, the Act prohibits federal agencies that maintain systems of records from maintaining any record "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Second, the Act requires agencies that maintain systems of records to publish in the Federal Register a "notice of the existence and character of the system of records" that explains, among other things, the categories of records maintained, categories of individuals on whom records are maintained, how and by whom the records will be used, and policies and practices regarding storage and access controls. *Id.* § 552a(e)(4); *see generally League of Women Voters*, 835 F. Supp. 3d at 99-100.

As plaintiff concedes (Br. 55), the first relevant provision of the Privacy Act bars it from collecting some of the information contained in New York's SVRL, specifically that concerning voters' party affiliations. The inclusion of this information makes the SVRL a record "describing how any individual exercises rights guaranteed by the First Amend-

ment." 5 U.S.C. § 552a(e)(7); *see, e.g.*, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990) (association with political party is protected by First Amendment); *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 172 (D.C. Cir. 2013) (collecting and retaining information about job applicants' political affiliation was improper under Privacy Act). Plaintiff concedes that collection of this information would be improper. (Br. 55.)

More generally, plaintiff has not followed the procedural steps that would allow it to maintain New York's SVRL. In particular, plaintiff has not issued a "systems of records notice" (SORN) covering the records sought, as required by statute. *See* 5 U.S.C. § 552a(e)(4). The existing SORN that plaintiff identifies (Br. 55-56) does not cover entire SVRLs. That SORN pertains only to records held by the DOJ's Civil Rights Division (CRT) about certain enumerated categories of individuals:

> Subjects of investigations, victims, potential witnesses, individuals of Japanese ancestry who were eligible, or potentially eligible, for restitution benefits as a result of their evacuation, relocation, or internment during World War II, and representatives on behalf of individuals and other correspondents on subjects directed or referred to CRT or other persons or organizations referred to CRT in potential or actual cases and matters of concern to CRT, and CRT employees who handle complaints, cases or matters of concern to CRT.

Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003).[14]

These discrete categories of individuals plainly do not encompass *every single registered voter in the country*. Opposing this commonsense conclusion, plaintiff cites an inapposite definition of "subject" in the context of grand-jury investigations and contends that the Privacy Act's notice requirement is satisfied because *all* voters nationwide are "subjects of investigations," because their voter registrations may come within the scope of plaintiff's investigations into "list maintenance and voter fraud." (Br. 57.) That would be quite an elephant in a mousehole, *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001), and would make the Act's notice requirement almost meaningless. At bottom, the SORN on which plaintiff relies "does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity." *Weber*, 816 F. Supp. 3d at 1193-94.

---

[14] The additional Federal Register citations that plaintiff supplies (Br. 56) contain only immaterial modifications to this 2003 SORN.

### B. Plaintiff's collection of the SVRL is barred by the federal Driver's Privacy Protection Act.

The Driver's Privacy Protection Act (DPPA) regulates the disclosure of personal information contained in the records of state motor-vehicle departments (DMVs). 18 U.S.C. § 2721; *see generally Reno v. Condon*, 528 U.S. 141 (2000). "[T]he statute was intended to bar the State from disclosing personal information obtained from DMV records without the individual's consent." *Fontanez v. Skepple*, 563 F. App'x 847, 849 (2d Cir. 2014) (summary order).

The DPPA provides that DMVs "shall not knowingly disclose or otherwise make available to any person or entity personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1). "Personal information" is defined to include, among other things, an individual's social security number and driver identification number, *id.* § 2725(3). The DPPA additionally prohibits disclosure of personal information by any authorized recipient of that information, subject to certain exceptions. *Id.* § 2721(c). In New York, the State Board of Elections is an authorized recipient of personal information from the state DMV. (J.A. 68-70.)

Plaintiff argues that it may permissibly collect the SVRL under the DPPA exception that allows disclosure "[f]or use by any government agency" in "carrying out its functions," 18 U.S.C. § 2721(b)(1), "namely assessing and ensuring compliance with federal election statutes" (Br. 62). But in order to claim the benefit of this exception, the information must be "*used* for the identified purpose." *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc). "When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection." *Id.* Plaintiff makes no attempt to explain how sensitive information contained in DMV records—which has never before been collected by the federal government at this scale—will in fact be used to ensure compliance with federal election statutes. *See Weber*, 816 F. Supp. 3d at 1195.

### C. Plaintiff's collection of the SVRL is barred by the federal E-Government Act.

The E-Government Act generally requires federal agencies to conduct a "privacy impact assessment" (PIA) before "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific

individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." Pub. L. No. 107-347, § 208(b)(1)(A)(ii), (B)(i), 116 Stat. 2899, 2921-2922 (2002).

Plaintiff concedes that it did not conduct a PIA (Br. 58), but its arguments about why one was not required are misplaced. First, plaintiff argues that the requirement does not apply because it "has not asked identical questions of nor imposed any reporting requirements on any persons." (Br. 58.) But the statute uses the passive voice, not the active voice: the requirement to conduct a PIA applies if an agency collects any information where identical questions "have been posed" to 10 or more persons. Pub. L. No. 107-347, § 208(b)(1)(A)(ii)(II). Plaintiff seeks information that was compiled as a result of identical questions—those on voter-registration forms—having been posed to millions of people.

Plaintiff additionally argues that it is exempt from conducting a PIA because it has not initiated a new collection of information. (Br. 59.) Plaintiff cites 44 U.S.C. § 3502(3)(B), which provides that the term "collection of information" under the E-Government Act "shall not include a collection of information described under section 3518(c)(1)." That section, in turn, exempts from the PIA requirement "an administrative

action or investigation involving an agency against specific individuals or entities." 44 U.S.C. § 3518(c)(1)(B)(ii). The problem, however, is that the statute expressly *includes* "the collection of information during the conduct of general investigations . . . undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry." *Id.* § 3518(c)(2). Plaintiff's demand for New York's SVRL is part of its effort to investigate state elections officials nationwide, and it thus qualifies as a "general investigation" that is indeed subject to the requirement to conduct a PIA, rather than being exempt as an investigation into specific individuals or entities.

Finally, plaintiff argues that the requirement to conduct a PIA does not apply because plaintiff did not "initiat[e] a new collection of information," Pub. L. No. 107-347, § 208(b)(1)(A)(ii), insofar as the SVRL had already been collected at the state level. (Br. 59-61.) Not so. In demanding the production of the SVRL, plaintiff has initiated a collection of information that is new for the federal government, and that is what triggers privacy protections under the E-Government Act. *See Weber*, 816 F. Supp. 3d at 1194.

### D. The State's production of the SVRL is barred by state law, which is not preempted.

Finally, New York state law also bars production of the information contained in the SVRL, and nothing in federal law preempts this provision of state law.

Under New York law, voting-registration records are public records with the express exception that a voter's driver's license number and social security number "shall not be released for public inspection," and "[n]o such records shall be handled at any time by any person other than" certain state and local election officials. N.Y. Election Law § 3-220(1); *see also* N.Y. Pub. Officers Law § 96-a(1)(a). This provision bars the production of the SVRL, which contains this sensitive information, to the federal government.

Plaintiff does not dispute that state law bars production of this information; it merely argues that the state law is preempted. (Br. 62-66.) But state law is preempted only "to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). In the context of federal legislation under the Elections Clause, "the statutory text accurately communicates the scope of Congress's preemptive intent." *Inter Tribal Council of Arizona*, 570 U.S. at 14.

There is no such preemptive intent here. Plaintiff repeatedly argues that the Civil Rights Act imposes a "sweeping" obligation to preserve and produce election records (Br. 63, 65) but points to no provision of federal law requiring the production of the sensitive personal information whose disclosure is barred by state law, or otherwise suggesting that Congress intended to preempt such provisions. There is none. In fact, federal law is entirely consistent with state law on this score: as discussed, the Driver's Privacy Protection Act, just like state law, expressly prohibits the disclosure of sensitive personal information, including driver's license numbers and social security numbers. (*See* Point III.C.2, *supra*.) Federal law accordingly does not preempt the provision of New York law that similarly prohibits disclosure of this information. *See United States v. Oregon*, 828 F. Supp. 3d 1092, 1107-08 (D. Or. 2026); *Weber*, 816 F. Supp. 3d at 1188-89.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated: Buffalo, New York
September 29, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellee State of New York

By: */s/ Sarah L. Rosenbluth*
SARAH L. ROSENBLUTH
Assistant Solicitor General

350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8407

BARBARA D. UNDERWOOD
*Solicitor General*
JEFFREY W. LANG
*Deputy Solicitor General*
SARAH L. ROSENBLUTH
*Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Sarah L. Rosenbluth, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,301 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Sarah L. Rosenbluth*